# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography**, and **Emilee Carpenter**,<br><br>        Plaintiffs,<br><br>   v.<br><br>**Letitia James**, in her official capacity as Attorney General of New York; **Jonathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,<br><br>        Defendants. | Case No. _____<br><br>**Verified Complaint** |

# Table of Contents

Introduction ............................................................................................................... 1

Jurisdiction and Venue.............................................................................................. 2

Plaintiffs.................................................................................................................... 3

Defendants ................................................................................................................ 3

Factual Background .................................................................................................. 4

    Emilee's Christian beliefs motivates everything she does. ................................. 4

    Emilee operates Emilee Carpenter, LLC as a photography business. ................. 5

    Emilee tells a visual narrative of God's design for marriage through her
    photography and blogging. ................................................................................. 7

    Emilee cannot create photographs, write blogs, or participate in ceremonies
    contrary to her religious beliefs.......................................................................... 14

    New York's law threatens Emilee's wedding photography and business............. 18

    Attorney General James may independently enforce New York's law with serious
    consequences. ...................................................................................................... 24

    The Division possesses aggressive enforcement mechanisms and can impose
    paralyzing penalties............................................................................................. 25

    New York's law imposes overwhelming burdens on Emilee's wedding
    photography......................................................................................................... 31

    New York only prosecutes its law against views the government disfavors. ........ 39

Legal Allegations ..................................................................................................... 45

    First Cause of Action First Amendment: Freedom of Speech, Association, and
    Press .................................................................................................................... 45

    Second Cause of Action  First Amendment: Free Exercise of Religion ................ 48

    Third Cause of Action First Amendment: Establishment Clause ........................ 50

    Fourth Cause of Action Fourteenth Amendment: Due Process............................ 51

Prayer for Relief....................................................................................................... 52

## Introduction

Plaintiff Emilee Carpenter ("Emilee") is a photographer, natural people person, and storyteller who crafts visual narratives through photography. Through her business, Emilee offers several types of photography, but wedding photography is her bread and butter. Emilee is also a Christian. Her faith and eye for beauty shape her photography—from first click to final edit. And just like other artists, Emilee decides whether to create based on *what* her artwork conveys, not *who* asks for it. That means Emilee cannot create some artwork for anyone—like photographs that flout her artistic style, celebrate obscenity, or demean others. She likewise cannot promote certain views on marriage.

New York finds this last type of editorial freedom too close-minded. So New York makes it illegal through its public accommodations laws which ban sexual-orientation discrimination. N.Y. Exec. Law § 296.2(a); N.Y. Civ. Rts. Law § 40-c. As applied to Emilee though, these laws do not simply dictate what she *does*; they dictate what she *says*. Emilee is already willing to work with clients no matter who they are, including those in the LGBT community. But not satisfied with equal treatment, New York officials demand ideological purity—that Emilee violate her conscience by professing the state's approved view about marriage.

Specifically, New York laws require Emilee to create photographs and blogs celebrating same-sex marriage because she creates photographs and blogs celebrating opposite-sex marriage. The laws also prohibit Emilee from adopting an editorial policy consistent with her beliefs about marriage. And the laws even make it illegal for Emilee to post statements on her business's own website explaining her religious views on marriage or her reasons for only creating this wedding content. N.Y. Exec. Law § 296.2(a) (forbidding statements that someone's "patronage" is "unwelcome, objectionable or not accepted, desired, or solicited").

1

If Emilee does any of this and speaks consistent with her faith, New York officials can force her business *and her personally* to pay limitless damages and a $100,000 fine, require her to create artwork against her beliefs via court order, revoke her business license, and lock her in jail for up to a year. N.Y. Exec. Law §§ 297(4)(c), 299; N.Y. Civ. Rts. Law § 40-d; N.Y. Exec. Law § 63(12). These severe penalties threaten Emilee's liberty, her livelihood, and her very way of life.

Emilee faces these risks each day she runs her company. She has already declined to respond to several requests to photograph same-sex weddings. And New York has already punished other business owners for holding Emilee's beliefs about marriage. In the end, New York's laws give Emilee a multiple-choice test with only bad answers: (a) violate the law; (b) ignore her faith; or (c) end her business.

But the First and Fourteenth Amendments give Emilee another option: (d) none of the above. These constitutional provisions ensure that Emilee—and all Americans—can choose what we say and what we celebrate. Just as the government cannot compel a lesbian baker to create a cake condemning same-sex marriage or an atheist playwright to wax positively about God, New York cannot force Emilee to convey messages she objects to. Emilee brings this lawsuit to protect her right and everyone's freedom (even those who disagree with her) to speak and live out their core convictions. Because in our diverse and pluralistic country, the solution to disagreement is more speech by diverse speakers, not compelled ideological uniformity by government bureaucrats.

## Jurisdiction and Venue

1.     This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occur within the Western District of New York; the effects of the challenged statute are felt in this District; and Defendants can and do perform official duties in this District.

## Plaintiffs

5.      Emilee is a United States Citizen and resides in Chemung County, New York.

6.      Emilee Carpenter, LLC is a for-profit limited liability company organized under New York law with its principal place of business also in Chemung County.

7.      Emilee is the sole owner, member, and employee of Emilee Carpenter, LLC.

## Defendants

8.      New York State Attorney General James has the duty to enforce the laws of New York throughout the state of New York (N.Y. Exec. Law § 63), including the laws challenged in this lawsuit—New York State's Human Rights Law and New York State's Civil Rights Law (collectively "New York's laws" or "the laws").[1]

9.      Attorney General Letitia James is the head of the Department of Law, which includes the Civil Rights Bureau. *See* N.Y. Exec. Law § 60.

10.      Attorney General James accepts, files, and receives notice of complaints alleging violations of New York's laws, and administers, enforces, and prosecutes

---

[1] Unless context indicates otherwise, the remainder of this complaint refers to New York State's Human Rights Law (N.Y. Exec. Law §§ 290-301) and its related regulations as the "human rights law" and New York State's Civil Rights Law (N.Y. Civ. Rts. Law §§ 40-c-40-d) as the "civil rights law."

New York's laws, including the laws' criminal provisions. *See, e.g.*, N.Y. Exec. Law §§ 63(9), (10), (12), 297(1), 299; N.Y. Civ. Rts. Law § 40-d; N.Y. Exec. App. § 465.3(a)(2); https://ag.ny.gov/civil-rights/complaint-forms.

11.     Attorney General James may also intervene in any hearing before the Division involving a complaint filed under the human rights law. *See* N.Y. Exec. Law § 297.4(4)(a); N.Y. Exec. App. § 465.12(c)(1).

12.     Attorney General James has regional offices in Rochester and Buffalo, New York. *See* https://ag.ny.gov/regional-office-contact-information.

13.     Johnathan J. Smith is the Commissioner and head of the New York State Division of Human Rights ("Division"). N.Y. Exec. Law § 293(1).

14.     Commissioner Smith receives complaints alleging violations of the human rights law; tests, investigates, and files complaints alleging violations of that law; and administers, enforces, and prosecutes that law. *See, e.g.*, N.Y. Exec. Law §§ 295.6-.7, 297.4(c); N.Y. Exec. App. §§ 465.3(3), 465.13(a).

15.      The Division has regional offices located in Rochester and Buffalo, New York. *See* https://dhr.ny.gov/contact-us.

16.     Weeden Wetmore is the District Attorney of Chemung County, New York.

17.     District Attorney Wetmore has authority to administer, enforce, and prosecute New York's laws' criminal provisions, including the civil rights law. *See* N.Y. County Law § 700; N.Y. Exec. Law § 299; N.Y. Civ. Rts. Law § 40-d.

18.     All defendants are named in their official capacities.[2]

## Factual Background

<u>Emilee's Christian beliefs motivate everything she does.</u>

19.     Emilee is a Christian.

---

[2] Unless context indicates otherwise, the remainder of the complaint refers to all defendants collectively as "New York."

20.    Emilee tries to live by this verse: "So, whether you eat or drink, or whatever you do, do it all for the glory of God." 1 Cor. 10:31 (ESV).

21.    This means Emilee's religious beliefs shape every aspect of her life, including her identity, her relationships with others, and her understanding of creation, truth, morality, purity, beauty, and excellence.

22.    Emilee believes that God gives people gifts and passions and commands them to steward these in a way that honors Him, including by sharing God's intent for His creation and promoting the Gospel—the belief that everyone needs forgiveness offered through God's son, Jesus.

23.    Emilee believes that God creates, calls, and equips some people to magnify God's goodness by creating aesthetically pleasing art that reflects God's beauty, artistry, and truth.

24.    Emilee believes that God has called her to use her creative talents to honor and glorify God through photography.

### Emilee operates a photography business, Emilee Carpenter, LLC.

25.    Emilee became a commissioned photographer in 2012 when she began photographing engagements and weddings for a profit.

26.    Emilee initially operated her photography business as a sole proprietorship.

27.    In November 2019, Emilee reorganized her business to gain the benefits of a corporate form, incorporated her business as a limited liability company, and renamed her company Emilee Carpenter, LLC.

28.    Emilee Carpenter, LLC's presumed name is Emilee Carpenter Photography.[3]

29.    Emilee also transitioned her social media sites to promote Emilee Carpenter Photography.

---

[3] Unless context indicates otherwise, the complaint below refers to Emilee Carpenter, LLC as Emilee Carpenter Photography and refers to all plaintiffs collectively as "Emilee."

30.     In June 2020, Emilee launched a website for Emilee Carpenter Photography (https://www.emileecarpenter.com/).

31.     This website hosts a blog controlled by Emilee.

32.     Emilee offers, solicits, and receives inquiries for engagement and wedding-photography services from the general public and provides these services to the general public.

33.     Whenever Emilee offers to photograph an engagement session for a couple, she also always offers to photograph the couple's wedding.

34.     Emilee offers two types of wedding-photography services: elopement weddings and traditional weddings (including micro-weddings attended by small groups of people).

35.     Whenever Emilee is hired by a couple to photograph their engagement or wedding, she always includes a complimentary blog post for the client.

36.     Emilee also offers, solicits, and receives inquiries for branding-photography services from the general public and provides these services to the general public.

37.     Emilee's branding-photography services depict and promote businesses and their services for business owners and businesses.

38.     For example, Emilee has photographed candid and choreographed images of business owners and their unique tools-of-the-trade for use in their LinkedIn profiles, websites, business cards, and other marketing.

39.     Emilee has provided branding-photography services for other photographers, dieticians, marketing professionals, worship leaders, authors, and others.

40.     Emilee's faith animates why and how she operates her business, what she creates, and her vision for her artwork.

41.     For this reason, in everything Emilee creates, she seeks to honor God's glory in His creation and display God's beauty, artistry and truth to others.

42.     For example, all of Emilee's photographs portray the subject(s) or content of the photograph in a positive, appealing, and uplifting manner.

43.     Emilee's faith also shapes how she treats others.

44.     Emilee believes that she must honor God in how she interacts with others, including current and potential clients and members of the public.

45.     Emilee seeks to obey the biblical command to love others by being honest with current and prospective clients and the public, by not lying or giving a false impression about what she will and will not create, and by treating them with love, honesty, fairness, and excellence.

### Emilee tells a visual narrative about God's design for marriage through her photography and blogging.

46.     Emilee believes that God designed marriage as a gift for people of all faiths, races, and backgrounds, to reflect the unity and diversity seen in the Trinity (Father, Son, and Holy Spirit), and to point people to Jesus' sacrificial and redemptive love for His Church.

47.     Emilee celebrates engagements and marriages between one man and one woman through what she photographs, participates in, and posts about in order to share God's design for marriage with her clients and the public consistent with her beliefs.

48.     Emilee has always desired to use her business to focus on crafting visual narratives celebrating marriages between one man and one woman because she believes marriage is a gift from God that should be treasured and celebrated.

49.     To do this, Emilee evaluates every engagement and wedding photography request she receives to determine whether she can fulfill the request consistent with her artistic judgment and religious beliefs.

50.     When Emilee receives a request, she researches that request online or through her personal and professional network to determine if she can potentially fulfill the request. *See infra*, ¶¶ 238-45, 312.

51.     If Emilee decides she can potentially fulfill the request, she sends the prospective client an informational email with follow up questions and always offers to connect with the prospective client over coffee or through a videoconference.

52.     If Emilee and the prospective client agree to move forward, the prospective client must agree in form or in substance to Emilee Carpenter Photography's service agreement.

53.     The form service agreement states that Emilee has "full artistic license and total editorial discretion over all aspects of" her photography.

54.     Emilee takes all engagement and wedding photographs according to her artistic judgment.

55.     In all of her photography, Emilee seeks to create photographs that evoke joyful emotions and tell a compelling story of the couple's union through thoughtful and detail-driven photographs and to positively portray the couple, their wedding (or engagement), and God's design for marriage.

56.     To this end, Emilee combines warm and earthy color tones with playful and moody subject matters.

57.     When Emilee photographs an engagement session, she always portrays the couple in positive and romantic ways to create beautiful photographs telling a visual narrative which communicates the love, intimacy, and sacrifice of God's design for marriage.

58.     She does this by capturing the couple interacting with each other in a playful, loving manner to celebrate their excitement and joy for their coming marriage.

59.     For example, Emilee prompts the couple to laugh and smile with each other, encourages them to act spontaneously, and directs the couple on how to pose, when to hold hands, when to embrace, and when to kiss.

60.     When Emilee photographs a wedding, she always portrays the couple in positive and romantic ways to create beautiful photographs telling a visual narrative which communicates the love, intimacy, and sacrifice of God's design for marriage.

61.     For example, at the wedding ceremony, Emilee always photographs the officiant delivering the homily, the couple exchanging vows, the couple kissing and embracing before the attendees, and the officiant announcing the couple as husband and wife to commemorate the bride and groom being joined together in marriage.

62.     For traditional weddings, Emilee typically photographs the bride getting dressed, portraits of the couple and their families, the bridal party, and the bride walking down the aisle.

63.     Emilee always personally attends and photographs the entire wedding ceremony.

64.     Emilee would not provide wedding photography if requested to photograph only a part of the wedding ceremony or everything but the wedding ceremony.

65.     When Emilee photographs a wedding, she is always personally excited for the couple and the marriage she is about to witness because of her beliefs about God's design for marriage.

66.     Emilee expresses her approval of the marriage and shares her excitement with the bride and groom and their family members and guests by interacting with them throughout the day, verbally encouraging them, reminding them to enjoy the special day, and congratulating the bride and groom in particular.

67.     Emilee uses her excitement and energy to effectively choreograph and pose the bride and groom and their family and guests during photographs and to maintain a lighthearted environment to capture her desired images.

68.     Emilee could not effectively provide her wedding photography if she did not personally and joyfully interact with the couple, the wedding party, and the wedding guests in these ways.

69.     Emilee also believes that every wedding is inherently religious because the wedding solemnizes and initiates a sacred institution (marriage) created by God.

70.     Many of the weddings Emilee has photographed have involved overtly religious elements like religious music, religious readings, communion, prayer, and a religious message by the pastor.

71.     When Emilee photographs a ceremony with overtly religious elements, she has always sung along with the music, listened to and affirmed the religious message, and engaged with the prayers.

72.     At every wedding Emilee has photographed, there has been an exchange of vows, an officiant, instructions to the wedding participants and/or guests, and a pronouncement of marriage.

73.     The officiants' instructions and pronouncement of marriage have been directed at the couple getting married and members of the audience, including Emilee.

74.     In these ways, Emilee acts as a witness before God and those assembled as bride and groom commit their lives to each other, exchange rings, are pronounced man and wife, and share their first kiss as a married couple.

75.     When the wedding includes a reception, Emilee always attends all or most of the wedding reception to photograph its special moments.

76.     Emilee always directs the bride and groom and their wedding party, the bride and groom's family, and the wedding guests, if any, before, during, and after the ceremony on how to pose for choreographed photographs.

77.     With each photograph she takes, Emilee uses her artistic discretion and technical proficiency with cameras to create her desired image consistent with her artistic style and religious beliefs.

78.     After the engagement session or wedding, Emilee edits the engagement or wedding photographs.

79.     Emilee first culls through thousands of images to reduce the total number of images to between 50 and 1,000, depending on the number of images purchased by the client.

80.     During this review, Emilee discards images that do not meet her artistic and moral standards, such as blurry photographs or photographs of persons blinking.

81.     After the culling process, Emilee edits the remaining photographs.

82.     For example, Emilee adjusts the image's tone by narrowing or expanding the range between the image's darkest and brightest areas to make the image more emotive.

83.     Emilee uses these and other techniques to create an image consistent with her artistic style.

84.     Once Emilee has edited at least some of the photographs, she emails 10-20 images to her client as a "sneak peak" via an online gallery.

85.     After editing all of the photographs, Emilee sends her clients a link to view the photographs on an online gallery.

86.     Emilee Carpenter Photography's logo appears throughout the online gallery.

87.     From the online gallery, Emilee's clients can download their desired images and share their images with friends and family.

88.     Emilee then posts a sampling of the photographs on her blog.

89.     Emilee selects which edited photographs to post on her blog and writes a post to celebrate the engagement or wedding, encourage the couple, and communicate her views on marriage to the couple and to the general public.

90.     Posting engagement and wedding photographs alongside text on her blog allows her to publicly tell uplifting stories about the couple and the beauty of marriage between a man and a woman in ways more powerful than through photography or words alone.

91.     Emilee's blog is an integral part of her business and wedding photography services.

92.     Emilee's website and blog allow her to publicly celebrate each couple; to publicly associate herself with her engagement and wedding photography; and to promote her business, artistic style, and approach to photography.

93.     Emilee's website and blog also allow her to publicly advocate for marriage as between one man and one woman consistent with her religious beliefs by depicting celebratory photographs and text of opposite-sex weddings.

94.     In this way, Emilee is like the many other commissioned photographers who post engagement and wedding photographs on their website, blogs, or social media sites to celebrate the couples, to associate their business with their photographs and photographic style, to allow the couple to associate with their business, and promote their views on topics including marriage.

95.     Emilee also selects and posts some of the photographs on her social media pages with commentary where Emilee's name, picture, and Emilee Carpenter Photography's logo appear sporadically.

96.     In these ways and more, Emilee associates herself with her wedding photography.

97.    Emilee's blog also allows her to proclaim her religious beliefs about marriage by publicly conveying the beauty and sacrificial nature of marriage between a man and a woman to her clients, their friends, and the public.

98.    For Emilee's engagement and wedding photography, Emilee's clients rely on her aesthetic vision and ability to celebrate their engagement and wedding in a meaningful way.

99.    Emilee makes most of her editorial decisions without any input from clients.

100.    When clients do offer suggestions, Emilee tries to blend their suggestions into her own aesthetic vision so that the final product effectively celebrates the couple's wedding and God's design for marriage.

101.    Clients usually defer to Emilee's suggestions and rely heavily on her artistic and editorial judgments.

102.    For all of her engagement and wedding photography, Emilee reserves the right to reject any objectionable requests, and retains full editorial control over what to photograph, how to photograph and edit, which photographs to upload to the online gallery, and which photographs to display and what to write on her blog.

103.    Emilee does not offer and would not accept any request for wedding or engagement photography that portrayed the couple, their marriage, or their wedding in a negative way.

104.    In all of the ways described above, Emilee makes numerous artistic and editorial decisions for her photography, editing, and blogging to positively portray the love, intimacy, and sacrifice of marriage between one man and one woman and to create visual narratives that celebrate the couple and promote God's design for marriage.

105.    Each component of Emilee's wedding photography services—her photography, edits, and blog—separately and in combination, is expressive in nature, as it involves images, symbols, or other modes of expression.

106.   Emilee believes that by capturing and conveying engagements, weddings, and marriages between one man and one woman, and by displaying them on her website and social media sites in an appealing way, she can persuade viewers that this type of marriage should be pursued and valued.

107.   Emilee's desire to convey this message has increased as she has seen the growing promotion of views of marriage that are inconsistent with lifelong unions between one man and one woman.

108.   Emilee hopes to counteract this cultural narrative by creating visual narratives telling a positive message about marriage as God intended it.

<u>Emilee cannot create photographs, write blogs, or participate in ceremonies contrary to her religious beliefs.</u>

109.   Not only do Emilee's religious and artistic beliefs inspire what she photographs, writes about, and participates in, these beliefs also dictate what she cannot create, say, or do.

110.   Emilee can only accept requests for her photography which are consistent with her editorial, artistic, and religious judgment.

111.   For example, Emilee does not provide photography in a "light, bright, and airy" style (a style emphasizing soft, pastel colors and natural light) because of her stylistic preference and artistic judgment to photograph in a style emphasizing warm, earthy, and moody tones.

112.   Likewise, Emilee only creates photographs and blogs and participates in ceremonies consistent with her understanding of the Bible's teachings.

113.   For Emilee, this means she cannot provide any photography services that require her to use her photography skills to celebrate anything immoral, dishonorable to God, or contrary to her religious beliefs or artistic judgment, or to participate in anything contrary to her religious beliefs.

14

114.    Emilee also does not provide photography services that demean others, devalue God's creation, condone racism, celebrate obscenity, promote violence, praise vulgarity, or otherwise contradict biblical principles.

115.    For example, Emilee would not provide branding photography for a business or non-profit that promotes abortion (like Planned Parenthood) or encourages drug use (like a marijuana dispensary).

116.    Emilee would not provide wedding photography for certain types of irreverent themed weddings—such as Halloween or Vampire-themed weddings—because Emilee believes that all wedding ceremonies are inherently religious and solemn events.

117.    Also, because Emilee believes that God created marriage to be a joyful, exclusive union between one man and one woman, she cannot provide wedding photography which depicts engaged or married couples, marriages, or weddings in a negative way or promotes or celebrates any engagements, weddings, or marriages not between one man and one woman, such as same-sex or polygamous engagements or marriages.

118.    Emilee cannot create the wedding photography described in paragraphs 116-117 because she always creates photography that positively portrays marriage, and creating wedding photography positively portraying same-sex, or polygamous weddings or weddings with irreverent themes, would promote activities contrary to her beliefs, express messages contradicting her beliefs, and express messages contradicting messages that Emilee wants to and does promote elsewhere.

119.    Emilee also cannot create the wedding photography described above because she always actively participates in the wedding ceremonies she photographs.

120.    If Emilee were compelled to photograph the ceremonies described above, she would feel coerced to remain silent and respectful during the ceremony and to

express her approval of the wedding by rejoicing with and congratulating the couple and their family on the new union.

121.   Emilee therefore cannot provide photography services for same-sex or polygamous engagements or weddings because photographing these events would force Emilee to participate in ceremonies that violate her religious beliefs.

122.   It is standard industry practice for commissioned photographers to decline to create content that violates or compromises their beliefs or editorial discretion.

123.   For these reasons, it is Emilee's policy and practice to offer and provide wedding photography services only celebrating weddings between one man and woman and to decline any photography requests celebrating any other weddings— including those for same-sex engagements or weddings—no matter who asks her to do so.

124.   Emilee also wants to legally bind Emilee Carpenter Photography and any future persons who become members of Emilee Carpenter Photography to maintain the same policy of only celebrating engagements and weddings between one man and one by adopting this policy into Emilee Carpenter Photography's operating agreement. *See infra*, ¶¶ 229-31.

125.   Emilee also desires to be honest and transparent with current and prospective clients about her desire to only photograph engagements and weddings between one man and one woman by posting a statement on her website or social media sites explaining the types of engagements and weddings she can and cannot celebrate. *See infra*, ¶¶ 246-51.

126.   Whenever Emilee receives a request she cannot fulfill because of a conflict with her artistic judgment, she generally tries to refer that request to another photographer who can do so.

127.   Emilee would like to adopt this same referral policy for requests she receives that conflict with her beliefs (like requests for same-sex marriage photography), but

has refrained from doing so because she does not respond to same-sex engagement or wedding requests for fear of being sued under New York's laws. *Infra*, ¶¶ 266-68.

128.    Emilee's policy of offering and providing wedding photography services celebrating weddings only between a man and a woman and of declining requests for photography services celebrating same-sex or polygamous engagements or weddings are never about the person requesting these services.

129.    Instead, Emilee's policy of not offering to photograph these ceremonies is an objection to promoting and participating in an event that violates her religious beliefs.

130.    For example, Emilee will create branding photographs for individuals who identify as LGBT or create branding photographs for a business owned and operated by LGBT individuals.

131.    Emilee will create wedding photographs depicting a wedding between a man and a woman when requested and paid to do so by an LGBT parent or friend of those getting married.

132.    Emilee will create wedding photographs depicting a wedding between a man and a woman when requested and paid to do so by an LGBT wedding planner or wedding vendor.

133.    Emilee would also photograph a staged wedding shoot for a bridal magazine or other business depicting and promoting a wedding using a male model as the groom and a female model as the bride, whether those models identify as LGBT or not.

134.    Emilee will create wedding photographs for the union of one man and one woman where one or both of the individuals identify as gay, lesbian, or bisexual, so long as the wedding ceremony reflects a genuine intent that the marriage be a lifelong union between one man and one woman.

135.    Several research institutes estimate that between thirteen and eighteen percent of adults who identify as gay or lesbian are married to members of the opposite sex.

136.    Emilee will create photographs described in paragraphs 130-134 so long as the photographs themselves do not require Emilee to participate in a ceremony or express a message that violates her religious beliefs or artistic judgment.

137.    On the other hand, because it is Emilee's policy to decline requests to create photographs that violate her religious beliefs or are conflict with her artistic judgment, Emilee does not accept every request to photograph an engagement or wedding between a heterosexual man and a heterosexual woman. *See supra*, ¶ 116.

138.    For example, Emilee would not photograph a staged wedding shoot for a bridal magazine or other business depicting and promoting a wedding using two male models as the grooms or two female models as the brides, whether those models identify as LGBT or not.

139.    Emilee would also not photograph an engagement or wedding between one man and one woman if requested to do so in a "light, bright, and airy" style.

140.    When evaluating whether any photography request is consistent with Emilee's religious beliefs and artistic judgment, Emilee considers, and it is her pattern and practice to consider, the message conveyed by the requested services and whether these services require her to create a message she opposes or participate in a ceremony she objects to, not the identity of who requests these services.

New York's laws threaten Emilee's wedding photography and business.

141.    Emilee desires to operate her business consistent with her religious beliefs and to express some of her religiously motivated beliefs.

142.   As Emilee was getting Emilee Carpenter, LLC started, she sought legal advice from a friend who is an attorney about her desire to promote marriages consistent with her religious beliefs.

143.   Emilee's friend made her aware of the human rights law.

144.   As Emilee researched more about that law, she realized that it threatened her ability to operate her business according to her faith, and restricted what she could post on her studio's website and social media sites and what she could say to prospective clients.

145.   Emilee also read news reports about other artists, like photographers, and other business owners in New York and elsewhere who were being sued and threatened with severe penalties for declining to celebrate or participate in same-sex wedding ceremonies.

146.   Among other things, the human rights law prohibits "unlawful discriminatory practices … because of" sexual orientation in "any place of public accommodation." N.Y. Exec. Law § 296.2(a).

147.   The human rights law defines a place of public accommodation as including "retail … establishments dealing with goods or services of any kind." N.Y. Exec. Law § 292.9.

148.   The term "place of public accommodation" is "construed liberally" and is not limited to public accommodations that are specifically defined in the law or that operate out of a physical space. N.Y. Exec. Law § 300.

149.   For example, the human rights law includes retailer's websites, commodity trading floors, and dating services as public accommodations. *See Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381 (E.D.N.Y. 2017); *D'Amico v. Commodities Exch. Inc.*, 652 N.Y.S.2d 294 (N.Y. App. Div. 1997); *Battaglia v. Buffalo Niagara*

*Introductions, Inc.*, No. 10138581, at 5 (N.Y. State Div. of Hum. Rights Jan. 28, 2014).[4]

150.    Emilee Carpenter Photography is a for-profit business offering goods, services, advantages, and privileges to the public.

151.    Emilee Carpenter Photography also promotes its goods, services, advantages, and privileges to the public on its website and social media sites, on an online wedding vendor directory, and through word-of-mouth from clients and personal and professional networks.

152.    Emilee Carpenter Photography's website, and the online wedding vendor directory she advertises on, have contact forms where anyone from the public can submit a request for Emilee's services.

153.    Emilee Carpenter Photography is therefore a place of public accommodation under and subject to the human rights law.

154.    Likewise, Emilee Carpenter Photography promotes its website (https://www.emileecarpenter.com/) and allows members of the public to contact Emilee through this website.

155.    Emilee Carpenter Photography's website also offers distinct goods, services, advantages, and privileges.

156.    For example, Emilee Carpenter Photography's website contains Emilee's blog which allows her to post photographs and write text publicly celebrating each couple she photographs and to showcase their engagement or wedding to a broader audience than they would otherwise be able to if Emilee did not have a website. *See supra*, ¶¶ 88-93.

---

[4] All Division orders cited in this complaint are available on the Division's website. *See Orders*, New York Division of Human Rights, https://dhr.ny.gov/orders (last visited Apr. 5, 2021).

157.   Emilee Carpenter Photography's website (https://www.emileecarpenter.com/)
is therefore also a place of public accommodation under and subject to the human
rights law.

158.   The human rights law prohibits "unlawful discriminatory practice[s]" in
public accommodations (§ 296.2(a)) through two clauses: the "Accommodations
Clause" and the "Publication Clause."

159.   The Accommodations Clause (§ 296.2(a)) makes it unlawful "for any person …
to refuse, withhold from or deny" any "person any of the … advantages, … or
privileges" of a place of public accommodation "because of" sexual orientation.

160.   As interpreted by New York, the Accommodations Clause prohibits Emilee
from

- asking prospective clients whether they want her to photograph a same-
  sex engagement or wedding;

- exclusively offering photography services that promote and celebrate
  engagements and weddings between one man and one woman;

- declining requests for photography services that promote and celebrate
  same-sex engagements and weddings if she offers these services when
  they promote and celebrate opposite-sex engagements and weddings;

- maintaining a written policy or unwritten practice or binding her
  company to a policy of offering or providing photography services only for
  engagements and weddings celebrating marriage between one man and
  one woman;

- maintaining a written policy or unwritten practice or binding her
  company to a policy of uniformly declining requests to create photographs
  celebrating same-sex engagements and weddings while accepting requests
  to create photographs celebrating opposite-sex engagements and
  weddings;

21

- displaying only photographs and blog posts celebrating marriages between one man and one woman on Emilee Carpenter Photography's website while declining to display any photographs or blog posts celebrating same-sex marriages; and

- providing any unequal treatment when providing photography services celebrating same-sex engagements and weddings compared to requests celebrating opposite-sex engagements and weddings.

161.   As to the last point, the Accommodations Clause also makes it unlawful for Emilee to treat photography requests for same-sex engagements and weddings different from photography requests for opposite-sex weddings—whether by responding to the former more slowly, by always referring the former to another photographer, or by offering any part of her services to the latter but not the former, such as posting wedding photographs or blogs for opposite-sex weddings on her website but not posting wedding photographs or blogs for same-sex weddings.

162.   In short, the Accommodations Clause forces Emilee to celebrate same-sex engagements or weddings and would require her to promote messages that violate her religious beliefs or require her to participate in religious ceremonies that violate her religious beliefs, something she cannot do. *See supra*, ¶¶ 109-23.

163.   This undercuts Emilee's message (expressed elsewhere in her photographs, website, blog, and social media sites) celebrating marriage between one man and one woman; harms Emilee's reputation among her past and prospective clients; and adversely affects Emilee's ability to share biblical truths about marriage with others.

164.   The Publication Clause also hinders Emilee's ability to explain on her own company's website, social media sites, or directly to prospective clients her religious beliefs about marriage and what services her company provides.

165.    Likewise, the Publication Clause prohibits Emilee from asking prospective clients questions sufficient for her to learn whether they are seeking photography services celebrating same-sex engagements or weddings so that she can be honest with them about the photographs she does and does not create.

166.    The Publication Clause does these things through two sub-clauses: the "Denial Clause" and the "Unwelcome Clause."

167.    The Denial Clause (§ 296.2(a)) makes it unlawful "to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that any of the … advantages, … and privileges of any" public accommodation "shall be refused, withheld from or denied to any person on account of … sexual orientation."

168.    The Unwelcome Clause (§ 296.2(a)) makes it unlawful "to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect that … the patronage or custom" at a public accommodation "of any person of or purporting to be of any particular … sexual orientation … is unwelcome, objectionable or not acceptable, desired, or solicited."

169.    The Publication Clause prohibits Emilee from explaining on her website and social media sites and directly to prospective clients, her religious beliefs about marriage and what types of engagement or wedding photography she provides.

170.    Likewise, the civil rights law contains a "Discrimination Clause" which prohibits "any … person" or "any firm, corporation or institution" from "discriminat[ing]" against any other person "because of … sexual orientation." N.Y. Civ. Rts. Law § 40-c(2).

171.    Emilee is a person and Emilee Carpenter Photography is a "firm, corporation or institution" subject to the civil rights law.

172.   The civil rights law operates identically to the Accommodations Clause and the Publication Clause's Denial Clause as to Emilee, Emilee Carpenter Photography, and Emilee Carpenter Photography's website.

173.   Therefore, the civil rights law prohibits Emilee and her company from engaging in the same activities as the Accommodations Clause and the Publication Clause's Denial Clause. *See supra*, ¶¶ 160-69.

<u>Attorney General James independently enforces New York's law with serious consequences.</u>

174.   New York is authorized to enforce the laws against Emilee in numerous ways.

175.   Attorney General James accepts complaints alleging violations of New York's laws "to address patterns, practices and policies of discrimination." *See* https://ag.ny.gov/civil-rights/complaint-forms.

176.   Attorney General James may file a civil action against public accommodations for alleged "repeated … illegal acts" or the "persistent … illegality in the carrying on, conducting or transaction of business" under the human rights law and civil rights law. N.Y. Exec. Law § 63(12). *See People v. Hamilton*, 125 A.D.2d 1000, 1001–02 (1986).

177.   The New York Attorney General's office has exercised its authority under Executive Law § 63(12) to investigate public accommodations for violating the human rights law and the civil rights law.

178.   Attorney General James has exercised her authority under Executive Law § 63(12) to prosecute businesses for violating anti-discrimination laws.

179.   Attorney General James considers a public accommodation's policy of offering expressive services (like photography) celebrating opposite-sex weddings but not same-sex weddings or declining these services for same-sex weddings while offering

them for opposite-sex weddings to be a "pattern[], practice[] and polic[y] of discrimination" and a "repeated … illegal act[]" or "persistent … illegality" under New York's law. *See* Br. for Mass. et al. as Amici Curiae in Support of Defs. at 10-14, 26-27, *303 Creative LLC v. Elenis*,  No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James).

180.    In civil actions filed by Attorney General James, the court may impose penalties including injunctions, damages, and cancellations of certificates for limited liability companies. N.Y. Exec. Law § 63(12).

<u>New York enforces the laws through aggressive enforcement mechanisms and paralyzing penalties.</u>

181.    The Division also accepts complaints against public accommodations from any "person or organization claiming to be aggrieved by an alleged unlawful discriminatory practice." N.Y. Exec. App. § 465.3(a)(1); N.Y. Exec. Law § 297.1.

182.    Advocacy organizations whose members are injured by an alleged discriminatory practice are an "aggrieved person" under the human rights law.

183.    The human rights law authorizes "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice" based on their "known relationship or association with" a member of a protected category to file a complaint against public accommodations with the Division. N.Y. Exec. App. § 466.14.

184.    The Division accepts complaints against public accommodations from persons who reside outside of the state of New York. *See Keimel v. Manchester Newspapers*, No. 10102907, at 5 (N.Y. State Div. of Hum. Rights May 1, 2007).

185.    Attorney General James may file a complaint alleging an unlawful discriminatory practice with the Division. N.Y. Exec. Law §§ 297.1; N.Y. Exec. App. § 465.3(a)(2).

186.    The Division also has authority to file a complaint alleging an unlawful discriminatory practice on its own motion. N.Y. Exec. Law §§ 295.6(b), 297.1; N.Y. Exec. App. § 465.3(a)(3).

187.    The Division describes its Division-initiated complaints as an "aggressive approach to fighting discrimination" in that the Division uses "vigorous prosecution of … discriminatory practices through investigations and/or complaints initiated by the Division itself." New York State Division of Hum. Rights, *2006/2007 Annual Report* 3 (2007), https://dhr.ny.gov/sites/default/files/pdf/annualreport_2006-07.pdf.

188.    The Division has an entire unit dedicated to initiating complaints. *See* https://dhr.ny.gov/agency-overview.

189.    The Division also has authority to use "testers" to investigate charges of discrimination. N.Y. Exec. Law § 295.6(b).

190.    As a Division representative stated during a Division-sponsored webinar, the Division "can also initiate what's called a Division initiated investigation. So, if we don't have a claimant … but … there's some suspicion of systemic pattern, then we can send in testers, we can send in investigators, and identify if there's a systemic pattern of discrimination." New York State Division of Human Rights, *GENDA & LGBTQ Rights Under the Human Rights Law-June 20, 2019 Webinar*, at 53:23-49, YouTube (June 24, 2019), https://www.youtube.com/watch?v=UEk_uf1gDkI&t=3224s.

191.    The Division has used this authority to investigate public accommodations by reviewing their websites and initiating over 100 "test calls" to determine if the public accommodations complied with the human rights law. *See* https://dhr.ny.gov/banking-services-improvements-2014.

192.    After settling these Division-initiated complaints, a Division representative claimed "these complaints should serve as a reminder that the Division's authority is not limited to handling complaints from members of the public and that we can

26

and we will take action to identify and remedy Human Rights Law violations on our own initiative." *See* https://dhr.ny.gov/banking-services-improvements-2014.

193.    Overall, the Division has initiated complaints and/or used testers to investigate alleged discrimination more than one hundred times since 2015.

194.    After the Division receives or files a complaint against a public accommodation, the Division shall "make prompt investigation" of the complaint to determine if there is probable cause to believe that an unlawful discriminatory practice occurred. N.Y. Exec. Law § 297.2(a).

195.    During this investigation, Attorney General James and Commissioner Smith have significant authority.

196.    Attorney General James "is authorized to take proof, issue subpoenas and administer oaths." N.Y. Exec. Law § 297.1.

197.    Likewise, the Division can subpoena witnesses, administer oaths, compel the production of documents, conduct "written or oral inquir[ies]," hold conferences, seek injunctions, or perform "any other method or combination thereof deemed suitable" for the investigation. N.Y. Exec. Law §§ 296.7, 297.3(a); N.Y. Exec. App. §§ 465.6(b), 465.9(a).

198.    The investigatory process imposes a significant burden on the party opposing the complaint (the "respondent").

199.    For one thing, the Division must complete its investigation within 180 days of receiving the complaint and respondents must therefore respond to the Division's inquiries within a limited timeframe. N.Y. Exec. Law § 297.2(a).

200.    This investigation occurs in an adversarial process because the Division investigates the respondent on the complaining party's behalf. N.Y. Exec. App. § 465.4(a), (d).

201.    Once the Division completes its investigation it issues a probable-cause report. N.Y. Exec. Law § 297.2(a); N.Y. Exec. App. § 465.8.

202.   During the investigation and after a probable-cause finding, the Division may attempt to settle the complaint with the respondent. N.Y. Exec. App. §§ 465.7(a)(1), 465.15.

203.   Settlement agreements require respondents "to refrain or cease and desist from the commission of unlawful discriminatory practices in the future" and may contain other terms. N.Y. Exec. App. §§ 465.7(b), 465.16(b)(2).

204.   Also after a probable-cause finding and if the complaint is not settled, the respondent must submit a sworn answer to the "complaint and appear at a public hearing." N.Y. Exec. Law § 297.4(a); N.Y. Exec. App. § 465.11(a), (c).

205.   The Division assigns a hearing examiner to conduct the hearing. N.Y. Exec. App. § 465.12(d)(1).

206.   If the respondent refuses to answer the complaint, the hearing examiner may enter a default judgment against the respondent. N.Y. Exec. Law § 297.4(b); N.Y. Exec. App. § 465.11(e).

207.   The complaint is supported by the Division's attorneys, by the Division's attorneys and the complainant's attorneys, or by the complainant's attorneys with the Division's approval. N.Y. Exec. Law § 297.4(a); N.Y. Exec. App. § 465.13(g), (h).

208.   At the Division's request, Attorney General James may also prosecute the human rights law in any civil action. N.Y. Exec. Law §§ 63(9).

209.   Before the hearing, Commissioner Smith and the Division may issue subpoenas to compel witnesses to appear and testify and to require the production of documents. N.Y. Exec. App. § 465.14(a).

210.   During the hearing, the hearing examiner has significant authority, including receiving and excluding evidence, examining witnesses, and permitting oral arguments and briefs. *See* N.Y. Exec. App. § 465.12(e), (o).

211.   After the hearing, the hearing examiner prepares a proposed order for the Commissioner's approval. N.Y. Exec. App. § 465.17(c).

212.    If Commissioner Smith finds that a respondent has engaged in an unlawful discriminatory practice, he can award significant remedies such as:

- requiring respondent "to cease and desist from" the unlawful practice;
- requiring a public accommodation to provide the "advantage[]," or "privilege[]" which was the subject of the complaint;
- awarding compensatory damages;
- assessing civil fines up to fifty thousand dollars for unlawful discriminatory acts and up to one hundred thousand dollars for unlawful discriminatory acts which are "willful, wanton or malicious"; and
- mandating compliance reports. N.Y. Exec. Law § 297.4(c), (e).

213.    The Division has also required places of public accommodations to establish "anti-discrimination training and procedures." *McCarthy v. Liberty Ridge Farm, LLC*, Nos. 10157952 & 10157963, at 23 (N.Y. State Div. of Hum. Rights July 2, 2014); *Scipio v. Wal-Mart Stores East, L.P.*, No. 10114171, at 13 (N.Y. State Div. of Hum. Rights Mar. 31, 2009).

214.    The Division has also fined owners or agents of public accommodations in their personal capacity. *McCarthy v. Liberty Ridge Farm, LLC*, Nos. 10157952 & 10157963, at 20-21 (N.Y. State Div. of Hum. Rights July 2, 2014).

215.    If a public accommodation violates any order of the Division, the owner of the public accommodation "shall be guilty of a misdemeanor" and may be fined five hundred dollars and be imprisoned for not more than one year.  N.Y. Exec. Law § 299.

216.    Attorney General James has authority to criminally prosecute public accommodations who violate a Division order. *See* N.Y. Exec. Law 63(10).

217.    District Attorney Wetmore also has authority to criminally prosecute public accommodations who violate a Division order. *See* N.Y. County Law § 700.

218.    The Division actively receives and initiates complaints for alleged violations of New York's human rights law, including those that allege discrimination because of sexual orientation in violation of the Accommodations and Publication Clauses.

219.    Between fiscal years 2012 and 2018, the Division received, investigated, and processed approximately 1,740 complaints against places of public accommodation under New York's law, including many complaints alleging sexual orientation discrimination.

220.    The human rights law also permits "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice" to file a civil action directly "in any court of appropriate jurisdiction" where he or she can recover the same relief as if the complaint were filed with the Division. N.Y. Exec. Law. § 297.9.

221.    Likewise, the civil rights law authorizes any "person aggrieved" by an act of discrimination to file suit "in any court of competent jurisdiction in the county in which the defendant shall reside." N.Y. Civ. Rts. Law § 40-d.

222.    Prior to filing suit, the aggrieved person must provide notice of suit to the Attorney General. N.Y. Civ. Rts. Law § 40-d.

223.    The purpose of this notice is to supply the Attorney General with sufficient information to administer, enforce, and prosecute the civil rights law.

224.    If any person is found to have discriminated against any other person because of sexual orientation, that person shall "be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars" and "shall be deemed guilty of a class A misdemeanor." N.Y. Civ. Rts. Law § 40-d.

225.    Attorney General James has authority to criminally prosecute any person who violates the civil rights law. *See* N.Y. Exec. Law 63(10).

226.    District Attorney Wetmore also has authority to criminally prosecute any person who violates the civil rights law. *See* N.Y. County Law § 700.

227.   District Attorney Wetmore may commence a criminal action against a person under the civil rights law without notifying Attorney General James.

New York's law imposes overwhelming burdens on Emilee's wedding photography.

228.   New York's laws have imposed and continue to impose significant pressures and burdens on Emilee and on how she operates and communicates about Emilee Carpenter Photography.

229.   For example, Emilee wants to amend her company's operating agreement to include a "Beliefs and Practices" policy statement that explains her artistic and religious beliefs for choosing to promote certain ideas but not others.

230.   A true and correct copy of the " Beliefs and Practices" policy statement Emilee desires to adopt is attached to this complaint as Exhibit 1.

231.   Emilee wants to adopt this editorial policy as an addendum to Emilee Carpenter Photography's operating agreement because it provides a policy that constrains Emilee Carpenter Photography's operations and ensures that its work is consistent with her artistic and religious beliefs; specifies the policies and editorial decisions that Emilee Carpenter Photography must follow when determining whether to provide requested services; ensures that the policies and editorial decisions indicated in the "Beliefs and Practices" policy will be applied consistently; and effectively and thoroughly explains her editorial decisions for not creating certain types of photography.

232.   But the Accommodations and Discrimination Clauses prohibit Emilee from adopting Emilee Carpenter Photography's desired "Beliefs and Practices" policy because the policy binds Emilee Carpenter Photography to not photograph same-sex weddings, which New York equates to refusing or withholding goods, services, advantages, or privileges from a person because of their sexual orientation. *See, e.g.*, *infra*, ¶¶ 262, 285-99.

233.   Because of the Accommodations and Discrimination Clauses, Emilee Carpenter Photography has not and will not formally amend its operating agreement to include its desired "Beliefs and Practices" policy (Exhibit 1).

234.   By forbidding Emilee from adopting her desired written editorial policy, the Accommodations and Discrimination Clauses have and continue to undercut Emilee's ability to exercise editorial judgment over her wedding photography and photography business, hinders her ability to bind future owners and employees to promote messages Emilee agrees with, hinders her ability to plan her business, and effectively requires Emilee to accept projects promoting messages contrary to her beliefs.

235.   The Accommodations, Publication, and Discrimination Clauses have and continue to hinder Emilee's ability to operate her business as efficiently as possible in other ways as well.

236.   For example, Emilee wants to ask prospective clients questions sufficient for her to learn whether they are seeking photography services celebrating same-sex engagements or weddings so that she can be transparent with them and let them know she does not create these photographs.

237.   But the Accommodations, Publication, and Discrimination Clauses forbid Emilee from asking this question.

238.   In turn, Emilee has had to research and continues to research every wedding photography request she receives to determine if the request seeks services that violate her beliefs.

239.   Doing this research takes time and effort and reduces the amount of time and effort Emilee can spend operating her business.

240.   Likewise, this process has and continues to cause Emilee to lose business opportunities because Emilee does not respond to requests if she cannot confirm that the request is for an engagement or wedding between one man and one woman.

241.   Emilee has and continues to ignore many requests because she could not confirm through research whether the request was for an engagement or wedding between one man and one woman or a same-sex engagement or wedding.

242.   In the past year, Emilee has ignored more than ten requests because she could not confirm through research whether the request was for an engagement or wedding between one man and one woman or a same-sex engagement or wedding.

243.   On average, more than ten percent of prospective clients who contact Emilee to make a request become actual clients of Emilee's for whom she provides photography services.

244.   Therefore, Emilee has lost revenue from photographing at least one engagement or wedding because of the Accommodations, Publication, and Discrimination Clauses.

245.   Emilee has photographed at least one less engagement or wedding than she otherwise would have because of the Accommodations, Publication, and Discrimination Clauses.

246.   The Accommodations, Publication, and Discrimination Clauses also have prohibited and continue to prohibit Emilee from posting on her business website a statement explaining her religious reasons for why she only promotes marriages between one man and one woman.

247.   A true and correct copy of this statement is attached to the complaint as Exhibit 2.

248.   Emilee wants to post this statement to briefly explain her services and beliefs to the public and to prospective clients because Emilee is religiously motivated to be transparent and honest with clients, potential clients, and the public. *Supra*, ¶ 45.

249.   By posting this statement, Emilee will be able to explain why she can only promote and celebrate marriages between one man and one woman and will avoid giving any false impression about what she will and will not create.

250.   Emilee also hopes that by posting this statement explaining her religious beliefs, prospective clients and the public will come to appreciate her point of view even if they disagree with it.

251.   Emilee also wants to make statements materially similar to Exhibit 2 directly to prospective clients when asked to explain her services.

252.   If Emilee posted her desired statement (Exhibit 2), or materially similar statements on her website or made materially similar statements directly to prospective clients, she would violate the Accommodations, Publication, and Discrimination Clauses.

253.   Because of the Accommodations, Publication, and Discrimination Clauses, Emilee has not and will not post her desired statement (Exhibit 2), or materially similar statements, on her website or make materially similar statements directly to prospective clients.

254.   By preventing Emilee from effectively communicating the photography services she can and cannot provide, the Accommodations, Publication, and Discrimination Clauses have required and continue to require Emilee to spend additional time and effort researching the requests she receives, reduces the amount of time and effort she spends on operating her business, and causes her to lose out on business opportunities and profit.

255.   By preventing Emilee from effectively communicating the photography services she can and cannot provide, the Accommodations, Publication, and Discrimination Clauses also have caused and continue to cause Emilee reputational harm by preventing her from clearly and honestly communicating her religious and artistic beliefs to prospective clients and the public.

256.   If not for the Accommodations, Publication, and Discrimination Clauses, Emilee would immediately initiate activities motivated by her religious beliefs.

257.    For example, if not for the Accommodations and Discrimination Clauses, Emilee would immediately sign and formally adopt her desired "Beliefs and Practices" policy (Exhibit 1) to bind her company to promote messages consistent with Emilee's religious beliefs.

258.    If not for the Accommodations, Publication, and Discrimination Clauses, Emilee would immediately begin asking prospective clients questions sufficient for her to determine whether they are seeking photography services celebrating a same-sex engagement or wedding.

259.    If not for the Accommodations, Publication, and Discrimination Clauses, Emilee would immediately post the statement in Exhibit 2 or materially similar statements on her business website and directly to prospective clients.

260.    Because of the severely intrusive nature of New York laws' investigative process (including the process described in paragraphs 194 to 211), the fear of going through this process has forced Emilee to refrain from the activities described above (including the activities described in paragraphs 229 to 258).

261.    Likewise, Emilee has and continues to refrain from the activities described above because she faces a credible threat and substantial risk that she will be investigated or prosecuted under New York's laws for engaging in these activities.

262.    For example, Attorney General James and the Division have taken the formal position that public accommodations discriminate on the basis of sexual orientation if they (A) have a religiously-based policy and practice of offering services celebrating opposite-sex weddings but not same-sex weddings or (B) have a religiously-based policy and practice of declining to provide services celebrating same-sex weddings while offering them for opposite-sex weddings. *See* Br. for Mass. et al. as Amici Curiae in Support of Defs. at 10-14, 26-27, *303 Creative LLC v. Elenis*, No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James);

*McCarthy v. Liberty Ridge Farm, LLC*, Nos. 10157952 & 10157963, at 17-19 (N.Y. State Div. of Hum. Rights July 2, 2014).

263.    In fact, the Division has already investigated and prosecuted business owners who declined to host a same-sex wedding because of the owners' religious beliefs about marriage. *See infra*, ¶¶ 287-92.

264.    The Division has also prosecuted, punished, and fined a public accommodation for having a "policy of accepting only opposite sex personal ads." *See Keimel v. Manchester Newspapers*, No. 10102907, at 5 (N.Y. State Div. of Hum. Rights May 1, 2007).

265.    Likewise, Emilee is refraining from the activities described above because she has already received several requests to provide photography services for same-sex weddings, which expose her to being investigated or prosecuted under New York's laws.

266.    In fact, Emilee has determined she has already received at least seven requests to provide photography celebrating same-sex weddings in the last year.

267.    Emilee has declined these requests by not responding to them.

268.    Emilee is also refraining from the activities described above (including the activities described in paragraphs 229 to 258) because she faces a credible threat and substantial risk that she will receive more requests to provide photography services for same-sex engagements or weddings, thereby further increasing her chances of being investigated or prosecuted under New York's laws because Emilee will always decline these requests.

269.    Emilee's desire to incorporate a "Beliefs and Practices" policy (Exhibit 1) in her operating agreement and post Exhibit 2 on her website has only increased because she has received so many recent requests to photograph same-sex weddings and each request subjects her business to lawsuits.

270.    Faced with this reality, Emilee realized that she needs to be clearer and more transparent with the public about what artwork she can and cannot create and that she needs to formalize her policies and practices to better explain and protect her artistic and religious freedom.

271.    Likewise, Emilee is refraining from posting Exhibit 2 or making materially similar statements on her business website or social media sites and directly to prospective clients because she faces a credible threat and substantial risk that she will be investigated or prosecuted under New York's laws for making these statements even if she does not receive a request to provide photography services for same-sex engagements or weddings.

272.    For example, Attorney General James has taken the formal position that public accommodations discriminate on the basis of sexual orientation if they publish communications with the effect of declining expressive services celebrating same-sex weddings but not opposite-sex weddings. *See* Br. for Mass. et al. as Amici Curiae in Support of Defs. at 13–-4, *303 Creative LLC v. Elenis*, No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James).

273.    The Division has investigated and prosecuted a complaint for an employment advertisement that violated New York's employment law (§ 296.1(d)) after the complainant viewed the advertisement and had "negative feelings" but did not apply for the advertised job. *Sullivan v. Animal Fair Media, Inc.*, No. 10122835, at 4-6 (N.Y. State Div. of Hum. Rights Feb. 18, 2011).

274.    Indeed, to file a complaint based on an advertisement, a complainant need only see the advertisement and claim to be personally aggrieved by it.

275.    The Division has also initiated on its own motion a complaint for an employment advertisement that violated New York's employment law (§ 296.1(d)) even without identifying a person aggrieved by the advertisement. *N.Y. State Div. of*

*Human Rights v. Golden Mine 2000*, No. 10169517, at 3-7 (N.Y. State Div. of Hum. Rights Apr. 28, 2016).

276.    Since launching her business's website, Emilee's website has received almost 3,000 unique views.

277.    Therefore, Emilee faces a credible threat and substantial risk that a person will view her desired statement (if posted) and file a complaint with the Division.

278.    Likewise, Emilee faces a credible threat and substantial risk that the Division would learn of her business, submit a "tester," and initiate a complaint against her if she posted her desired statement. *See, e.g.*, *supra*, ¶¶ 189-93.

279.    Emilee also faces a credible threat and substantial risk of being investigated or prosecuted under New York's law by declining additional requests to provide photography services celebrating same-sex engagements or weddings because of New York's demographics.

280.    For example, as of 2019, almost sixty-five thousand same-sex couples live in New York. *See* https://www.census.gov/data/tables/time-series/demo/same-sex-couples/ssc-house-characteristics.html.

281.    Between 2012 and 2017, almost 16,000 same-sex couples married in the state of New York, excluding same-sex marriages in New York City. *See* https://www.health.ny.gov/statistics/vital_statistics/2012/table47a.htm; https://www.health.ny.gov/statistics/vital_statistics/2013/table47a.htm; https://www.health.ny.gov/statistics/vital_statistics/2014/table47a.htm; https://www.health.ny.gov/statistics/vital_statistics/2015/table47a.htm; https://www.health.ny.gov/statistics/vital_statistics/2016/table47a.htm; https://www.health.ny.gov/statistics/vital_statistics/2017/table47a.htm.

282.    Upon information and belief, statistics for same-sex marriages within New York City are separately maintained.

38

283.   As of 2016, there were a total of approximately 16,000 married same-sex couples in New York City and more than 33,000 married same-sex couples in New York State. *See* https://comptroller.nyc.gov/reports/same-sex-marriage-new-insights-from-the-2016-american-community-survey/.

284.   Overall, New York has the second highest LGBT population in the United States with over 700,000 people who identify as lesbian, gay, or bisexual. *See* https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Adult-US-Pop-Jul-2020.pdf.

New York only prosecutes its laws against views the government disfavors.

285.   New York interprets its laws' prohibition on sexual-orientation discrimination as prohibiting businesses from declining to offer or provide services celebrating same-sex marriage because of the business owner's religious objections to same-sex marriage.

286.   For example, Attorney General James equates a public accommodation's decision to only celebrate marriages between a man and a woman to be sexual orientation discrimination "[n]o matter the sincerity of a business owner's religious beliefs or other deeply held views." Br. for Mass. et al. as Amici Curiae in Support of Defs. at 10, *303 Creative LLC v. Elenis,* No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James).

287.   Attorney General James adopts the former Attorney General of New York's view that public accommodations violate New York's laws if they decline to celebrate a same-sex marriage even based on "[r]eligious objections to same-sex marriage." Br. for the Att'y Gen. of New York as Amicus Curiae in Support of Resp't at *18, *Gifford v. McCarthy*, 137 A.D.3d 30 (N.Y. App. Div. 2016), 2015 WL 13813477.

288.    Likewise, the Division considers it to be sexual-orientation discrimination if a public accommodation declines to celebrate a same-sex wedding "even if the [public accommodation's] action reflected its owners' sincere religious beliefs." Br. and App. on Behalf of Resp't State Div. of Hum. Rights at 32, *Gifford v. McCarthy*, 137 A.D.3d 30 (N.Y. App. Div. 2016).

289.    The Division, with the New York State Attorney General's Office's support, recently prosecuted and fined a wedding venue and its owners for maintaining a policy of only hosting marriages between one man and one woman. *See McCarthy v. Liberty Ridge Farm, LLC*, Nos. 10157952 & 10157963, at 17-22 (N.Y. State Div. of Hum. Rights July 2, 2014).

290.    The Division punished the wedding venue and its owners even though the policy was a result of the owners' "'specific religious belief regarding marriage', i.e. that it should be between a man and a woman." *See McCarthy v. Liberty Ridge Farm, LLC*, Nos. 10157952 & 10157963, at 10 (N.Y. State Div. of Hum. Rights July 2, 2014).

291.    Yet the Division dismisses complaints against public accommodations when they articulate a non-religious legitimate and nondiscriminatory reason for declining a request. *See Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581, at 5-6 (N.Y. State Div. of Hum. Rights Jan. 28, 2012); *Morgan v. Zaharo Cab Corp.*, No. 10117888, at 4-5 (N.Y. State Div. of Hum. Rights Nov. 14, 2008).

292.    By punishing the wedding venue and its owners, the Division manifests hostility towards religious beliefs like Emilee's.

293.    The Division manifests hostility towards religious beliefs like Emilee's by treating religious objections to celebrating same-sex marriage worse than other public accommodations' non-religious legitimate and nondiscriminatory reasons for declining to provide other services.

40

294.    The Division also manifests hostility towards religious beliefs like Emilee's by concluding that such religious beliefs are themselves illegitimate and discriminatory.

295.    Attorney General James has manifested hostility towards religious beliefs like Emilee's by concluding "[a]n objection to two people of the same sex marrying" regardless of "the sincerity of a business owner's religious beliefs" is equivalent to sexual orientation discrimination. Br. for Mass. et al. as Amici Curiae in Support of Defs. at 9-10, *303 Creative LLC v. Elenis*, No. 19-1413 (10th Cir. Apr. 29, 2020) (joined by Attorney General James).

296.    For example, Attorney General James also called the United States Supreme Court's decision in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S.Ct. 1719 (2018), condemning a state's hostility towards religious beliefs like Emilee's, "a setback for all of us committed to moving our country forward." https://twitter.com/TishJames/status/1003779868465786880.

297.    As applied to Emilee, New York's laws prohibit her from promoting and celebrating her religious views about marriage by providing wedding photography services exclusively for engagements and weddings celebrating one man and one woman, but this law allows other wedding photographers to promote and celebrate their views supporting same-sex marriage.

298.    Also as applied to Emilee, New York's laws prohibit Emilee Carpenter Photography's website from only offering to display and promote engagements and weddings between one man and one woman and from declining to display or promote same-sex engagements and weddings, but this law allows other wedding photographers to display, promote, and celebrate their views supporting same-sex marriage on their websites.

299.   This distinction in treatment is based on the particular view that a photographer holds about marriage and the content that photographer expresses, both through the photographer's services and on the photographer's website.

300.   Many photographers in New York offer to photograph opposite-sex and same-sex engagements and weddings.

301.   For example, Wedding Wire is an online service that allows individuals to search for wedding vendors (including wedding photographers), and it lists over 2,300 wedding photographers in New York. *See* https://www.weddingwire.com/c/ny-new-york/wedding-photographers/10-sca.html.

302.   Wedding Wire's Nondiscrimination Policy prohibits its vendors—including wedding photographers—from "refusing to provide or accept services" based on sexual orientation. *See* https://www.weddingwire.com/corp/legal/terms-of-use.

303.   Upon information and belief, there are at least 2,300 photographers in New York who will photograph same-sex and opposite-sex weddings.

304.   Many New York-based photographers who photograph opposite-sex weddings also promote and celebrate same-sex marriage on their social media sites, blogs, and websites.

305.   For example, many New York-based photographers write statements on their websites or social media sites expressing their support for same-sex marriage, their willingness to photograph same-sex weddings, and their celebration of same-sex marriage, and they display photographs of same-sex weddings on their websites, blogs, and social media sites that positively depict same-sex weddings.

306.   Emilee is in direct competition with the photographers identified above and personally competes in the same arena in terms of competing for clients seeking a photographer for opposite-sex engagement sessions or weddings.

42

307.   But New York's laws illegally impose increased burdens on Emilee that it does not impose on these other New York businesses, which gives her competitors a competitive advantage.

308.   For example, to avoid being harmed by New York's laws, Emilee has and continues to refrain from adopting her desired policy into her company's operating agreement (Exhibit 1), publishing her desired statement (Exhibit 2), and tailoring her services, website, and operating her business in certain ways, while these other New York photography businesses do not face these obstacles because they willingly promote opposite-sex and same-sex weddings.

309.   Emilee is religiously motivated to share her beliefs that God designed marriage to be between one man and one woman with her clients and with the public in an effort to persuade her clients and the public that this design for marriage should be celebrated. *See supra*, ¶¶ 19-24, 46-49, 104-08.

310.   But New York's laws create an uneven playing field upon which Emilee has not and still cannot advocate for her views on marriage in the public arena on equal terms with New York photography businesses that promote opposite-sex and same-sex weddings.

311.   Emilee also cannot direct her marketing to business opportunities consistent with her artistic and religious beliefs, bind her company to follow her artistic and religious beliefs about marriage, or tailor her services or operate her business in certain ways, while New York photography businesses that promote opposite-sex and same-sex weddings face no such restrictions.

312.   Emilee has expended and continues to expend resources to research every engagement and wedding request she receives before responding to the request and loses business opportunities when she cannot confirm the request is consistent with her religious views, while other New York photography businesses that promote

opposite-sex and same-sex weddings need not engage in this research or lose these opportunities.

313.    These differences have made and continue to make it harder for Emilee to compete and intensify the competition in the wedding photography market, have made and will make it easier for her competition to compete against her, have lowered and will lower the costs and effort other businesses exert when offering wedding photography, illegally structure a competitive environment, have made and will make it harder for Emilee to promote or market her business and views on marriage in comparison to these other businesses, and have imposed and will impose a reputational harm on her business that these other businesses do not suffer.

314.    Additionally, although New York's laws restrict Emilee's desired activities, they make several exemptions from its discrimination provisions for public accommodations, employers, and landlords. *See, e.g.*, N.Y. Exec. Law § 292.9 (excluding certain public and private accommodations from New York's law); § 296.1(d) (allowing employers to state preferences in postings for bona fide occupational qualifications); § 296.2(b) (exempting public accommodations on case-by-case basis from law as to sex when "based on bona fide considerations of public policy"); § 296.3(b) (allowing employers to discriminate based on disability if accommodating employee's disability would cause an "undue hardship"); § 296.5(a) (allowing landlords to restrict rental of all rooms in a housing accommodation to individuals of the same sex); § 296.10(a) (allowing employers to discriminate based on religion if accommodating employee's religious beliefs would cause an "undue hardship").

315.    New York laws also allow medical offices to refer certain classes of patients to other offices if the referral is based on sound medical judgment without violating its laws.

316.    New York also exempts religious entities from providing "services, accommodations, advantages, facilities, goods, or privileges for the solemnization or celebration of a marriage." N.Y. Dom. Rel. Law § 10-b

317.    These exemptions undermine any basis for compelling Emilee to create wedding photography or write blogs celebrating same-sex weddings.

## Legal Allegations

318.    Plaintiffs and Plaintiffs' website are subject to and must comply with New York's Accommodations, Publication, and Discrimination Clauses.

319.    These clauses violate Plaintiffs' constitutional rights, and chill and deter Plaintiffs from exercising their constitutional rights.

320.    As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief.

321.    Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

322.    Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

First Cause of Action
First Amendment: Freedom of Speech, Association, and Press

323.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-322 of this complaint.

324.    The First Amendment's Free Speech and Press Clauses protect Plaintiffs' ability to speak; to create, publish, sell, and distribute speech; to associate with others for expressive purposes; and to associate with messages of Plaintiffs' choosing.

325.    The First Amendment also protects Plaintiffs' ability not to speak; to exercise editorial control over their speech; to operate their expressive business to express their views; to decline to create, publish, sell, or distribute speech; and to decline to associate with others and with other messages for expressive purposes.

326.    The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

327.    The First Amendment also prohibits the government from conditioning a benefit on the relinquishment of any First Amendment right.

328.    Plaintiffs' wedding photography, and all activities associated with this service, are forms of protected speech and expressive association, and Plaintiffs publish their speech to the public.

329.    As applied to Plaintiffs, the Accommodations and Discrimination Clauses compel speech Plaintiffs object to, interfere with their editorial judgment, compel them to sell, publish, and disseminate speech they object to, compel them to engage in expressive associations they deem objectionable, forbid them from tailoring their business, exercising their editorial discretion in their business, and from adopting certain policies, and regulate speech, association, and publication based on content, viewpoint, and speaker identity.

330.    As applied to Plaintiffs, the Accommodations and Discrimination Clauses condition their ability to participate in the wedding industry and to create wedding photography promoting marriage between one man and one woman on the requirement that Plaintiffs also create wedding photography promoting marriages other than those between one man and one woman.

331.    As applied to Plaintiffs, the Accommodations, Publication, and Discrimination Clauses are content, viewpoint, and speaker-based regulations that ban, chill, and burden Plaintiffs' desired speech (and publication of that speech) on

Emilee Carpenter Photography's website and directly to prospective clients, and that inhibits Plaintiffs from forming expressive associations they desire to form and from avoiding expressive associations they want to avoid.

332.    As applied to Plaintiffs, the Publication Clauses' Unwelcome Clause and the Discrimination Clause is vague and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the Unwelcome and Discrimination Clauses.

333.    The Publication Clause's Unwelcome Clause is also facially unconstitutional because it is vague, overbroad, allows unbridled discretion, and is a content-based and viewpoint-based regulation that bans, chills, and burdens speech, association, and publication of speech.

334.    Plaintiffs have not and will not engage in certain protected speech because of the Accommodations, Publication, and Discrimination Clauses.

335.    If not for the Accommodations, Publication, and Discrimination Clauses, Plaintiffs would immediately begin to engage in this protected speech.

336.    Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free-speech, free-association, and free-press rights.

337.    Accordingly, as applied to Plaintiffs, the Accommodations, Publication, and Discrimination Clauses violate the First Amendment's protections for free speech, free association, and free press.

338.    Accordingly, the Publication Clause's Unwelcome Clause facially violates the First Amendment's protections for free speech, free association, and free press.

Second Cause of Action
First Amendment: Free Exercise of Religion

339.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1–322 of this complaint.

340.   The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

341.   The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being subject to individualized assessments, being subject to laws that lack neutrality and general application, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

342.   Plaintiffs exercise their religion under the First Amendment when they operate their business, adopt policies consistent with their religious beliefs, exercise their editorial judgment consistent with their religious beliefs, honestly communicate with clients and prospective clients about the photography they can and cannot create, participate in wedding ceremonies, and celebrate marriages between one man and one woman.

343.   As applied to Plaintiffs, the Accommodations, Publication, and Discrimination Clauses substantially burden Plaintiffs' sincerely held religious beliefs by requiring them either to operate their expressive business in ways that violate their religious beliefs or to close their business, by preventing them from maintaining policies consistent with their religious views on marriage, by stopping them from being honest with prospective clients by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech, by compelling speech that they are religiously

48

obligated to avoid, and by forcing their participation in activities prohibited by their religious beliefs.

344.    The Accommodations, Publication, and Discrimination Clauses do not force nonreligious persons and businesses, or persons and business with favored religious views, to choose between these same options when faced with requests to promote messages they disagree with or when they must decide how to explain why they decline to promote certain messages.

345.    The Accommodations, Publication, and Discrimination Clauses impermissibly prefer secular views over religious views, and certain religious views over others, by allowing those who own and operate public accommodations to express beliefs (religious or otherwise) in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

346.    The Accommodations, Publication, and Discrimination Clauses are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiffs due to their religious beliefs.

347.    The Accommodations, Publication, and Discrimination Clauses are not neutral or generally applicable because New York's laws and other laws and regulations adopted by New York contain several categorical exemptions, yet Defendants refuse to grant a religious exemption to Plaintiffs.

348.    The Accommodations, Publication, and Discrimination Clauses also violate Plaintiffs' free-exercise rights under the hybrid-rights doctrine because they implicate free-exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, and press.

349.    The Accommodations, Publication, and Discrimination Clauses impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs and to stop operating their business according to their religious beliefs.

350.   Plaintiffs have not and will not engage in certain religiously motivated conduct because of the Accommodations, Publication, and Discrimination Clauses.

351.   If not for the Accommodations, Publication, and Discrimination Clauses, Plaintiffs would immediately begin to act in ways motivated by their religious beliefs.

352.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing the rights to freely exercise their religion.

353.   Accordingly, as applied to Plaintiffs, the Accommodations, Publication, and Discrimination Clauses violate the First Amendment's protections to freely exercise religion.

Third Cause of Action
First Amendment: Establishment Clause

354.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1–322 of this complaint.

355.   The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

356.   The Accommodations and Discrimination Clauses force Plaintiffs to participate in religious exercises contrary to their sincere religious beliefs.

357.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs.

358.   Accordingly, as applied to Plaintiffs, the Accommodations and Discrimination Clauses violate the First Amendment's protections to be free from the establishment of religion.

50

Fourth Cause of Action
Fourteenth Amendment: Due Process

359.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1-322 of this complaint.

360.   The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violate New York's law.

361.   The Publication Clause's Unwelcome Clause prohibits any place of public accommodation from making "written or printed communication, notice or advertisement, to the effect that" a person's "patronage or custom" at the place of public accommodation is "unwelcome, objectionable or not acceptable, desired, or solicited" because of the person's sexual orientation.

362.   New York's law nowhere defines "unwelcome, objectionable or not acceptable, desired, or solicited."

363.   Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, or made directly to prospective clients indicate a person's "patronage or custom" at a place of public accommodation is "unwelcome, objectionable or not acceptable, desired, or solicited" and therefore cannot know what is prohibited by the Unwelcome Clause.

364.   Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Unwelcome Clause in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

365.   Accordingly, facially and as applied to Plaintiffs, the Publication Clause's Unwelcome Clause violates the Fourteenth Amendment's Due Process Clause.

**Prayer for Relief**

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.      A preliminary and permanent injunction to stop Defendants and any person acting in concert with them from:

   a.  enforcing the Accommodations, Publication, and Discrimination Clauses as applied to Plaintiffs' constitutionally protected speech, association, free press, religious exercise rights, and their right to be free from religious establishments; and

   b.  enforcing the Publication Clause's Unwelcome Clause facially.

2.      A declaration that the Accommodations, Publication, and Discrimination Clauses has violated and continues to violate Plaintiffs' First Amendment rights under the United States Constitution to engage in speech, association, press, free exercise of religion, and to be free from the establishment of religion as applied to Plaintiffs' constitutionally protected activities;

3.      A declaration that the Publication Clause's Unwelcome Clause facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.      That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

5.      That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

6.      That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.      That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

8.     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 6th day of April, 2021.


|  | By: s/Jonathan A. Scruggs |
|---|---|

Raymond J. Dague
New York Bar No. 1242254
**Dague & Martin, P.C.**
4874 Onondaga Road
Syracuse, New York 13215
(315) 422-2052
(315) 474-4334 (facsimile)
rjdague@daguelaw.com

Jonathan A. Scruggs
Arizona Bar No. 030505
Bryan D. Neihart*
Arizona Bar No. 035937
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (facsimile)
jscruggs@ADFlegal.org
bneihart@ADFlegal.org


ATTORNEYS FOR PLAINTIFFS


*_Pro Hac Vice_ Admission Forthcoming

54

## DECLARATION UNDER PENALTY OF PERJURY

I, Emilee Carpenter, a citizen of the United States and a resident of the State of New York, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of April 2021 at Chemung County, New York.

_____
Emilee Carpenter