UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMILEE CARPENTER, LLC d/b/a
Emilee Carpenter Photography and
Emilee Carpenter,

                Plaintiffs,

    -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
JONATHAN J. SMITH, in his official capacity
as Interim Commissioner of the New York State
Division of Human Rights; and
WEEDEN WETMORE, in his official capacity as
District Attorney of Chemung County,

                Defendants.

_____

**21-CV-6303**

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
PRELIMINARY INJUNCTION MOTION**

**LETITIA JAMES**
New York State Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430

By:    _/s/ Heather L. McKay_
       HEATHER L. MCKAY
       Assistant Attorney General
       SANDRA PULLMAN
       Senior Counsel, Civil Rights Bureau
       RICK SAWYER*
       Special Counsel, Civil Rights Bureau
       SWATI R. PRAKASH**
       Assistant Attorney General
       HANNAH BERNARD**
       Volunteer Assistant Attorney General
       * Application for admission forthcoming.
       ** Appearing of counsel

1

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

STANDARD OF REVIEW ......................................................................................... 3

FACTS ..................................................................................................................... 3

ARGUMENT ............................................................................................................ 8

   I.    Plaintiff cannot establish standing or ripeness. ............................................... 8

   II.    Plaintiff cannot show irreparable harm. ........................................................ 10

   III.    A preliminary injunction would substantially harm the State's efforts to protect the public from discrimination. ........................................................................... 13

   IV.    Plaintiff cannot show a likelihood of success on the merits. ........................... 15

      A.    The antidiscrimination laws do not compel Plaintiff's speech. .................................. 15

      B.    New York's antidiscrimination law does not restrict Plaintiff's speech. ................... 20

      C.    New York's antidiscrimination law does not compel religious participation. ........... 21

      D.    New York's antidiscrimination law does not disfavor religion. ................................. 22

      E.    The "hybrid rights" doctrine is not recognized in the Second Circuit. ...................... 25

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*, No. 16-cv-02372-MSK-CBS, 2017 WL 4331065 (D. Colo. Sept. 1, 2017) .................................................................................................................................. 8

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995) ........................................................................ 3

*Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067 (2019) .................................................. 1, 15

*Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581 (DHR Jan. 28, 2012) .......................... 23

*Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760 (W.D.N.Y. 2020) ....................... 3, 10, 11

*Brooklyn Brands LLC v. Lieberman*, No. 18-cv-7245-LDH-ST, 2018 WL 10246003 (E.D.N.Y. Dec. 23, 2018)........................................................................................................................... 11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)......................... 21

*Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661 (2010) .................................. 16, 18, 19

*Costello v. McEnery*, 767 F. Supp. 72 (S.D.N.Y. 1991).............................................................. 11

*DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397 (2d Cir. 2001) .................................... 22

*Elane Photography LLC v. Willock*, 309 P.3d 53 (N.M. 2013)................................................... 18

*Elliot v. Gen. Motors LLC*, 829 F.3d 135 (2d Cir. 2016)............................................................ 10

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167 (2d Cir. 2006)............................................... 11

*Gifford v. McCarthy*, 137 A.D.3d 30 (3d Dep't 2016) ............................................................... 23

*Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1964) .................................................. 14, 19

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group*, 515 U.S. 557 (1995)............. 17, 19

*Latino Officers Ass'n v. Safir*, 170 F.3d 167 (2d Cir. 1999)...................................................... 11

*Leebaert v. Harrington*, 332 F.3d 134 (2d Cir. 2003) ............................................................... 25

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ..................................................... 19

*Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38 (1st Cir. 2016) ........................................ 22

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................................... 13

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719 (2018)................ passim

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983) .................... 16

*Monserrate v. New York State Senate*, 599 F.3d 148 (2d Cir. 2010)..................................... 3, 13

*Morgan v. Zaharo Cab Corp.*, No. 1011788 (DHR July 2, 2014) .............................................. 23

*N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013)............................... 12

*Pezza v. The Mill River Club, Inc.*, No. 3507000 (DHR Dec. 26, 2006)...................................... 9

*Pike Co. v. Tri-Krete Ltd.*, 349 F. Supp. 3d 265 (W.D.N.Y. 2018)............................................ 11

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ......................................................................... 21

*Ragin v. N.Y. Times Co.*, 923 F.2d 995 (2d Cir. 1991) ............................................................... 20

*Reinach v. Wisehart*, 209 A.D.2d 332 (1st Dept. 1994) ............................................................... 5

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ..................................................................... 14, 19

*Rumsfeld v. Forum for Acad. and Inst. Rts., Inc.*, 547 U.S. 47 (2006) ...................... 13, 16, 18, 21

*Soules v. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817 (2d Cir. 1992)..................................... 13, 21

*Steinberg v. Nations Café*, No. 2302311 (DHR May 27, 2005) ................................................. 10

*Sun v. Lucky Joy Restaurant, Inc.*, No. 10126349 (DHR Oct. 2, 2009) ....................................... 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................................................ 9

*Telescope Media Grp. v. Lucero*, Civ. No. 16-4094 (JRT/LIB) (D. Minn. Apr. 21, 2021) .......... 8

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000)............................................................................... 11

*Updegrove v. Herring*, No. 20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30, 2021) ............... 8

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 3

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018)........................................................ 18

**Statutes**

9 NYCRR 465.8 ...................................................................................................................... 5

N.Y. Civ. Rts. Law § 79-i ....................................................................................................... 5

N.Y. Exec. Law § 296 ..................................................................................................... passim

N.Y. Exec. Law § 297 .......................................................................................................... 5, 9

N.Y. Exec. Law § 63 ................................................................................................................ 6

NY Dom. Rel. Law § 10-b ...................................................................................................... 25

## PRELIMINARY STATEMENT

The First Amendment "aim[s] to foster a society in which people of all beliefs can live together harmoniously." *Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2074 (2019). Antidiscrimination laws promote such a society by allowing people of different beliefs and backgrounds equal access to the marketplace. The laws ensure that businesses voluntarily offering their services to the public cannot pick and choose customers based on their race, religion, or other protected characteristic. For over a century, New York's antidiscrimination laws—which were enacted, in part, to correct entrenched and sometimes violent anti-religious hostility—have prohibited such discriminatory business conduct. They permit New Yorkers to live together openly and without fear of being denied goods or services because of protected statuses, religious beliefs, or other characteristics.

In 2002, after more than a decade of factfinding, the Legislature added "sexual orientation" to the characteristics protected by New York law. It found that LGBT New Yorkers lived in an "all-pervasive climate of fear" and that providing equal access to the marketplace could improve not only LGBT lives but also the lives of all New Yorkers. In doing so, the Legislature drew careful lines. It protected religious rights by maintaining exemptions for religious organizations, like churches, that objected to homosexuality. But it did not exempt for-profit commercial enterprises because such exemptions would swallow the whole law.

Plaintiff, a for-profit wedding photography business and its owner, now seeks a preliminary injunction granting such an exemption. For several independent reasons, the motion should be denied.

For one thing, Plaintiff has not justified the extraordinary relief of a preliminary injunction because she has not shown any imminent risk of enforcement that would either

1

provide standing or constitute irreparable injury. Plaintiff has never been the subject of any investigation or enforcement action and admittedly continues to operate her business as she likes, without any chilling of her business practices. And, perhaps because her complaint raises an essentially abstract dispute, Plaintiff's claims rely on repeated mischaracterizations of the scope of New York's public accommodation statutes. An immediate preliminary injunction is simply not warranted under these circumstances.

Granting a preliminary injunction would also strike a significant blow to the public interest. Even if such an injunction were limited only to Plaintiff, the vague and open-ended relief she has requested—an exemption from antidiscrimination enforcement divorced from any specific facts—would risk authorizing her to engage in discriminatory conduct that would unquestionably violate the law. For example, Plaintiff asserts that she offers LGBT customers any service *except* wedding photography, but that claim has not been tested by discovery. An exemption from the antidiscrimination laws would allow such admittedly unlawful conduct to go unchecked. And the sweeping exemption she has requested, based largely on her description of her business as "expressive," could encourage other businesses to seek to close their doors to disfavored New Yorkers: Citing their expressive rights, lawyers could turn away Black clients; sign printers could refuse to serve veterans; brand consultants could reject Christians. The harmony of different beliefs New York has sought for over a century would devolve into a cacophony of hostile voices, each telling the rest that they are not welcome.

The facts before the Court do not justify such a result. The Supreme Court has warned against subjecting LGBT people to "indignities when they seek goods and services in an open market." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719, 1732 (2018). New York's public accommodations laws serve the compelling state interest of protecting

against such harms. Plaintiff has demonstrated neither the irreparable injury nor the likelihood of success on the merits that would warrant interfering with New York's long-standing policies.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010). In cases such as this, where the moving party seeks to enjoin the State from enforcing its own laws, "the party must demonstrate a clear or substantial likelihood of success on the merits and make a strong showing of irreparable harm." *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 771 (W.D.N.Y. 2020) (cleaned up). Such a heightened standard is appropriate because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam). The moving party must also demonstrate that the injunction serves the public interest, and courts must "pay particular regard for the public consequences of employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## FACTS

**The Legislature enacted the public accommodation law to protect all New Yorkers.**

For well over a century, the Legislature has ensured that "all persons within the jurisdiction of this State" are "entitled to the full and equal accommodations, advantages, facilities and privileges of…places of public accommodation." L. 1895 Ch. 1042 § 1. In 1952, the Legislature declared public-accommodations discrimination a matter of "state concern" because discrimination threatens "not only the rights and proper privileges of…inhabitants but menaces the institutions and foundation of a free democratic state." L. 1952 Ch. 285 § 290,

3

attached as Ex. P to McKay Decl. And religious organizations agreed. In support of the 1952
Amendment to N.Y. Exec. Law § 296, the American Jewish Committee wrote, "our democratic
institutions and way of life are being strengthened by the elimination of disparities between the
American ideal of equal rights and practices of discrimination because of…creed." *Id.* The
American Jewish Congress wrote, "we feel that your recommendations will go far in providing
equal opportunities for all people and religious freedom to all." *Id.*

The Legislature regularly revisits the antidiscrimination laws to make them more
effective. For example, in 1981, the Legislature reacted to a rise in violence against houses of
worship by stiffening the penalties for violations of the antidiscrimination laws. L. 1981 Ch. 870,
attached as Ex. M to McKay Decl. The Legislature specifically identified a pipe bomb explosion
at a Jewish center, a burglary at a temple, and an act of arson at an Orthodox Hebrew School in
Rockland County as the impetus for the amendment. *Id*. Groups such as the Anti-Defamation
League expressed their support for the stiffer penalties, noting an increase in the number of cross
burnings and swastika desecrations in the state. *Id.*

**The Legislature added sexual orientation as a protected class in 2002.**

The Legislature has also expanded the categories of New Yorkers protected by the law.
*See* https://dhr.ny.gov/agency-history. One such expansion was the addition of sexual orientation
as a protected class in 2002. L. 2002 Ch. 2, attached as Ex. N to McKay Decl. The purpose was
to rid the state of an "all-pervasive climate of fear" within which gay and lesbian citizens were
forced to live, including hostility, distrust, and physical violence. *Id*. The Legislature believed
that an improvement in this climate would improve the quality of life not only for gay and
lesbian residents, but for all. *Id.* In amending the law, the Legislature affirmed that sexual-
orientation discrimination, like other forms of discrimination, "menaces the institutions and

4

foundation of a free democratic state." *Id.*

### State Defendants safeguard religious freedom.

For over 50 years, the New York State Division of Human Rights has enforced the Human Rights Law. *See* https://dhr.ny.gov/agency-history. The Division reviews and investigates complaints concerning possible discrimination. N.Y. Exec. Law § 297(1). Upon receiving a complaint, an investigator will compile an administrative record, which allows them to visit the respondent's business, request documentation, and conduct interviews. Smith Decl. ¶ 11. After the investigative process, a Regional Director reviews all recommendations to determine the accuracy of the facts and legal sufficiency. 9 NYCRR 465.8. To proceed with a recommendation, the Division must determine that it has jurisdiction and that there is probable cause that the respondent has engaged in unlawful discriminatory behavior. N.Y. Exec. Law § 297(2)(a). If neither exists, the complaint must be dismissed. N.Y. Exec. Law § 297(2)(a).

The antidiscrimination laws that Plaintiff attacks include numerous protections for religion. *See* N.Y. Exec. Law § 296(10); N.Y. Civ. Rts. Law § 79-i (prohibiting discrimination against person refusing to perform or assist in abortion that is contrary to religious beliefs); *Reinach v. Wisehart*, 209 A.D.2d 332 (1st Dept. 1994) (affirming "jury's finding that defendant terminated plaintiff's employment because of plaintiff's sabbath observance in violation of Executive Law § 296(10)"). The Division has a history of enforcing those laws to protect people not just from sexual orientation discrimination, but also religious discrimination. *See, e.g.*, Smith Decl. Ex. B (complainant terminated in discriminatory manner for drinking coffee in area of bakery where only Jewish individuals were permitted to eat); Ex. C (respondent violated Human Rights Law when it denied employment to Jewish complainant and Sabbath observer); Ex. D (finding harassment on basis of religion and race where complainant was frequently subjected to

abusive language by his landlord). The Division further enforces the law to protect religious

rights in places of public accommodation. *See, e.g.*, Smith Decl. Ex. E (exclusion of club

membership based on religion is unlawful discrimination); Ex. F (refusal to serve food to Falun

Gong members was discrimination); Ex. G (café's refusal to provide disposable cups in

accordance with kosher dietary restrictions and to serve kosher patrons was unlawful).

Likewise, under Executive Law § 63(12), the New York State Office of the Attorney

General ("OAG") investigates and prosecutes instances of religious discrimination in

employment, housing, and places of public accommodation. Clarke Decl. ¶ 10. In addition to

commencing its own enforcement actions to guarantee New Yorkers' religious freedom, the

OAG intervened in a Fair Housing Act case on behalf of Hasidic Jewish families in 2019 and

established a Religious Rights Initiative in 2011. *See* Clarke Decl. ¶¶ 11–12.

## State law favors religious organizations with unique exemptions.

To recognize the unique needs of religious organizations, New York law accommodates

religious practice through exemptions specifically tailored to these groups. N.Y. Exec. Law

§ 296(11). When providing a public accommodation, a religious organization is expressly

permitted to limit admission or give preference to "persons of the same religion or

denomination" and take "such action as is calculated by such organization to promote [its]

religious principles." *Id.* Likewise, the law does not require religious organizations to perform

marriages that do not accord with their faith. When the Legislature added "sexual orientation" as

a protected class, it specifically retained this exemption but chose not to extend it to for-profit

businesses. *See* SONDA Senate Floor Debate, 12/17/2002 at 6797–98, attached as Ex. O to

McKay Decl., (arguing bill would not "dictate to religious entities how they must conduct their

internal practices" but "where the general public is affected…it would no longer be an acceptable

course of action to discriminate against any citizen…on the basis of their sexual orientation, real or perceived").

To further accommodate religious organizations, the Human Rights Law incorporates a ministerial exception in employment, which allows religious employers to take religion into account for certain hiring decisions. *See* Smith Decl. Ex. A. But the ministerial exception does not apply to secular businesses or to non-ministerial roles. *See id.*; *Lysek v. Christian Centr. Acad.*, No. 10180743 (DHR May 15, 2018), *aff'd sub nom Matter of Christian Cent. Acad. v. N.Y. Div. of Human Rts.*, 172 A.D. 3d 1911 (4th Dep't 2019) (finding that the respondent was not a religious organization and the ministerial exception did not apply). Narrow exceptions in other parts of the law, including a bona fide occupational qualification, do not apply to customers seeking goods or services from a business. *See* Smith Decl. ¶ 42. Such exemptions have never been extended to public accommodations for secular or religious reasons. N.Y. Exec. Law § 296; Smith Decl. ¶ 43.

### Plaintiff has not been the subject of any enforcement action.

Plaintiff owns and operates a wedding photography business, Emilee Carpenter, LLC (Emilee Carpenter Photography). Docket Entry ("D.E.") 3-5 ¶¶ 37, 39. She is the sole employee and member of the business. D.E. 3-5 ¶ 40. Emilee Carpenter Photography "offers, solicits, and receives" inquiries from the general public for photography for engagements and weddings. D.E. 3-5 ¶ 63. Plaintiff concedes that her business is a place of public accommodation as defined by the New York Human Rights Law. D.E. 1 ¶ 153. Plaintiff promotes her business using the Emilee Carpenter Photography website. D.E. 3-5 ¶ 45. Part of the website is a blog, which also promotes the business to the public. D.E. 3-5 ¶¶ 49, 115. Plaintiff uses the website and blog to capture more web traffic, set herself apart from other wedding photographers, convey a

particular message about marriage, and to provide value to her business. D.E. 3-5 ¶ 141.

Plaintiff has a religious objection to same-sex weddings—she believes that God created marriage to be celebrated between one man and one woman. D.E. 3-5 ¶¶ 68–69. Because of that belief, she refuses to provide wedding photography services to same-sex couples. D.E. 3-5 ¶ 199. When plaintiff receives an inquiry for services, she researches the prospective request online or through her personal and professional networks. D.E. 3-5 ¶ 78. If she perceives that the couple does not comprise one man and one woman, she does not respond to the request. D.E. 1 ¶ 240. Because Plaintiff's practice is to do her own research and ignore certain requests, she has not published on her website a statement nor had any direct conversations with prospective clients explaining her refusal to provide perceived LGBT clients services. D.E. 3-5 ¶¶ 241, 246.

Neither the OAG nor the Division has ever taken any enforcement action against Plaintiff. Clarke Decl. ¶¶ 19–20; Smith Decl. ¶ 24. Nor has Plaintiff been the subject of any complaint made to OAG or the Division. Clarke Decl. ¶ 18; Smith Decl. ¶¶ 21–22.

## ARGUMENT

### I.  Plaintiff cannot establish standing or ripeness.

Plaintiff lacks standing and fails to state a ripe claim because she has not established a live "case or controversy," thus depriving this Court of jurisdiction over her claims. *See, e.g.*, *303 Creative LLC v. Elenis*, No. 16-cv-02372-MSK-CBS, 2017 WL 4331065 (D. Colo. Sept. 1, 2017) (partially dismissing a similar lawsuit for standing); *Updegrove v. Herring*, No. 20-cv-1141, 2021 WL 1206805 (E.D. Va. Mar. 30, 2021) (same).[1] Plaintiff cannot establish the

---

[1] Standing is particularly important in a case such as this to avoid "a smoke and mirrors case and controversy…likely conjured up by Plaintiffs to establish binding First Amendment precedent." *See, e.g.*, *Telescope Media Grp. v. Lucero*, Civ. No. 16-4094 (JRT/LIB), D.E. 82 at 6 (D. Minn. Apr. 21, 2021) (granting wedding videographer's unusual motion to voluntarily dismiss its

"credible threat of prosecution" required for standing in a pre-enforcement challenge. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (cleaned up).

Not only has Plaintiff failed to show a "credible threat of prosecution," but State Defendants' declarations establish that she cannot. State Defendants have received no complaint about Plaintiff or her business. Clarke Decl. ¶ 18; Smith Decl. ¶¶ 21–22. Beyond preparing to defend this lawsuit, State Defendants have not investigated her in any way. Clarke Decl. ¶ 19; Smith Decl. ¶ 23. And State Defendants would not pursue any enforcement action, let alone levy any sanction, without first conducting an investigation. Any such investigation would require multiple steps of careful examination of law and facts, including an intensive document review, site visits and interviews, executive review for factual and legal accuracy, and an official finding of probable cause. Smith Decl. ¶¶ 9–15; N.Y. Exec. Law § 297(2)(a); *see also* Clarke Decl. ¶ 9. That process weighs the complainant's rights with those of the business under investigation, considering the business's non-discriminatory explanations of its conduct. None of that has happened here.

Nor can Plaintiff rely on a history of arbitrary or hostile enforcement of the antidiscrimination laws. It does not exist. For decades, State Defendants have enforced the laws evenly to prevent discrimination based on *any* protected category, whether religious faith, race, or sexual orientation, and have consistently defended religious New Yorkers from discrimination. *See, e.g.*, *Sun v. Lucky Joy Restaurant, Inc.*, No. 10126349 (DHR Oct. 2, 2009), Ex. F to Smith Decl.; *Pezza v. The Mill River Club, Inc.*, No. 3507000 (DHR Dec. 26, 2006), Ex. E to Smith Decl.; *Steinberg v. Nations Café*, No. 2302311 (DHR May 27, 2005), Ex. G to Smith

---

challenge to the Minnesota Human Rights Act with prejudice after it received the state defendant's first set of discovery requests).

Decl.; Clarke Decl. ¶¶ 11–13.

Perhaps because Plaintiffs' claims raise an abstract dispute over New York's public accommodations laws, Plaintiffs repeatedly misstate the scope of those statutes. For example, the laws do not require her to "participate in same-sex weddings in the same way she does for opposite sex weddings," including by singing and praying. D.E. 3-1 at 20. Nor do the laws require Plaintiff to post photographs of same-sex weddings on the business's website, or to affirmatively "celebrate" such weddings. *Id.* at 9–10. And the laws do not restrict or otherwise affect Plaintiff's speech, unconnected to her decision to offer services to the public at large—let alone demand any "ideological purity" from Plaintiff. D.E. 1 at 1–2.

By asking the Court to speculate on whether Defendants would embark on an investigation into Plaintiff and how it would turn out, and by basing her claims on misunderstandings of the way that New York actually operates, Plaintiff improperly seeks an advisory opinion. *See Elliot v. Gen. Motors LLC*, 829 F.3d 135, 168 (2d Cir. 2016) (holding "courts may not give an opinion advising what the law would be on a hypothetical set of facts" (cleaned up)).

## II.    Plaintiff cannot show irreparable harm.

Beyond failing to establish standing, Plaintiff does not even try to make the "strong showing" of irreparable harm required to enjoin enforcement of New York law. *See Bimber's Delwood*, 496 F. Supp. 3d at 771 (cleaned up). She cannot rely on any actual injury she has suffered—because State Defendants have not taken any enforcement action against her or her company. And she cannot identify any imminent injury. State Defendants have not targeted her for enforcement or received any complaints about her business that would trigger an investigation. Nor has she established that such complaints are likely to be forthcoming. She has

not and cannot show any injury that is not "remote nor speculative" and could not be remedied after trial in this matter. *Pike Co. v. Tri-Krete Ltd.*, 349 F. Supp. 3d 265, 271 (W.D.N.Y. 2018) (cleaned up). And because Plaintiff waited to file this lawsuit until 2021, nine years after she first started offering wedding photography, *see* D.E. 3-5 ¶¶ 28–37, her "lack of diligence...alone may preclude the granting of injunctive relief." *Brooklyn Brands LLC v. Lieberman*, No. 18-cv-7245-LDH-ST, 2018 WL 10246003, at *1 (E.D.N.Y. Dec. 23, 2018); *see also Costello v. McEnery*, 767 F. Supp. 72, 78 (S.D.N.Y. 1991) (holding one-year delay in bringing First Amendment claim suggested no irreparable harm).

In the absence of actual or imminent harm, Plaintiff incorrectly asserts that she is entitled to an injunction just because she brought First Amendment claims. D.E. 3-1 at 25. As explained in Point IV below, these claims do not pass even the first hurdle—likelihood of success on the merits. *See Bimber's Delwood*, 496 F. Supp. 3d at 789 (rejecting injunction absent likelihood of success on First Amendment claim). But even if they did, the Second Circuit has held again and again that plaintiffs with putative First Amendment claims must *still* show an imminent and irreparable harm: "conjectural chill is not sufficient." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 181–82 (2d Cir. 2006) (reversing grant of preliminary injunction) (cleaned up); *see also Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) (same).

Plaintiff cites two cases illustrating the point. In both cases, the court considered real (as opposed to conjectural) chilled speech and weighed the practical consequences of an injunction. In *Tunick v. Safir*, New York City denied a permit to a photographer who wanted to photograph dozens of nude models in a Manhattan neighborhood. 209 F.3d 67, 69 (2d Cir. 2000). The plaintiff alleged an unlawful "prior restraint[]" on speech, but a question of New York law required certification to the New York Court of Appeals. *Id.* at 88. The Second Circuit stayed the

district court's injunction—further extending the restraint on the plaintiff's speech—concluding that the delay required to fully adjudicate the claim was justified under the circumstances. *Id.* at 87–89. By contrast, in *N.Y. Progress and Protection PAC v. Walsh*, the court concluded that "timing is of the essence" and enjoined a campaign contribution cap mere weeks before a mayoral election, allowing the plaintiff to make its proposed campaign contribution before doing so would be pointless. 733 F.3d 483, 485–87 (2d Cir. 2013) (cleaned up) (distinguishing cases of conjectural chill). There, the law prevented the plaintiff from making the donation, and it was only the injunction that allowed plaintiff to act before time ran out. *Id.*

Here, Plaintiff does not and cannot identify a similar restraint on her putative rights that requires immediate intervention. *See* D.E. 3-1 at 25. Her speech has never been chilled. By her own admission, Plaintiff has been operating her business in the manner she likes for years without interference. That includes determining clients' sexual orientation through simple social media research and ignoring requests without tipping off same-sex couples to her intentions. Though she may worry about hypothetical future enforcement—a fully conjectural harm—that has not stopped her from running her business in the meantime. And conjectures about future enforcement do not justify an injunction now, before discovery and trial. If she loses at trial, a preliminary injunction will not protect her from hypothetical future enforcement actions— including for unlawful discrimination during the litigation. If she wins, no enforcement or penalties would be permissible.

That leaves the one statement the laws actually prohibit: a notice on Plaintiff's website denying wedding photography services to same-sex couples. *See* D.E. 3-1 at 25.[2] Such facially

---

[2] But for the statement refusing service to same-sex couples, Plaintiff has already posted her statement of religious beliefs on her website. *See* Clarke Decl. Ex. S. As discussed above, New York law does not prohibit such a statement in any way.

discriminatory statements warrant "straightforward treatment": they are not protected by the First Amendment. *Soules v. Dep't of Hous. & Urb. Dev.*, 967 F.2d 817, 824 (2d Cir. 1992). The Supreme Court has already rejected the idea that Plaintiff should "be allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages.'" *Masterpiece Cakeshop*, 138 S.Ct. at 1728–29. That is because such messages are discriminatory conduct put into words, not protected speech. *See Rumsfeld v. Forum for Acad. and Inst. Rts., Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*") (prohibiting a sign reading "White Applicants Only" hardly means that a law regulates "the employer's speech rather than conduct"). Because the First Amendment does not protect such speech, Plaintiff suffers no injury by continuing to refrain from posting it.[3]

## III.    A preliminary injunction would substantially harm the State's efforts to protect the public from discrimination.

By contrast, the "extraordinary remedy" of a preliminary injunction would substantially harm the State's ability to protect its citizens from discrimination. *Monserrate*, 599 F.3d at 154 (cleaned up). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up); *see also SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021) ("In a suit against the government, balancing of the equities merges into our consideration of the public interest"). Here, that injury is all the more acute because Plaintiff seeks a broad exemption from New York's antidiscrimination laws, which have been applied consistently and neutrally for decades. But such an exemption would allow Plaintiff to discriminate in indisputably unlawful ways—by, for example, denying *all*

---

[3] Unlike Plaintiff's speculative claims here, holdings in many cases in this area of law turn on the specifics of the particular proceedings at issue. *See, e.g., Masterpiece Cakeshop*, 138 S.Ct. at 1729–31.

photography services to LGBT customers. Indeed, without discovery here or other investigation, State Defendants have no way of knowing whether her actual (as opposed to stated) business practice is limited to denying *only* wedding photography to LGBT customers.

There can be no question that protecting New Yorkers from discrimination is one of the most compelling government interests. Antidiscrimination law "reflects the State's strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *see also Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 250 (1964). And, relevant here, those laws put into action the Supreme Court's command to halt the "indignities" LGBT people experience "when they seek goods and services in an open market." *Masterpiece Cakeshop*, 138 S.Ct. at 1732. But the laws do not protect only LGBT individuals. Because all New Yorkers express many different protected characteristics throughout their lives—including religion, race, sex, military status, disability, and age—the laws affect literally every person in the state. And, as the Legislature found, such laws protect "the institutions and foundation of a free democratic state." McKay Ex. N.

Plaintiffs' dismissive assertion that "New York suffers no harm" from a preliminary injunction is therefore risible. Granting Plaintiff a blanket exemption from New York's antidiscrimination laws would open the door to other businesses to seek exemptions to discriminate for other reasons.[4] Plaintiff's proposed First Amendment safe harbor could apply to

---

[4] Even when intended to be narrow in scope, rulings that appear to sanction discrimination can drive vendors to discriminate when they otherwise would not. One study found that wedding vendors who were willing to serve both same- and opposite-sex couples before the *Masterpiece Cakeshop* ruling were seven percentage points less likely to serve same-sex couples after the ruling was announced, even though the case did not establish any religious exemption to anti-discrimination laws. *See* Netta Barak-Corren, *Religious Exemptions Increase Discrimination*

any business offering purportedly expressive services of any kind—from sign printers to accountants and from photo studios to law firms—vitiating the law for broad swathes of professional services. And the spread of professional branding, including curated social media accounts and blogs like Plaintiff's, has added an "expressive" component to many services that never had one before—for example, a bed and breakfast with a "curated" social media identity could argue that its branding is an essential part of its accommodations and ban customers who do not fit the "brand," such as older people or military veterans. But under Plaintiff's proposed rule, provided the expression was part of the service, such discrimination would be permissible. Plaintiff herself might quickly find that the law no longer prevented discrimination against her as a Christian. The resulting society would make a mockery of the First Amendment's command to live together "harmoniously" as people with different beliefs and backgrounds retreated into hostile bunkers. *Cf. Am. Legion*, 139 S.Ct. at 2074.

Although the State will ultimately prevail in preventing such backsliding—because there is no First Amendment protection for picking and choosing customers—the sting New Yorkers would experience from such exclusion cannot be reversed.

IV.    **Plaintiff cannot show a likelihood of success on the merits.**

A.    **The antidiscrimination laws do not compel Plaintiff's speech.**

Plaintiff's various theories of compelled speech fail at the first step: nothing in New York's antidiscrimination laws compel her to speak. As applied to Plaintiff, the laws require one thing and one thing only: she must offer the same services to everyone without discriminating based on a protected characteristic. Such "generally applicable economic regulations" of

---

*Towards Same-sex Couples: Evidence from* Masterpiece Cakeshop, J. Legal Stud. (forthcoming 2021).

15

business conduct are unremarkable and do not offend the First Amendment. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983); *see also Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 694–95 (2010); *Masterpiece Cakeshop*, 138 S.Ct. at 1727.

Plaintiff herself concedes the laws' facial neutrality, D.E. 3-1 at 10, but insists that they require far more of her than they do. Without citing any case law, official guidance, or DHR enforcement decisions, Plaintiff asserts that the laws require her to "tell positive stories about and participate in" same-sex weddings the same way she does for opposite-sex weddings. D.E. 3-1 at 3. Not so. This made-up requirement has no basis in the statutes themselves or the corpus of case law interpreting them. Plaintiff need not feature same-sex couples on her website or even tell "positive stories" about their weddings. Nor does the law forbid her from expressing her religious views regarding marriage—even on her company's website. The law requires only that she offer the same services to LGBT customers that she offers to others. Any other requirement, in the absence of some proof that State Defendants would enforce the laws as she proposes, is mere conjecture.

Plaintiff goes further, asserting that because photography is expressive, her provision of wedding-photography services to a same-sex couple would constitute compelled speech. But that stretches the compelled-speech doctrine beyond recognition. The Supreme Court has made clear that being required to "afford equal access" to others is not the same as compelling speech. *FAIR*, 547 U.S. at 60 (requiring that law schools host military recruiters "affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*").

Plaintiff also ignores the meaningful differences between public-accommodations laws—which apply to her business solely because it has chosen to sell goods and services to the public

at large—and laws that would seek to control speech unconnected to any requirement of equal access. Public-accommodation laws prohibit "the *act* of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds," and do not "target speech or discriminate on the basis of its content." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group*, 515 U.S. 557, 572 (1995) (emphasis added). Thus, a law could not (and New York law does not) compel Plaintiff to express support for same-sex marriages if she were producing a documentary or photo book on her own account—just as a photographer could not be compelled to produce pro-war photographs. But a business that chooses to offer services to the public cannot rely on the freedom of expression it would have on its own account to exclude access to others in operating its publicly available business—thus, for example, it would not violate the First Amendment to require a photo studio to photograph a wounded veteran and his family, even if the photographer were personally opposed to war. *See* N.Y. Exec. Law § 296 (prohibiting discrimination based on military status). The same conclusion applies to Plaintiff's wedding-photography business and the requirement of New York law that she provide her services without regard to faith, race, or sexual orientation.

Plaintiff's failure to acknowledge this distinction leads her to rely, incorrectly, on *Hurley*, a case rejecting the "peculiar way" Massachusetts applied its antidiscrimination law to a St. Patrick's Day parade. 515 U.S. at 572. *Hurley* emphasized that the antidiscrimination statute was "well within the State's usual power…when a legislature has reason to believe that a given group is the target of discrimination, [and it did not] as a general matter, violate the First or Fourteenth Amendments." *Id.* The state's error was in treating the parade as a public accommodation. *Id.* The parade organizer was not offering its expressive services on the market, but, rather, assembling a coherent chorus of messages "rather like a composer" chooses different voices

when putting together a symphony. *Id.* at 574. The parade was speech, not a public accommodation. *See id.*; *FAIR*, 547 U.S. at 63 ("The expressive nature of a parade was central to [the] holding in *Hurley*.").

By offering wedding photography on the open market, Plaintiff's business is wholly different. She is not assembling a symphony or putting together a parade to express her views, but rather offering a commercial service to a series of customers. Plaintiff's choice of customers is a business practice, not a form of expression. *See Elane Photography LLC v. Willock*, 309 P.3d 53, 68 (N.M. 2013) ("While photography may be expressive, the operation of a photography business is not."). Hence, denying service to an entire class of customers is a business decision, not an "editorial judgment." D.E. 3-5 ¶¶ 216, 323. Refusing to shoot in a "light and airy" style may be a stylistic choice; refusing to shoot any and all same-sex weddings is not. *See, e.g.*, *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 125–27 (2d Cir. 2018) (recognizing discrimination directed at conduct, not merely identity, of protected person); *Christian Legal*, 561 U.S. at 672 (rejecting defense that organization's prohibition against LGBT members targeted conduct, not protected status).

What Plaintiff appears to be most concerned about is the implication that, if she were to provide her wedding-photography services at a same-sex wedding, she would be deemed to be expressing support for that wedding against her personal beliefs. But it is far from clear that any reasonable observer would draw such an implication—any more than a photographer hired to document a religious ceremony (like a christening) would be presumed to support or adhere to that religion. Instead, what Plaintiff does is essentially what every other wedding vendor does: offer a standardized service to couples who wish to document their own wedding. *See* D.E. 3-1 at 12 (comparing Plaintiff's photographs with other photographers'). In providing those services to

18

others, Plaintiff's own expression is incidental to the final product, which is produced for the

principal benefit of the customer, and any content-neutral regulation regarding her choice of

customers is therefore permissible. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Were Plaintiff to shoot a documentary film opposing same-sex marriage, the calculus would of

course be different; it would be a "peculiar" application of antidiscrimination laws, forbidden by

the First Amendment, to treat the film itself as an accommodation. *Hurley*, 557 U.S. at 572. Her

wedding photography services do not merit the same treatment.

New York's antidiscrimination laws, like other such laws, are "textbook viewpoint

neutral" and must be considered under a deferential standard of review. *Christian Legal*, 561

U.S. at 680, 694–95; *see also Ward*, 491 U.S. at 791; *Roberts*, 468 U.S. at 623. Such laws are

valid even if they disproportionately affect a particular viewpoint; what matters is the

government's intent in enacting the regulation. *See*, *e.g.*, *Madsen v. Women's Health Ctr., Inc.*,

512 U.S. 753, 763 (1994) (holding that a regulation's disproportionate impact on a particular

viewpoint does not render it "viewpoint based" but "suggests only that those in the group *whose*

*conduct* violated the court's order happen to share the same opinion").

But the public accommodations laws would survive even strict scrutiny. The eradication

of discrimination is a compelling governmental interest. *See, e.g.*, *Masterpiece Cakeshop*, 138

S.Ct. at 1728 (holding that the "law can protect gay persons, just as it can protect other classes of

individuals, in acquiring whatever products and services they choose on the same terms and

conditions as are offered to other members of the public"); *Roberts*, 468 U.S. at 624 (holding

antidiscrimination law "plainly serves compelling state interests of the highest order"); *Heart of*

*Atlanta*, 379 U.S. at 250 (holding antidiscrimination laws "vindicate the deprivation of personal

dignity" entailed by discrimination (cleaned up)). Here, the Legislature concluded that expanding

antidiscrimination protection to LGBT individuals was necessary to rid the state of an "all-pervasive climate of fear," including hostility, distrust, and physical violence. McKay Ex. N. The Legislature acted to protect not only LGBT customers seeking services but all New Yorkers, concluding that anti-LGBT discrimination "menaces the institutions and foundation of a free democratic state." *Id.*

And any restriction on Plaintiff's alleged First Amendment freedoms is minimal. Plaintiff is free, in her private capacity to say whatever she wants about religion or marriage. The law requires only that she offer services to same-sex couples on an equal footing and prohibits her from openly discriminating in her commercial speech. Such modest restrictions are permissible. *See, e.g.*, *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991) (upholding ordinance prohibiting racial discrimination in advertising against newspaper's First Amendment challenge).

**B.    New York's antidiscrimination law does not restrict Plaintiff's speech.**

Next, Plaintiff misreads New York's antidiscrimination law to place dramatic (and fictitious) restraints on her speech. She claims that the laws prohibit her from expressing her religious views about marriage or asking prospective clients if they are planning a same-sex wedding. The laws do nothing of the sort. Nothing in the statutes themselves or the case law interpreting them prohibits Plaintiff from expressing her views or asking questions of her prospective clients. The only thing she may not do is deny service to LGBT customers based solely on their sexual orientation.

In only one narrow and permissible sense does New York law affirmatively restrain Plaintiff's speech. New York's antidiscrimination law prevents a business from touting a discriminatory policy by prohibiting statements that customers' patronage is "unwelcome, objectionable or not acceptable, desired or solicited" because of a protected characteristic. N.Y.

Exec. Law § 296(2)(a). But such a prohibition—akin to a "White Applicants Only" sign—has repeatedly survived First Amendment challenges because it regulates discriminatory *conduct* that happens to be put into action through words. *See FAIR*, 547 U.S. at 62 (prohibiting a sign reading "White Applicants Only" hardly means that a law regulates "the employer's speech rather than conduct"); *Soules*, 967 F.2d at 824 (holding that facially discriminatory ads and statements merit "straightforward treatment" and do not violate First Amendment); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) (holding that "words can…violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets)"); *see also Masterpiece Cakeshop*, 138 S.Ct. at 1728–29 (rejecting the notion that "purveyors of goods and services who object to gay marriages for moral and religious reasons…be allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages'").

Under that law, Plaintiff may say whatever she likes about her religious beliefs. But she cannot do what she proposes here—to use her website and blog to promote an illegal policy of discrimination, a digital alternative to the shop sign reading "opposite-sex customers only." *See FAIR*, 547 U.S. at 62; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980) (holding that commercial speech is not protected if it does not concern "lawful activity").

## V. New York's antidiscrimination law does not compel religious participation.

Like Plaintiff's compelled-speech claim, her compelled-religion claim relies on a twisted reading of New York law. She asserts that the laws require her to "participate in same-sex weddings in the same way she does for opposite sex weddings," including by singing and praying. D.E. 3-1 at 20. But, like her other straw-man statutory constructions, those requirements can be found nowhere in the statutes themselves or the case law interpreting them. New York

does not have an "equality of celebration" requirement—the law requires only that Plaintiff photograph same-sex weddings if she also photographs opposite-sex weddings. She may sing, pray, or celebrate—or refrain from doing so—as her own faith dictates. Photographing a same-sex wedding is no more compelled religious practice than photographing *any* wedding of a faith other than Plaintiff's, whether Catholic, Jewish, Hindu, or Muslim.

Plaintiff's own citations make clear that merely photographing a wedding is not compelled religious practice. In *DeStefano v. Emergency Hous. Grp., Inc.*, the court found compelled religious practice where "state funds are used to coerce worship or prayer." 247 F.3d 397, 411–12 (2d Cir. 2001). Putting aside whether a hypothetical antidiscrimination enforcement action would meet that requirement—itself a questionable proposition—the court went on to define "worship" as "the reverent love and devotion accorded a deity, an idol, or a sacred object and the ceremonies, prayers, or other religious forms by which this love is expressed." *Id.* at 412 n.8 (cleaned up). Snapping photographs at a wedding, the only action the challenged antidiscrimination laws would require of Plaintiff, is notably absent from that list.

Similarly, in *Marrero-Méndez v. Calixto-Rodríguez*, the issue was not, as Plaintiff dismissively puts it, standing in "close proximity" to prayer, but, rather that State actors violated the Establishment Clause with a mandatory state-sponsored prayer and did not allow the plaintiff to leave until it was finished. 830 F.3d 38, 45 (1st Cir. 2016). Plaintiff completely ignores both the state-sponsorship requirement and the coercion in that case, neither of which is present here.

C.   **New York's antidiscrimination law does not disfavor religion.**

Without any basis, Plaintiff alleges that New York's public accommodations law disfavors religious as compared to secular conduct. In fact, the opposite is true. Because religion is a protected characteristic under the very laws that Plaintiff challenges here, both DHR and the

OAG have advocated for religious rights and repeatedly acted to protect New Yorkers from discrimination on the basis of creed. *See* Clarke Decl. ¶¶ 11–13; Smith Decl. ¶¶ 27–37.

Thus, Plaintiff herself would be protected if, for example, a vendor was to refuse to serve her based on disagreement with her religion.

Contrary to Plaintiff's unsupported allegations, DHR has never excused discrimination in public accommodations based on secular justifications. In the two cases Plaintiff cites, D.E. 1 ¶ 291, DHR determined that *no discrimination had taken place*—not that discrimination was justified for secular reasons. *See Morgan v. Zaharo Cab Corp.*, No. 1011788, at 3–5 (DHR July 2, 2014) (concluding driver never saw claimant and thus had no way of knowing her race or faith), attached as Smith Decl. Ex. K; *Battaglia v. Buffalo Niagara Intro., Inc.*, No. 10138581, at 5–6 (DHR Jan. 28, 2012) (concluding dating company had rejected applicant because he lied on his application form, not due to his disability), attached as Smith Decl. Ex. L. These cases stand in stark contrast to the single example Plaintiff found of sexual orientation discrimination enforcement, where a wedding venue's owners had a blanket policy of denying service to same-sex couples. D.E. 1 ¶¶ 214, 290; *see also Gifford v. McCarthy*, 137 A.D.3d 30, 37 (3d Dep't 2016).

Nor does the bona fide occupational qualification, or "BFOQ" defense, constitute a public accommodations exemption available for secular but not religious reasons. The BFOQ defense prevents penalizing an *employer* for not hiring a person who is incapable of performing the job.[5] Simply put, the law does not recognize a bona fide *occupational* qualification for a *customer*—the exemption is *only* for an employee based on the nature of the job sought.

---

[5] *See, e.g.*, Smith Decl, Ex. I (finding that sex was a BFOQ for the position of monitoring a boys' bathroom because of its deplorable condition, the need for unannounced inspections, and the resultant embarrassment if this monitoring were performed by a female).

Plaintiff's other attempts to compare exemptions in employment and housing, *see* D.E. 1 ¶ 314, are similarly inapplicable to her stated desired to discriminate against potential clients in her place of public accommodation. *See* N.Y. Exec. Law §§ 296(3)(b) (limited disability exemption if employer shows "undue burden" based on three-factor test), 296(10)(a) (limited religious accommodation exemption for employers who can show "undue hardship" after engaging in "bona fide effort" to accommodate), 296(5)(a) (allowing owners to rent rooms to members of same sex); *see also* Smith Decl. Ex. A.

The sole exemption Plaintiff identifies in the public accommodations provision of the Human Rights Law permits a business to bar a person because of *sex* from a *place* of public accommodation based on "bona fide considerations of public policy" (such as preventing sexual assault). NY Exec. Law § 296(2)(b). It does not allow a secular business to withhold *services* because of *sexual orientation*. The law does not provide an exemption for sexual orientation discrimination on any basis, and the State Defendants have never permitted one.

In fact, rather than being denied exemptions available to secular entities, religious institutions or organizations do have an exemption available to them when providing public accommodations. The law expressly provides that "[n]othing contained in this section shall be construed to bar any religious or denominational institution or organization or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting … admission to or giving preference to persons of the same religion or denomination or from taking such action as is calculated by such organization to promote the religious principles for which it is established or maintained." N.Y. Exec. Law § 296(11). Although the Legislature did not intend for this exemption to apply to for-profit photography companies like Plaintiff's, this makes clear that the law does not favor secular

interests at the expense of religious ones.

Similarly, the Legislature protected the religious rights of the clergy by maintaining an exemption related to services provided at same-sex weddings. *See* D.E. 1 ¶ 316; NY Dom. Rel. Law § 10-b. Under that exemption, a religious order may decline to celebrate weddings that do not reflect its religion or denomination. NY Dom. Rel. Law § 10-b. But the Legislature drew the line at clergy, and the exemption does not apply to for-profit businesses like Plaintiff's. Plaintiff does not operate a church or provide religious services; she takes photos of customers' weddings for hire. As the Supreme Court explained, religious exemptions like New York's properly respect *the clergy's* religious exercise but must be confined to religious orders or else "a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws." *Masterpiece Cakeshop*, 138 S.Ct. at 1727.

**D.    The "hybrid rights" doctrine is not recognized in the Second Circuit.**

Plaintiff concedes that the "hybrid rights" doctrine is not recognized in the Second Circuit. *See* D.E. 3-1 at 21–22; *Leebaert v. Harrington*, 332 F.3d 134, 143–44 (2d Cir. 2003). Plaintiff's claim under this theory therefore cannot justify an injunction.

<strong>CONCLUSION</strong>

Plaintiff cannot show a likelihood of success on the merits, and the balance of equities weighs against granting a preliminary injunction. The motion should be denied.

Dated: June 16, 2021                       LETITIA JAMES
                                           Attorney General for the State of New York
                                           *Attorney for State Defendants*

                                           s/ Heather L. McKay
                                           HEATHER L. MCKAY
                                           Assistant Attorney General of Counsel
                                           NYS Office of the Attorney General
                                           144 Exchange Boulevard, Suite 200

Rochester, New York 14614
Telephone: (585) 546-7430
heather.mckay@ag.ny.gov