**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography** and **Emilee Carpenter**,<br><br>              Plaintiffs,<br><br>    v.<br><br>**Letitia James**, in her official capacity as Attorney General of New York; **Jonathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,<br>              Defendants. | Case No. 6:21-CV-06303<br><br>PROPOSED<br>AMICUS CURIAE BRIEF |

## <u>INTRODUCTION</u>

This brief first argues that New York misapplied its antidiscrimination statute, a misstep partly caused by New York's misinterpretation of *Obergefell v. Hodges*. New York is part of a larger national trend in which authorities are using antidiscrimination statutes as swords to punish already marginalized people (such as supporters of the conjugal understanding of marriage), rather than as shields to protect people from unjust discrimination (such as African Americans in the wake of Jim Crow and today). Second, this brief argues that support for marriage as the union of husband and wife is essentially different from opposition to interracial marriage, and that the status of African Americans is importantly different from that of Americans who identify as gay. As a result, First Amendment protections for people who act on the belief that marriage unites husband and wife differ in critical ways from hypothesized First Amendment protections for racists—and the courts can distinguish the two cases. Third and finally, this brief argues that protections for citizens who support the conjugal understanding of marriage bear much more similarity to protections for pro-life citizens. Just as

protections for pro-life citizens have not been deemed "discriminatory" on the basis of sex or otherwise anti-woman because pro-life medicine isn't sexist, so too should pro-conjugal marriage actions be treated as non-discriminatory because such actions aren't anti-gay.

In *Obergefell v. Hodges*, the Supreme Court correctly noted that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here."[1] At stake in this case is whether these people and their decent and honorable beliefs may, consistent with the protections of the U.S. Constitution, be so disparaged by state governments. Advocates argue that, if the Court finds a First Amendment right to decline to use one's artistic talents to photograph a same-sex wedding, then the Court would also have to protect a photographer's choice to refuse to photograph an interracial wedding.

But no such conclusion follows.

Opposition to interracial marriage developed as one aspect of a larger system of racism and white supremacy. Such opposition is an outlier from the historic understanding and practice of marriage, founded not on decent and honorable premises but on bigotry. By contrast, support for marriage as the conjugal union of husband and wife has been a human universal until just recently, regardless of views about sexual orientation. That view of marriage is based on the capacity that a man and a woman possess to unite in a conjugal act, create new life, and unite that new life with both a mother and a father. Whether ultimately sound or not, this view of marriage is reasonable, is based on decent and honorable premises, and disparages no one.

Exemptions from laws banning discrimination on the basis of race run the risk of

---

[1] 135 S. Ct. 2584, 2602 (2015).

undermining the valid purposes of those laws—such as eliminating the public effects of racist bigotry—by perpetuating the myth that blacks are inferior to whites. This myth contributes to a culture where the badges and incidents of slavery persist, as African-Americans continue to confront a host of disadvantages. But First Amendment protections for people who act in accordance with the conjugal understanding of marriage need not undermine the valid purposes of laws that ban discrimination on the basis of sexual orientation—such as eliminating the public effects of anti-gay bigotry—because support for conjugal marriage isn't anti-gay. A ruling in favor of Emilee Carpenter sends no message about the supposed inferiority of people who identify as gay—indeed, it sends no message about them or their sexual orientations at all. It would simply say that citizens who support the historic understanding of marriage are not bigots, and that the state may not drive them out of business or civic life. Such a ruling doesn't threaten the social status of people who identify as gay or their community's profound and still-growing political influence.

A better comparison for this case is to laws that ban discrimination on the basis of sex. If a state applied such a law in a way that forced a Catholic hospital to perform abortions or forced a crisis pregnancy center to advertise abortion, a ruling by the Supreme Court in favor of a right to not perform or promote abortion would not undermine the valid purposes of a sex nondiscrimination policy—such as eliminating the public effects of sexism—because pro- life medicine isn't sexist. Pro-life convictions need not flow from or communicate hostility to women. A ruling in favor of a pro-life citizen sends no message about patriarchy or female subordination; it says simply that pro-life citizens are not bigots and that the state may not exclude them from public life. A ruling to protect the liberties of citizens who support a conjugal understanding of marriage would do the same for those citizens.

But a District Court ruling against Carpenter would tar citizens who support the conjugal understanding of marriage with the charge of bigotry. The court's refusal to grant First Amendment protections to Carpenter would teach that her reasonable convictions and associated conduct are so gravely unjust that they cannot be tolerated in a pluralistic society. If *Obergefell* was about respecting the freedom of people who identify as gay to live as they wish, then Americans who believe in the conjugal understanding of marriage should enjoy that same freedom. No doubt many people oppose Carpenter's beliefs. But, as the Supreme Court noted in *Obergefell*, when that "personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied."[2] The District Court should not allow New York to so demean and stigmatize supporters of conjugal marriage. It should not allow the state to "punish the wicked."[3]

In short, pro-life conscience protections do not undermine *Roe v. Wade* or women's equality.[4] Neither do conscience protections for conjugal marriage supporters undermine *Obergefell* or gay equality.[5] By contrast, conscience protections for opponents of interracial marriage could undermine the purposes of *Loving v. Virginia, Brown v. Board of Education*, and the Civil Rights Act of 1964: racial equality.[6]

## I. SHIELDS OR SWORDS? THE USES AND ABUSES OF ANTIDISCRIMINATION LAW: IMPOSING SEXUAL ORTHODOXY

---

[2] *Id.*

[3] *See* Tim Gill, Andy Kroll, *Meet the Megadonor Behind the LGBTQ Rights Movement*, Rolling Stone (June 23, 2017), http://www.rollingstone.com/politics/features/meet-tim-gill-megadonor-behind- lgbtq-rights-movement-wins-w489213 [https://perma.cc/8E9G-4BSS].

[4] *See* 410 U.S. 113 (1973).

[5] *See* 135 S. Ct. at 2602.

[6] *See* 78 Stat. 241 (1964); 388 U.S. 1 (1967); Brown v. Bd. of Educ., 347 U.S. 483 (1954), *supplemented sub nom.* Brown v. Bd. of Educ., 349 U.S. 294 (1955).

States can avoid First Amendment showdowns by refusing to classify support for traditional marriage as "discrimination." The Supreme Court stated in its majority opinion in *Obergefell* that belief in marriage as the union of husband and wife is held "in good faith by reasonable and sincere people here and throughout the world."[7] It noted that "many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here."[8] The states should not disparage these people and their decent and honorable beliefs, either.

A big part of the problem is that sexual-orientation antidiscrimination laws are now being used to "punish the wicked," in the words of Tim Gill, their biggest financial backer (to the tune of $500 million).[9] But antidiscrimination policies should serve as shields, not swords. These laws are meant to shield people from unjust discrimination that might prevent them from flourishing in society, not to punish people for acting on reasonable beliefs.

We apply other antidiscrimination statutes in a more fair and nuanced way. Bans on religion-based discrimination are not used to force secular organizations to violate their beliefs. Religious antidiscrimination policies have not been used, for example, to force Planned Parenthood to hire pro-life Catholics. Religion antidiscrimination laws simply do not seek to impose *religious* orthodoxy on the country.

But sexual orientation and gender identity (SOGI) antidiscrimination policies *are* used to impose *sexual* orthodoxy. They're used to try to force Catholic schools to employ people who undermine the schools' sexual values and to coerce Christian photographers to lend their artistic talents to messages about marriage with which they disagree. SOGI laws are used to

---

[7] 135 S. Ct. at 2594.
[8] *Id.* at 2602.
[9] *See* Kroll, *supra* note 4.

punish people of good will who simply seek the freedom to lead their lives in accordance with their beliefs about human sexuality.

But this is a mistake. Discrimination in the broad sense is simply the making of distinctions. It's a necessity of life. Discrimination in the familiar moralized sense, however, involves mistreatment based on irrelevant factors. For clarity, this brief uses "distinguish" to mean conduct neutrally, and "discriminate" to mean wrongful distinctions. We distinguish or discriminate based on X when we take X as a reason for treating someone differently. We "distinguish" based on relevant factors—as when we require recipients of driver's licenses to be able to see. We "discriminate" based on *irrelevant* factors—as when many states once required voters to be white.[10] Of course, there might be some traits on which we both distinguish and discriminate, and disentangling the two can take work: We distinguish on the basis of sex when we have separate male and female bathrooms; we discriminate on the basis of sex when we say men should take economics and women take home economics in high school.[11]

Invidious discrimination is rooted in unfair, socially debilitating attitudes or ideas about individuals' worth, proper social status, abilities, or actions. Bans on interracial marriage were paradigms of invidious discrimination.[12] They were based on beliefs about African Americans, especially their supposed incompetence and threat to whites (especially women). A photographer refusing to photograph an interracial wedding discriminates invidiously on the basis of race. He takes that factor—race—into consideration where it is irrelevant and mistreats people on that basis, and thus his behavior serves to perpetuate myths about African Americans

---

[10] *See* John Corvino, Ryan T. Anderson & Sherif Girgis, Debating Religious Liberty and Discrimination 163–168 (2017).

[11] *See, e.g.*, 45 C.F.R. §§ 618.405, 618.410 (2017) (implementing Title IX).

[12] *See* Loving v. Virginia, 388 U.S. 1 (1967).

that are unfair and socially debilitating.

Emilee Carpenter, by contrast, doesn't discriminate—nor does she even distinguish—on the basis of sexual orientation. Rather, she refuses to photograph a same-sex wedding because she objects to same-sex marriage, based on her common Christian belief that a same-sex wedding isn't marital (along with many other relationships—e.g., sexual and not, dyadic and larger, same- and opposite-sex).[13] Nowhere need Carpenter's reasoning even refer to the partners' sexual orientation—or any ideas or attitudes about gay people, good or bad, explicit or implicit.

Some people's refusals to photograph same-sex weddings might be ill-motivated. However, as Section 3 demonstrates, it's unfair to assume that actions based on the conjugal understanding of marriage are premised on ideas hostile to people who identify as gay. Indeed, refusals to photograph same-sex wedding celebrations needn't be based on beliefs or attitudes about people who identify as gay at all, good or bad. Though such actions might have disparate impact, they need not discriminate *or distinguish* on the basis of sexual orientation.

That convictions about marriage (and parenting) need not be based on convictions about sexual orientation is seen most clearly in the case of Catholic Charities adoption agencies. They decline to place the children entrusted to their care with same-sex couples—not because of the individuals' sexual orientations, but because of the agencies' conviction that children deserve both a mother and a father. These agencies believe that men and women are not interchangeable, that mothers and fathers are not replaceable, that the two best dads in the world cannot make up for a missing mom, and that the two best moms in the world cannot

---

[13] *See* 3 John Finnis, Human Rights and Common Good: Collected Essays 315–388 (2011); John Witte Jr., From Sacrament to Contract: Marriage, Religion, and Law in the Western Tradition (2d ed. 2012); Scott Yenor, Family Politics: The Idea of Marriage in Modern Political Thought (2011).

make up for a missing dad. These beliefs have nothing to do with sexual orientation.[14] Catholic Charities does not say that people who identify as gay cannot love or care for children; it does not consider sexual orientation *at all*. Its preference for placing children with mothers and fathers is not an instance of discrimination based on sexual orientation.[15]

Therefore, affirming Carpenter's First Amendment rights here would not undermine any of the valid purposes of the state's sexual orientation nondiscrimination law. By contrast, an exemption from such a law for a hospital that refused to perform chemotherapy because the patient identified as gay could undermine the valid purpose of such a law—as could an exemption for Emilee Carpenter had she refused to create business branding photographs for customers who identify as gay. When the underlying act discriminates on the basis of sexual orientation per se, and has no root in "decent and honorable" beliefs, an exemption could, like exemptions in the cases of racism, send the signal that citizens who identify as gay count as less than other citizens. But acting in accordance with the conviction that marriage is the union of husband and wife sends no such message.

## II. THE CONTEXT OF RACE-BASED REFUSALS

Comparisons to a case involving a hypothetical racist go wrong right from the start because social context matters for claims of discrimination, and the social contexts for these two cases are profoundly different. Emilee Carpenter has always served all customers—black and white, gay and straight—but has had to turn down certain orders because of the nature of the occasion being celebrated and the message she'd be forced to communicate. By contrast, photographers who declined to photograph interracial weddings also declined to treat African

---

[14] *See* RYAN T. ANDERSON, TRUTH OVERRULED: THE FUTURE OF MARRIAGE AND RELIGIOUS FREEDOM (2015); SHERIF GIRGIS, RYAN T. ANDERSON & ROBERT P. GEORGE, WHAT IS MARRIAGE? MAN AND WOMAN: A DEFENSE (2012).
[15] *See* CORVINO, ANDERSON & GIRGIS, *supra* note 13.

Americans equally in a host of circumstances: They refused to serve them at all. Racists did not

and do not simply object to interracial marriage; they objected and object to contact with

African Americans on an equal footing.

    History makes this fact clear. Before the Civil War, a dehumanizing regime of race-

based chattel slavery existed in many states. After abolition, Jim Crow laws enforced race-

based segregation. Those laws mandated the separation of blacks from whites, preventing them

from associating or contracting with one another. Even after the Court struck down Jim Crow

laws, integration did not come easily or willingly in many instances. Public policy, therefore,

sought to eliminate racial discrimination even when committed by private actors on private

property.

    Before the enactment of the Civil Rights Act of 1964, racial segregation was rampant

and entrenched, and African Americans were treated as second-class citizens. Individuals,

businesses, and associations across the country excluded blacks in ways that caused grave

material and social harms without justification, without market forces acting as a corrective,

and with the government's tacit and often explicit backing. As the NAACP points out in its

brief filed with the Colorado Court of Appeals in the *Masterpiece* case:

> African Americans were relegated to second-class citizenship by a system of laws,
> ordinances, and customs that segregated white and African-American people in
> every possible area of life, including places of public accommodation. This system
> of segregation was designed to prevent African Americans from breaking the racial
> hierarchy established during slavery.[16]

    African Americans were denied loans, kept out of decent homes, and denied job

opportunities—except as servants, janitors, and manual laborers. These material harms both

---

[16] Brief of NAACP Legal Defense & Educational Fund, Inc., as Amici Curiae Supporting Appel- lees, Charlie Craig v. Masterpiece Cakeshop, Inc. et al, No. 2014CA135 (Colo. App. Ct. Feb. 17, 2015), https://www.aclu.org/sites/default/files/field_document/0007-2015-02-17_09-05-34_2015.02.13_ldf_ amicus_brief_as_filed.pdf [https://perma.cc/EHE8-3Y7D].

built on and fortified the social harms of a culture corrupted by views of white supremacy that treated blacks as less intelligent, less skilled, and in some respects less human. Making it harder for blacks and whites to mingle on equal terms was not just incidental: It was the whole point. Discrimination was so pervasive that the risks of lost economic opportunities or sullied reputation were nonexistent to those who engaged in it. Social and market forces, instead of punishing discrimination, rewarded it through the collusion of many whites, with a heavy assist from the state. Given the irrelevance of race to almost any transaction, and given the widespread and flagrant racial animus of the time, no claims of benign motives are plausible.[17]

The context of Carpenter's case could not be more different. There is no heterosexual-supremacist movement akin to the movement for white supremacy. There has never been an equivalent of Jim Crow for people who identify as gay. There are no denials of their right to vote, no lynching campaigns, no signs over water fountains saying "Gay" and "Straight." This is not to deny that those identified as gay have experienced bigotry or that they still do. Anti-gay bigotry exists. As with other forms of mistreatment, our communities must fight it. But Carpenter's conduct is not an instance of bigotry, as explained below, and the actual instances of anti-gay bigotry that remain simply cannot be compared to the systematic material and social harms wrought by racism. As a result, enforcing Carpenter's First Amendment rights would undermine neither the social standing of people who identify as gay, nor the valid purposes of a sexual orientation nondiscrimination policy.

## III. OPPOSITION TO INTERRACIAL MARRIAGE WAS PART OF A RACIST SYSTEM; SUPPORT FOR CONJUGAL MARRIAGE IS NOT ANTI- ANYTHING

Bans on interracial marriage were the exception in world history. They have existed

---

[17] *See* CORVINO, ANDERSON & GIRGIS, *supra* note 13, at 162–184.

*only* in societies with a race-based caste system, in connection with race-based slavery. Opposition to interracial marriage was based on racism and belief in white supremacy, and thus contributed to a dehumanizing system treating African Americans first as property and later as second-class citizens.

The understanding of marriage as the union of a man and a woman, on the other hand, has been the norm throughout human history, shared by the great thinkers and religions of both East and West, and by cultures with a wide variety of viewpoints about homosexuality. Likewise, many religions reasonably teach that human beings are created male and female, and that male and female are created for each other in marriage.[18] Nothing even remotely similar is true of race and legally enforced racial separation.

Interracial marriage bans were unknown to history until colonial America. English common law, which the U.S. inherited, imposed no barriers to interracial marriage.[19] Anti-miscegenation statutes, which first appeared in Maryland in 1661, were the result of African slavery.[20] Since then, they've existed *only* in societies with a race-based caste system. Thus, Harvard historian Nancy Cott observes:

> It is important to retrieve the singularity of the racial basis for these laws. Ever since ancient Rome, class-stratified and estate-based societies had instituted laws against intermarriage between individuals of unequal social or civil status, with the aim of preserving the integrity of the ruling class.  But the English colonies stand out as the first secular authorities to nullify and criminalize intermarriage on the basis of race or color designations.[21]

This history shows that anti-miscegenation laws were part of an effort to hold a race of

---

[18] *See* ANDERSON, *supra* note 18; GIRGIS, ANDERSON & GEORGE, *supra* note 18.
[19] Irving G. Tragen, *Statutory Prohibitions against Interracial Marriage*, 32 CAL. L. REV. 269 (1944); *see also* Francis Beckwith, *Interracial Marriage and Same-Sex Marriage*, PUB. DISCOURSE (May 21, 2010), http://www.thepublicdiscourse.com/2010/05/1324/./ [https://perma.cc/F9C7-PTCX].
[20] Beckwith, *supra* note 24.
[21] NANCY F. COTT, PUBLIC VOWS: A HISTORY OF MARRIAGE AND THE NATION 483 (2000).

people in a condition of economic and political inferiority and servitude. They were openly premised on the idea that contact with African Americans on an equal plane was wrong. That idea, and its basic premises in the supposed inferiority of African Americans, is the essence of bigotry. Actions based on such bigotry contribute to the wider culture of dehumanization and subordination that antidiscrimination law is justly aimed to combat.

The convictions behind Emilee Carpenter's conscience claims could not form a sharper contrast with the rationale of racism. Her conviction about marriage has been present throughout human history. As one historian observes: "Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies. Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature."[22]

Great thinkers, too, affirm the special value of male-female unions as the foundations of family life. Plato wrote favorably of legislating to have people "couple[], male and female, and lovingly pair together, and live the rest of their lives" together.[23] Plutarch wrote of marriage as "a union of life between man and woman for the delights of love and the begetting of children."[24] He considered marriage a distinct form of friendship embodied in the "physical union" of intercourse.[25] For Musonius Rufus, the first-century Roman Stoic, a "husband and wife" should "come together for the purpose of making a life in common and of procreating children, and furthermore of regarding all things in common between them even their own bodies."[26]

---

[22] G. ROBINA QUALE, A HISTORY OF MARRIAGE SYSTEMS 2 (1988).

[23] 4 PLATO, THE DIALOGUES OF PLATO 407 (Benjamin Jowett trans. & ed., Oxford Univ. 1953) (c. 360 B.C.).

[24] Plutarch, *Life of Solon, in* 20 PLUTARCH'S LIVES 4 (Loeb ed. 1961) (c. 100 A.D.).

[25] Plutarch, *Erotikas, in* 20 PLUTARCH'S LIVES 769 (Loeb ed. 1961) (c. 100 A.D.).

[26] Musonius Rufus, *Discourses XIIIA, in* CORA E. LUTZ, MUSONIUS RUFUS "THE ROMAN SOCRATES" (Yale Univ. Press 1947), *available at* https://sites.google.com/site/thestoiclife/the_teachers/musonius-rufus/lectures/13-0 [https://perma.cc/VU9D-JVE3].

Not one of these thinkers was Jewish or Christian or in contact with Abrahamic religion. Nor were they ignorant of same-sex sexual relations, which were common in their societies. These thinkers were not motivated by sectarian religious concerns, ignorance, or hostility of any type toward anyone. They and other great thinkers—of both East and West, from Augustine and Aquinas, Maimonides and al-Farabi, and Luther and Calvin, to Locke and Kant, Confucius, Gandhi and Martin Luther King—held the honest and reasoned conviction that male-female sexual bonds had distinctive value for individuals and society.

To note this history is not merely to say something about the past but to shed light on the present. Today's beliefs about conjugal marriage aren't isolated. They grew organically out of millennia-old religious and moral traditions that taught the distinct value of male-female union; of mothers and fathers; of joining man and woman as one flesh, and generations as one family.[27] Whether those principles are ultimately sound or unsound, they continue to provide intelligible reasons to affirm conjugal marriage that have nothing to do with animus.

Emilee Carpenter and many other citizens today are shaped by, and find guidance and motivation in, those traditions—be it the classical Western legal-philosophical traditions stretching from Plato to our day, or the Jewish or Christian or Muslim traditions. History demonstrates that these intellectual streams do not have bigotry as their source. It is therefore unfair to assume that the citizens they nourish are bigots. Thus, a First Amendment ruling in favor of believers in conjugal marriage need not send any negative social message about anyone. The only message sent in protections for such citizens is that Americans of good will reasonably disagree about marriage, whereas the message sent in opposition to interracial marriage is that one group of citizens is inferior to another.

---

[27] *See* Girgis, Anderson & George, *supra* note 18; Anderson, *supra* note 18.

Some critics say that, while it might have been possible for Aristotle, Kant, or Gandhi to hold such views without animus, it isn't for us—knowing what we do now about sexuality. Not so. These traditions teach that there is distinct value in the one-flesh union that only man and woman can form, and in the kinship ties that such union offers children. Those ideals don't hang precariously on empirical assumptions about sexual orientation. Nor does the recent trend toward a more flexible marriage-as-simple-companionship model make it irrational to continue to affirm these ideals.

No doubt bigotry motivates some traditionalists. But not Carpenter. It would be unfair to punish her and similar professionals who believe in conjugal marriage. After all, as George Chauncey and other historians of the LGBT experience, who submitted their research to advance gay rights litigation, noted, "widespread discrimination" based on "homosexual status developed only in the twentieth century and peaked from the 1930s to the 1960s."[28] Bigotry is not the reasonable, much less the most natural, motive to read into Phillips' decision to decline a custom cake order. And ruling in his favor would not have negative social costs, as the next sections explain.

## IV. THE SOCIAL COSTS OF PROTECTIONS FOR RACISTS

Exemptions from laws banning discrimination on the basis of race run the risk of undermining the valid purposes of those laws—such as eliminating the public effects of racist bigotry—by perpetuating the myth that blacks are inferior to whites. Indeed, actions based on religious beliefs justifying white supremacy were part of the racism that the laws were meant to combat. The NAACP brief mentioned above notes the "religious arguments justifying slavery,

---

[28] Brief for Professors of History George Chauncey, Nancy F. Cott et al., as Amici Curiae Supporting Petitioners, Lawrence v. Texas, 539 U.S. 558 (2003) (No. 02-102), http://cdm16035. contentdm.oclc.org/cdm/ref/collection/p16035coll2/id/23; [https://perma.cc/3QKF-MN6E]; *see also* GEORGE CHAUNCEY, GAY NEW YORK: GENDER, URBAN CULTURE, AND THE MAKING OF THE GAY MALE WORLD, 1890–1940 173, 337 (1994).

defending Jim Crow segregation, implementing anti-miscegenation laws, and, of course, supporting laws and practices that denied African Americans the full and equal enjoyment of places of public accommodation."[29] The purpose of such practices was to retain the wicked system of white supremacy: "Proprietors unwilling to serve African-American customers relied on religious arguments that validated fears of racial integration."[30] As the NAACP notes, "[t]hese laws, policies, and customs were designed to dehumanize African Americans and maintain the racial hierarchy established during the time of slavery."[31] The Vice President of the Confederate States of America exemplified the way in which religion was perverted to justify racism and slavery:

> With us, all of the white race, however high or low, rich or poor, are equal in the eye of the law. Not so with the negro. Subordination is his place. He, by nature, or by the curse against Canaan, is fitted for that condition which he occupies in our system. It is, indeed, in conformity with the ordinance of the Creator.[32]

This belief system was geared precisely to racial subordination. We should not minimize how pervasive and destructive white supremacy was, and is. Dr. Martin Luther King, Jr., in his *Letter from a Birmingham Jail*, aptly highlighted the overarching purpose of segregation and racial discrimination:

> [W]hen you suddenly find your tongue twisted and your speech stammering as you seek to explain to your six year old daughter why she can't go to the public amusement park that has just been advertised on television, and see tears welling up in her eyes when she is told that Funtown is closed to colored children, and see ominous clouds of inferiority beginning to form in her little mental sky, and see her beginning to distort her personality by developing an unconscious bitterness toward white people; when you have to concoct an answer for a five year old son who is asking: "Daddy, why do white people treat colored people so mean?"; when you take a cross county drive and find it necessary to sleep night after night in the

---

[29] Brief of NAACP Legal Defense & Educational Fund, Inc., *supra* note 21, at 4.
[30] *Id.*
[31] *Id.* at 6.
[32] Alexander H. Stephens, Corner Stone Speech (Mar. 21, 1861), *available at* http://teachingamericanhistory.org/library/document/cornerstone-speech [https://perma.cc/X4HV-ZTHL].

uncomfortable corners of your automobile because no motel will accept you; when you are humiliated day in and day out by nagging signs reading "white" and "colored"; when your first name becomes "nigger," your middle name becomes "boy" (however old you are) and your last name becomes "John," and your wife and mother are never given the respected title "Mrs."; when you are harried by day and haunted by night by the fact that you are a Negro, living constantly at tiptoe stance, never quite knowing what to expect next, and are plagued with inner fears and outer resentments.[33]

These are the realities that laws banning discrimination on the basis of race were meant to combat. And combatting racial discrimination is a compelling government interest pursued in narrowly tailored ways. As the Supreme Court noted in *Burwell v. Hobby Lobby Stores, Inc.*, "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."[34] What the Court said regarding employment law could also apply to public accommodations law. An exemption to a law prohibiting racial discrimination in public accommodations could undermine the purpose of that law by sending the message that intentional racism is protected conduct. In sending that message, such an exemption would amplify existing messages that say African Americans count for less, are subhuman, and may be treated as such. In doing so, it increases the odds that people engage in deplorable acts based on notions of white supremacy.

Therefore, comparing First Amendment protections for Carpenter to protections for a racist ignores the differing social context and how that context shapes the relevant legal analysis. For not only are the acts of the racist and of Carpenter different, so too are the messages that rulings in favor of each would send—and the harms that those messages could contribute to.

---

[33] Martin Luther King, Jr., *Letter from a Birmingham Jail*, AFR. STUD. CTR.—UNIV. PA. (Apr. 16, 1963), https://www.africa.upenn.edu/Articles_Gen/Letter_Birmingham.html [https://perma.cc/K59G- M2D5].
[34] 134 S. Ct. 2751, 2783 (2014).

Moreover, these concerns about racist messages and ensuing material harms are by no means obsolete as sadly witnessed by recent events. Combatting racism is a compelling state interest given not just the history of government- endorsed white supremacy but also its current effects, the badges and incidents of slavery. Despite the progress made in combatting racism, African Americans continue to face both outright discrimination and systemic disadvantages.

The United States is still confronting racism and its effects. The persistence of the badges and incidents of slavery demonstrates the need for racial nondiscrimination laws and how exemptions from race nondiscrimination laws could undermine those laws' purpose by spreading the idea that African Americans are inferior and may be treated as such.

These important social and historical differences help explain why the Court could rule in favor of Carpenter but not in favor of a racist photographer. Combatting racism through a nondiscrimination statute that is applied without exemptions may be the least restrictive means of achieving compelling interests because any exemption could allow the cancer of racism to grow, spread the idea that African Americans are inferior, and thus cause the harms it was meant to combat.

**CONCLUSION**

The United States has reached compromises on similarly difficult moral and cultural issues before. Following *Roe v. Wade*, Americans refused to use sex antidiscrimination law as a sword to punish pro-lifers. In 1993, in *Bray v. Alexandria Women's Health Clinic*, the Supreme Court resolutely rejected the argument that pro-lifers are inherently discriminatory: "Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at

all concerning), women. ”[35]

The same is true when it comes to marriage as the union of husband and wife: there are common and respectable reasons for supporting it that have nothing to do with hatred or condescension. But this is not true when it comes to opposition to interracial marriage—and this is where the analogies to racism break down. When the Supreme Court struck down bans on interracial marriage, it did not say that opposition to interracial marriage was based on "decent and honorable premises" and held "in good faith by reasonable and sincere people here and throughout the world."[36] It did not say it, because it could not say it.

Opposition to interracial marriage developed as one aspect of a larger system of racism and white supremacy, as part of an effort to hold a race of people in a condition of economic and political inferiority and servitude. It was based on the idea that contact with African Americans on an equal plane is wrong.

That idea, and its premise of the supposed inferiority of African Americans, is the essence of bigotry. Photographers who declined to photograph interracial weddings also declined to treat African Americans equally in a host of circumstances. Racists did not simply object to interracial marriage; they objected to contact with African Americans on an equal footing.

By contrast, marriage as the union of husband and wife has been a universal human practice until just recently, regardless of views about sexual orientation. This vision of marriage is based on the capacity that a man and a woman possess to unite as one flesh, create new life, and unite that new life with both a mother and a father. Whether ultimately sound or not, this view of marriage is reasonable, based on decent and honorable premises, and

---

[35] 506 U.S. 263, 270 (1993).
[36] *Obergefell*, 135 S. Ct. at 2594.

disparaging of no one. A lack of disparagement also explains why photographers like Emilee Carpenter have been serving gay customers faithfully for years.

Sparing people such as Carpenter from the sword does not undermine the valid purposes of anti-discrimination law—eliminating the public effects of anti-gay bigotry— because support for conjugal marriage is not anti-gay. Protecting freedom here sends no message about the supposed inferiority of those identifying as gay; it sends no message about sexual orientation at all.

It does say that citizens who support the historic understanding of sex and marriage are not bigots. It ensures their equal social status and opportunities. It protects their businesses, livelihoods, and professional vocations. And it benefits the rest of society by allowing these citizens to continue offering their services, especially social services, charities, and schools.

Faithful professionals and the faith-based social services of any religion that believes we are created male and female, and that male and female are created for each other, are at stake. A line of questioning on the comparisons to interracial marriage brought up the case of Bob Jones University, a school that lost its nonprofit tax status because it prohibited interracial dating and marriage. But do we really want to live in a country where acting on a belief about marriage that people have held throughout all of recorded history—that it is a union of male and female—is treated as the functional and legal equivalent of racism?

All of us should work to prevent such an outcome. Which is why Carpenter need not have ended up in court. We must refuse to use antidiscrimination laws as swords to impose sexual orthodoxy on the nation. As Americans continue to disagree about sex, we must refuse to weaponize the redefinition of marriage. Anti-gay bigotry exists and should be condemned. But support for marriage as the union of husband and wife is not anti-gay. Just as we have

combated sexism without treating pro-life medicine as sexist, we can combat anti-gay bigotry without treating Orthodox Jews, Roman Catholics, Muslims, Evangelicals, and Latter-day Saints as bigots.

Professor Koppelman says that he has "worked very hard to create a regime in which it's safe to be gay" and for similar reasons "would also like that regime to be one that's safe for religious dissenters." Not every disagreement is discrimination. And our law should not say otherwise.

Dated: June 21, 2021

/s/ Philip J. Vecchio, Esq.
Philip J. Vecchio, P.C.
Attorney At Law
24 Huntswood Lane
East Greenbush, New York 12061
Email:  PVecchio@nycap.rr.com
Telephone: (518) 857-2897
Facsimile: (518) 479-4335
*Attorney for Amici Curiae: Frederick Douglass Foundation, Coalition of African American Pastors, The Restoration Project and Conservative Clergy of Color*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Emilee Carpenter, LLC d/b/a Emilee Carpenter Photography** and **Emilee Carpenter**,<br><br>                    Plaintiffs,<br><br>      v.<br><br>**Letitia James**, in her official capacity as Attorney General of New York; **Jonathan J. Smith**, in his official capacity as Interim Commissioner of the New York State Division of Human Rights; and **Weeden Wetmore**, in his official capacity as District Attorney of Chemung County,<br>                    Defendants. | Case No. 6:21-CV-06303 |

**Certificate of Service**

I certify that on June 21, 2021, I electronically filed the foregoing document with the

Clerk of Court by using the CM/ECF system and that all participants in the case are registered

CM/ECF users and will be served by the CM/ECF system.

/s/ Philip J. Vecchio, Esq.
Philip J. Vecchio, P.C.
Attorney At Law
24 Huntswood Lane
East Greenbush, New York 12061
Email:  PVecchio@nycap.rr.com
Telephone: (518) 857-2897
Facsimile: (518) 479-4335
*Attorney for Amici Curiae: Frederick Douglass Foundation, Coalition of African American Pastors, The Restoration Project and Conservative Clergy of Color*