# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK
### ROCHESTER DIVISION

EMILEE CARPENTER, LLC *doing business as*
EMILEE CARPENTER PHOTOGRAPHY and
EMILEE CARPENTER,

*Plaintiffs,*

v.

Case No. 6:21-cv-06303-FPG

LETICIA JAMES, *in her official capacity as*
*Attorney General of New York*, JOHNATHAN J.
SMITH, *in his official capacity as Interim*
*Commissioner of the New York State Division*
*of Human Rights*, and WEEDON WETMORE, *in*
*his official capacity as District Attorney of*
*Chemung County*,

*Defendants.*

---

**PROPOSED BRIEF OF RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE***
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

---

RICHARD B. KATSKEE*
KENNETH D. UPTON, JR.*
SARAH R. GOETZ*
   *Americans United for Separation of*
     *Church and State*
   *1310 L Street NW, Suite 200*
   *Washington, DC 20005*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *katskee@au.org*

FERNANDO SANTIAGO
   *Santiago Burger LLP*
   *2280 East Avenue, 2nd Floor*
   *Rochester, NY 14610*
   *(585)_563-2400*
   *(585) 563-7526 (fax)*
   *fernando@litgrp.com*

* *Pro hac vice application forthcoming.*

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ............................................................................................................. ii

Identity and Interests of *Amici Curiae* .............................................................................. 1

Introduction and Summary of Argument ............................................................................ 2

Argument ............................................................................................................................ 3

I.    The Religion Clauses Neither Require Nor Authorize The Exemption That
Plaintiffs Seek. .......................................................................................................... 3

    A.    The Religion Clauses do not require the requested exemption. ................... 4

        1.    The public-accommodations law evinces no hostility toward religion. .............. 4

        2.    The public-accommodations law does not coerce Carpenter to
participate in religious activity. .......................................................... 12

    B.    The Establishment Clause forbids the requested exemption. ..................... 13

II.    Antidiscrimination Laws Protect Religious Freedom ............................................ 17

Conclusion ....................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)................................................................................11

*Battaglia v. Buffalo Niagara Introductions, Inc.,*
  No. 10138581 (N.Y. Div. Hum. Rights Jan. 28, 2012) ...............................8

*Bostock v. Clayton County,*
  140 S. Ct. 1731 (2020)..............................................................................9

*Bray v. Alexandria Women's Health Clinic,*
  506 U.S. 263 (1993)................................................................................10

*Brown v. Bd. of Educ.,*
  347 U.S. 483 (1954)................................................................................16

*Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C.*
  *Dep't of Health & Mental Hygiene,*
  763 F.3d 183 (2d Cir. 2014)...................................................................5, 6

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010)................................................................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993).................................................................2, 4, 5, 6, 10

*Corp. of the Presiding Bishop v. Amos,*
  483 U.S. 327 (1987)................................................................................15

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
  492 U.S. 573 (1989)................................................................................12

*Cutter v. Wilkinson,*
  544 U.S. 709 (2005)...........................................................................13, 15

*Emp. Div. v. Smith,*
  494 U.S. 872 (1990)............................................................................4, 5, 6

*Epperson v. Arkansas,*
  393 U.S. 97 (1968)....................................................................................3

*Estate of Thornton v. Caldor, Inc.,*
  472 U.S. 703 (1985).........................................................................3, 13, 14

*Fatihah v. Neal,*
  No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016).............................19

*Fields v. City of Tulsa*,
 753 F.3d 1000 (10th Cir. 2014) ......................................................................13

*Fulton v. City of Philadelphia*,
 __ U.S. __, No. 19-123 (June 17, 2021) ..........................................5, 7, 9, 10, 11

*Heart of Atlanta Motel, Inc. v. United States*,
 379 U.S. 241 (1964).........................................................................11, 12, 16, 17

*Henderson v. Kennedy*,
 253 F.3d 12 (D.C. Cir. 2001) ........................................................................18

*Hernandez v. C.I.R.*,
 490 U.S. 680 (1989)........................................................................................5

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 565 U.S. 171 (2012)......................................................................................15

*Huri v. Office of the Chief Judge*,
 804 F.3d 826 (7th Cir. 2015) .......................................................................19

*Khedr v. IHOP Restaurants, LLC*,
 197 F. Supp. 3d 384 (D. Conn. 2016) ..........................................................19

*Lawrence v. Texas*,
 539 U.S. 558 (2003)......................................................................................10

*Lee v. Weisman*,
 505 U.S. 577 (1992)......................................................................................12

*Leebaert v. Harrington*,
 332 F.3d 134 (2d Cir. 2003)..........................................................................10

*Loving v. Virginia*,
 388 U.S. 1 (1967)..........................................................................................10

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
 485 U.S. 439 (1988)........................................................................................5

*Martineau v. Ghezzi*,
 389 F. Supp. 187 (N.D.N.Y. 1974) ................................................................9

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
 138 S. Ct. 1719 (2018)...................................................................10, 11, 15, 16

*McCreary County v. ACLU of Ky.*,
 545 U.S. 844 (2005)........................................................................................3

*McGowan v. Maryland*,
 366 U.S. 420 (1961)........................................................................................5

*Minnesota ex rel. McClure v. Sports & Health Club, Inc.*,
 370 N.W.2d 844 (Minn. 1985)......................................................................19

*Morgan v. Zaharo Cab Corp.*,
    No. 10117888 (N.Y. Div. Hum. Rights Nov. 14, 2008) ......................................................8

*Nappi v. Holland Christian Home Ass'n*,
    No. 11-cv-2832, 2015 WL 5023007 (D.N.J. Aug. 21, 2015) ...............................................19

*New Hope Family Servs., Inc. v. Poole*,
    966 F.3d 145 (2d Cir. 2020) ..................................................................................................4

*Newman v. Piggie Park Enters., Inc.*,
    390 U.S. 400 (1968) ..............................................................................................................18

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ..............................................................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) .....................................................................................................3, 15

*Paletz v. Adaya*,
    No. B247184, 2014 WL 7402324
    (Cal. Ct. App. Dec. 29, 2014) ...............................................................................................19

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) ..............................................................................................................14

*Reynolds v. United States*,
    98 U.S. 145 (1878) ..................................................................................................................4

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ..........................................................................................10, 11, 16, 17

*Romer v. Evans*,
    517 U.S. 620 (1996) ..............................................................................................................18

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ..............................................................................................................14

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ................................................................................................6

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ........................................................................................................5, 6

*Texas Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) .............................................................................................................14, 15

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) ..............................................................................................................12

*Turner v. Safley*,
    482 U.S. 78 (1987) ................................................................................................................10

*United States v. Lee*,
    455 U.S. 252 (1982) ...........................................................................................................6, 14

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972).................................................................................14

**Constitutions and Statutes**

U.S. Const. amend. I ............................................................................ *passim*

N.Y. Exec. Law § 292.9...............................................................................7

N.Y. Exec. Law § 296.1...............................................................................7

N.Y. Exec. Law § 296.2............................................................................2, 3

N.Y. Exec. Law § 296.5...............................................................................7

N.Y. Exec. Law § 296.11.............................................................................7

2002 N.Y. Sess. Laws A.1971......................................................................8

**Other Authorities**

James Madison, Memorial and Remonstrance Against Religious
   Assessments (1785), reprinted in *Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947).............................................................................14, 15

CHRISTY MALLORY ET AL., WILLIAMS INST., THE IMPACT OF STIGMA
   AND DISCRIMINATION AGAINST LGBT PEOPLE IN TEXAS (2017),
   https://bit.ly/2UtopRq ...............................................................................17

Brent Staples, *Traveling While Black: The Green Book's Black History*,
   N.Y. TIMES (Jan. 25, 2019), https://nyti.ms/3aaPiAB ...................................17

**IDENTITY AND INTERESTS OF *AMICI CURIAE***

*Amici* are religious and civil-rights organizations that are united in respecting the important but distinct roles of religion and government in our Nation. *Amici* represent diverse faiths and beliefs while sharing a commitment to ensuring that LGBTQ persons, and all people, remain free from officially sanctioned discrimination. When government grants religion-based exemptions from antidiscrimination laws, it favors the benefited religious beliefs over the religious beliefs, core values, and fundamental rights of others. The exemptions thus convey not only governmental preference for the benefited religion, but also official disregard toward other faiths and beliefs— including disfavor for the deep commitment of *amici* and their members to equal respect for and equal treatment of all people. The *amici* are:

- Americans United for Separation of Church and State.

- ADL (Anti-Defamation League).

- Bend the Arc: A Jewish Partnership for Justice.

- Central Conference of American Rabbis.

- Global Justice Institute, Metropolitan Community Churches.

- Hindu American Foundation.

- Men of Reform Judaism.

- Methodist Federation for Social Action.

- National Council of Jewish Women.

- New York Conference, United Church of Christ.

- Reconstructionist Rabbinical Association.

- Union for Reform Judaism.

- Women of Reform Judaism.

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York law requires that public accommodations serve all comers regardless of their sexual orientation. *See* N.Y. Exec. Law § 296.2(a). The law thus ensures that LGBTQ people do not suffer the stigma and degradation of discrimination when they seek to buy goods and services on the same terms as everyone else.

Because we live in a Nation that is defined by its religious pluralism, the many and varied beliefs among the citizenry make it inevitable that secular laws—including New York's public-accommodations law—will at times offend some people's religious sensibilities. The Supreme Court's Religion Clause jurisprudence specifically addresses those situations.

First of all, while religion and religious practices may not be specially disfavored, there is no Free Exercise Clause violation when a law that regulates conduct for valid secular purposes and in a nondiscriminatory manner incidentally burdens some religious exercise. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). Section 296.2 is just such a law. To protect the equal rights and equal dignity of all people, New York prohibits discrimination in places of public accommodation on the basis of "race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability or marital status," regardless of the motivation for the discrimination. To make good on that guarantee, including its protections against religious discrimination for all New Yorkers, businesses that open themselves to the public must provide equal service to members of those protected classes even if they would prefer not to, whether based on religious motivations or otherwise. As a matter of law, that requirement does not amount to a free-exercise violation.

Indeed, not only is there no free-exercise right to discriminate in the operation of public accommodations, but the Establishment Clause forbids it. For if in exempting religious exercise from general laws, government shifted material costs, burdens, or other harms to third parties, it

would impermissibly favor the benefited religion and its adherents over the beliefs, rights, and interests of nonbeneficiaries. *See, e.g.*, *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985). The religious exemption that Carpenter seeks would do exactly that, by elevating the business's religious views over the religious beliefs and equal civil rights of LGBTQ people.

Exempting businesses from the law so that they may refuse service to customers who do not conform to their religious views would undermine, not advance, religious freedom. As noted, § 296.2 prohibits not just sexual-orientation discrimination but also religious, racial, and other forms of invidious discrimination in public accommodations. A sweeping exemption for religiously motivated discrimination to permit Carpenter to deny equal service to same-sex couples would necessarily also permit businesses to deny service to people of the "wrong" religion—or race, or sex, or any other characteristic protected by the law. A ruling in Carpenter's favor would thus hamstring New York's ability to ensure that its citizens can live as equal members of the community regardless of faith or belief.

## ARGUMENT

## I.   THE RELIGION CLAUSES NEITHER REQUIRE NOR AUTHORIZE THE EXEMPTION THAT PLAINTIFFS SEEK.

The First Amendment's Religion Clauses work in tandem to safeguard religious freedom for all by barring both governmental favoritism and governmental antagonism toward religion. *See McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (Religion Clauses mandate "governmental neutrality" (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))). But the constitutional guarantee of religious freedom does not entitle anyone to "general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). The Free Exercise Clause is not, and never has been, a free pass to violate the law. Not only does that Clause not require an exemption here, but the Establishment Clause outright forbids it.

3

### A. The Religion Clauses do not require the requested exemption.

#### 1. *The public-accommodations law evinces no hostility toward religion.*

Though government cannot regulate a religious practice *because* it is religious (*see Lukumi*, 508 U.S. at 531–33), religion-based disagreement with the law does not excuse noncompliance. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, . . . permit[ting] every citizen to become a law unto himself." *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878)).

The Supreme Court has therefore held that laws that apply generally and are neutral with respect to religion need satisfy only rational-basis review, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. Strict scrutiny is reserved for laws that disfavor religion or a religious practice *because* it is religious. *Id.* at 531–32. New York's public-accommodations law does neither. Thus, Carpenter's religious motivations cannot excuse noncompliance, and the free-exercise claim fails as a matter of law.

*a.* The neutrality requirement means that a law must not "restrict practices because of their religious motivation." *Id*. at 533. Discriminatory intent may be apparent on the face of a law; or it may be revealed through the law's practical effects, as when legal requirements have been "gerrymandered with care to proscribe" religious conduct *qua* religious conduct. *See id.* at 533– 34, 542. But neutrality is not undermined just because a law *affects* a claimant's religious exercise. Rather, to trigger strict scrutiny the claimant must show that the state has targeted specific religious conduct for maltreatment. *See id.*; *New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 162–63 (2d Cir. 2020). General applicability is the closely related requirement that the state, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. It thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying state

interests. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *cf. Lukumi*, 508 U.S. at 543–44. Nor may the state establish "a mechanism for individualized exemptions" that would allow it to reject an exemption just because a person's conduct is religiously motivated. *Fulton v. City of Philadelphia*, __ U.S. __, No. 19-123, slip op. at 6 (June 17, 2021) (quoting *Smith*, 494 U.S. at 884).

*b.* New York's public-accommodations law is neutral and generally applicable. Far from "*purposefully* singl[ing] out religious conduct" for discriminatory treatment (*see Cent. Rabbinical Cong. of U.S. & Can. v. N.Y.C. Dep't of Health & Mental Hygiene*, 763 F.3d 183, 194 (2d Cir. 2014)), it bars discrimination in all places of public accommodation. A business's motivations for denying service, religious or otherwise, are immaterial. And Carpenter offers no evidence that the law was "specifically directed at . . . religious practice" (*id.* (quoting *Smith*, 494 U.S. at 878)). At most, it asserts that the public-accommodations law conflicts with its religious beliefs. But the fact that a law may affect some religiously motivated conduct is an unavoidable result of how law operates in a religiously diverse society. *Cf. Smith*, 494 U.S. at 888–89; *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988) ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires."). Such incidental effects do not amount to religious targeting or render a law non-neutral. *See Lukumi*, 508 U.S. at 533–34.

Accordingly, New York may enact and enforce laws when, as here, it acts on "a legitimate concern of government for reasons quite apart from [religious] discrimination." *Id.* at 535. That is true even if the law disproportionately affects some religious exercise.[1] *See, e.g., id.* at 531 (a law

---

[1] Nor does a law cease to be neutral just because some religious (or secular) beliefs are *un*affected by it. Incidental alignment of the state's secular aims with some people's beliefs does not amount to an unconstitutional religious preference any more than incidental disagreement does. *See Hernandez v. C.I.R.*, 490 U.S. 680, 696 (1989) ("[A] statute primarily having a secular effect does not violate the Establishment Clause merely because it 'happens to coincide . . . with the tenets of some or all religions.'" (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961))). Carpenter's

may be neutral and generally applicable "even if [it] has the incidental effect of burdening *a particular religious practice*" (emphasis added)). "The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009).

A free-exercise jurisprudence that instead treated neutral, generally applicable laws as impermissibly targeting religion whenever a religious individual or group happened to be affected (or felt more burdened than other groups) would "open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind," from drug laws to traffic laws. *See Smith*, 494 U.S. at 888–89. The Supreme Court has thus flatly rejected that approach: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)). So has the Second Circuit: "[A] state can determine that a certain harm should be prohibited generally, and a citizen is not, under the auspices of her religion, constitutionally entitled to an exemption." *Cent. Rabbinical Cong.*, 763 F.3d at 196.

Nor is the neutrality and general applicability of New York's public-accommodations law undermined by any asserted system of exemptions for secular activities (*cf.* Compl. ¶¶ 314–317; Mot. 21). As the Supreme Court recently clarified, a law may fail the requirements of neutrality and general applicability if it treats religious activity more harshly than some secular activities that equally undermine the underlying state interests. *See Tandon*, 141 S. Ct. at 1296. The law at issue in *Tandon*, for example, was not neutral and generally applicable because it

---

insistence that § 296.2 favors businesses with beliefs that do not call for discrimination against LGBTQ people (*see* Compl. ¶ 345) is irrelevant as a matter of law.

imposed more severe restrictions on religious gatherings to limit the transmission of COVID-19 than on secular gatherings that posed the same risk of spreading the virus. *Id.* at 1296–97. If § 296.2 prohibited religiously motivated denials of service but permitted nonreligious denials that equally undermined the law's purpose of promoting a fair and free marketplace and eradicating discrimination in public accommodations against LGBTQ people, heightened scrutiny would apply. But the statute does no such thing.

That the public-accommodations law does not encompass "private accommodations" (Compl. ¶ 314) is irrelevant. An entity that is "in its nature distinctly private" (N.Y. Exec. Law § 292.9) definitionally does not risk subjecting the citizens of New York to the stigma and degradation of being denied equal access to goods and services in the public marketplace.

Nor do purported carve-outs in *other* state antidiscrimination laws undermine the neutrality and general applicability of *this* law. *Contra* Compl. ¶ 314. Whether there might be statutory exceptions for employment (*e.g.*, N.Y. Exec. Law § 296.1), housing (*e.g.*, N.Y. Exec. Law § 296.5), or any other sphere is of no moment because the public-accommodations law regulates the particular relationship between businesses and customers to promote free and fair access to goods and services in the marketplace. The employer-employee relationship is different in kind and entails different considerations and governmental objectives, so it is governed by an entirely different suite of regulations. Section 296.11's special employment and housing provisions for religious organizations are immaterial for the same reasons. The pertinent legal question is whether the *challenged* law is neutral and generally applicable, not whether some *other* law falls short. Carpenter casts the State's antidiscrimination interests at too "high [a] level of generality" for the free-exercise analysis, contrary to Supreme Court mandate. *Cf. Fulton*, slip op. at 13–14. And

because "[a]ll laws are selective to some extent," that does not automatically defeat neutrality and general applicability. *See Lukumi*, 508 U.S. at 542–43.[2]

Though § 296.2(b) allows that "the division [may] grant[] an exemption based on bona fide considerations of public policy" for limiting access "because of the sex of [the] person," that does not create a system of exemptions that would entitle Carpenter to a religious exemption from the requirement to serve same-sex couples. As a matter of statutory interpretation under the canon *expressio unius est exclusio alterius*, the legislature's choice to enumerate "sex," "sexual orientation," "race," "creed," and the other characteristics as discrete, individually protected classes and to authorize exemptions solely with respect to the first of those signifies that exemptions are *not* available for the others. Had the legislature intended for the exemption to apply to sexual-orientation discrimination, it would have amended the text of § 296.2(b) accordingly when it added "sexual orientation" as a protected class. But it did not. *See* 2002 N.Y. Sess. Laws A.1971.

The possibility of exemptions from the bar on one category of discrimination does not trigger a right to a religious exemption from the *absolute* bans on *other* categories of discrimination, because since no one may be exempted from *those* prohibitions for nonreligious

---

[2] As for the two administrative proceedings to which Carpenter points (Compl. ¶ 291; Mot. 23), they simply do not involve exemptions from the public-accommodations law, religious or otherwise. Rather, the factfinders in both cases determined that the defendants had not denied service on the basis of protected characteristics. *See Morgan v. Zaharo Cab Corp.*, No. 10117888 (N.Y. Div. Hum. Rights Nov. 14, 2008) (no evidence that taxi driver was aware that complainant tried to enter cab, much less that driver knew complainant's race and religion and refused service because of them); *Battaglia v. Buffalo Niagara Introductions, Inc.*, No. 10138581 (N.Y. Div. Hum. Rights Jan. 28, 2012) (matchmaker refused service based on prospective client's refusal to share personal information, not his disability). In other words, the cases do not excuse violations of an otherwise-applicable antidiscrimination law but instead find that the law had not been violated in the first place. It's the difference between turning away customers seeking wedding-photography services because they are a same-sex couple (which the State bars to ensure equal access to goods and services in the marketplace), and turning away a couple because they want the photographer to travel across the country for the ceremony (which the law does not address).

reasons, there is no equal-treatment rationale for requiring religious exemptions from them either.[3] A legal requirement may cease to be generally applicable only if the state establishes a system of individualized exemptions from *that* requirement. *See Fulton*, slip op. at 5–6. (And even if the possibility of exemptions from the prohibition against sex-based discrimination had any bearing here, the requirement of a public-policy rationale is in no way parallel to the absolute discretion that compromised the antidiscrimination scheme in *Fulton*.[4])

New York seeks to eradicate discrimination by regulating all public accommodations equally and absolutely. Carpenter does not plausibly allege that the State has singled out for unfavorable treatment those that refuse service for religious reasons while allowing others to refuse service for nonreligious reasons. Neither does it plausibly allege that the State has in any other respect treated it worse than similarly situated covered entities. Nor does it identify any exemptions from the public-accommodations law that undermine the State's interests in eradicating sexual-orientation discrimination and promoting equal access to the marketplace in the way or to the

---

[3] That is so regardless of whether in other respects or as a general matter the meaning of "sex" encompasses sexual orientation or discrimination on the basis of sex encompasses sexual-orientation discrimination. *Cf., e.g.*, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739–43 (2020). The legislature plainly expressed its intention to treat sexual orientation like race, religion, and the other protected classes—not like sex—for purposes of the exemption power.

[4] The high bar that the public-policy requirement demands is in all events a far cry from the absolute discretion that gave rise to a right to a religious exemption in *Fulton*. The sole application of it that we have found was a determination that because of distinct licensure requirements for barbers (who are licensed to cut men's hair) and cosmetologists (who are licensed to cut women's hair), "a licensed [shop owner] must provide services to any person regardless of sex in the shop, provided the owner has licensed operators in each category to perform the services required by the patron." *Martineau v. Ghezzi*, 389 F. Supp. 187, 192 (N.D.N.Y. 1974). In other words, a limited exemption was created solely because two laws, both serving compelling interests (eradicating discrimination in public accommodations, on the one hand, and safeguarding citizens' health and safety, on the other) were incompatible in a particular circumstance. Shop owners could take the exemption only if they could not comply with both laws—i.e., if they were not licensed to serve both men and women. The exception was, moreover, merely a temporary one, to allow the state to resolve the conflict between the statutes. And even during that period, the State would continue to investigate and resolve violations of the public-accommodations law. *Id.*

degree that Carpenter's requested exemption would—or indeed at all. And there is no whiff of religious animus, either on the law's face or in its application. Neither *Lukumi*, nor *Tandon*, nor any other authority supports application of heightened scrutiny under these circumstances.[5]

    *c.* Because § 296.2 is neutral and generally applicable and evinces neither favoritism nor animus toward any religion, it is subject to rational-basis review only (*see Lukumi*, 508 U.S. at 531). And it more than satisfies that test: It serves not just a legitimate state interest but a compelling one, prohibiting invidious discrimination and its associated harmful effects in depriving New Yorkers of fair and free access to goods and services in the marketplace (*see Fulton*, slip op. at 14–15 (recognizing that "this [antidiscrimination] interest is a weighty one, for '[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth'" (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018))); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) ("[E]liminating discrimination and assuring its citizens equal access to publicly available goods and services . . . plainly serves compelling state interests of the highest order.")).[6] And it is not just

---

[5] Nor is heightened scrutiny triggered by adding a free-speech claim to the legally insupportable free-exercise claim. As Carpenter acknowledges (Mot. 21–22), the Second Circuit has straightforwardly rejected that so-called hybrid-rights approach (*Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003)).

[6] Carpenter insists that it refuses service based not on sexual orientation but on the same-sex character of marriages. *See* Compl. ¶¶ 128–140. But the Supreme Court has "declined to distinguish between status and conduct in this context," because the two are so closely linked. *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010); *accord Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring in the judgment); *cf. Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

  Carpenter's desire to create sub-classes of marriages based on the (protected) characteristics of the partners undermines the value of the civil status of marriage for members of a protected class. A fundamental right is defined by the nature of the right itself, not by the identity of those who seek to exercise it or have been excluded from doing so in the past. *See Obergefell v. Hodges*, 576 U.S. 644, 671 (2015); *see generally, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (rejecting separate category for marriages of interracial couples); *Turner v. Safley*, 482 U.S. 78 (1987) (same as to prisoner marriages). Allowing businesses to close their doors to same-sex couples who exercise

rationally related but narrowly tailored to achieving that end, because prohibiting the discrimination sought to be eradicated "abridges no more [activity] than is necessary to accomplish that purpose" (*Roberts*, 468 U.S. at 628–29). New York need not substitute Carpenter's proposed alternatives (*see* Mot. 23–25) where they "will not be as effective" in achieving the State's objective to eradicate discrimination (*see Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004)).

The Supreme Court's decision in *Fulton* changes none of this. *Fulton* held that Philadelphia's asserted interests in equal treatment of parents and children in its foster-care system were undermined by the City's absolute discretion to grant exemptions written into the antidiscrimination requirements in the contracts with child-placement agencies; and hence, the refusal of a comparable religious exemption did not survive strict scrutiny. Slip op. at 14–15. For the reasons already explained, no such system of exemptions mars New York's public-accommodations law. Moreover, the *Fulton* Court took pains to explain that in Philadelphia, foster-care agencies are *not* public accommodations—a consideration apparently significant to the Court's reasoning. *See id.* at 10–13. That distinction matters, because whatever the governmental interests in regulating a "uniquely selective" system like foster care in Philadelphia (*id.* at 12), they are different from the interests in regulating public accommodations that provide "a benefit to the general public allowing individual members of the general public to avail themselves of that benefit" (*id.* at 11–12 (citation omitted)). As explained further in Section I.B., *infra*, a public accommodation's discrimination against a prospective patron not only carries dignitary harm to the individual (*see Masterpiece*, 138 S. Ct. at 1729), but also has "a substantial and harmful effect" on both local and interstate commerce (*see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964)). The State therefore has compelling interests in "completely obliterat[ing]"

---

their fundamental right to marry would revive the second-class status that the Supreme Court forbade in *Obergefell*. New York has a compelling interest in ensuring that that does not happen.

discrimination "as to all public accommodations." *Id.* at 260. And because the State makes no distinction whatever between religious and nonreligious denials of service to same-sex couples, allowing none of them, the free-exercise claim fails as a matter of law.

### 2. *The public-accommodations law does not coerce Carpenter to participate in religious activity.*

Carpenter's contention that the law is unconstitutionally coercive in violation of both the Free Exercise and Establishment Clauses (*see* Mot. 19–21) likewise fails as a matter of law.

"It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece v. Galloway*, 572 U.S. 565, 586 (2014) (plurality opinion) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring)). Whether a law coerces religious exercise is an objective question for the courts. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592–94 (1992) (making fact-specific determination that prayer at public-school event was coercive); *Town of Greece*, 572 U.S. at 588–89 (plurality opinion) (rejecting plaintiffs' argument that official prayers were coercive, based on Court's interpretation of factual record). A plaintiff's subjective feelings, standing alone, are legally insufficient.

Emilee Carpenter says that she "always actively participates in the wedding ceremonies she photographs," "rejoicing with and congratulating the couple and their family on the new union." Compl. ¶¶ 119, 120. But the law does not require her to officiate a wedding ceremony, swear to the validity of a marriage, or "rejoice" in it. Rather, the law requires only that a business, having chosen to offer the service of wedding photography to the public, must provide that same service—taking photos—regardless of the sexual orientation (or race or religion) of the marrying couple. The wedded couple is paying the photographer to memorialize their wedding, not to participate in it. Merely being present to do a job while invited guests celebrate a significant religious activity in their lives does not constitute legal coercion to join the religious practice. *See*

12

*Fields v. City of Tulsa*, 753 F.3d 1000, 1010–12 (10th Cir. 2014) (no coercion where police officer ordered to attend event at Islamic community center, when attending events hosted by secular and religious organizations was regular aspect of his duties). It would take voluntary additional acts not required by the law to create even the appearance of "participation" in the religious exercise. And the business here can, and presumably does, make clear that it and its photographer are not participants in any religious activities merely by photographing those activities for a fee.

That a business or its proprietor believes that the statute coerces religious activity, whether because "all wedding ceremonies are inherently religious and solemn events" (Compl. ¶ 116) or otherwise, does not make it so. This Court must decide, from an objective standpoint, whether the requirement to provide services on an equal basis coerces the contracting business to engage in religious exercise at each and every client's wedding. From that perspective, Carpenter is no more forced to participate in religious activity with which it disagrees when it is hired for a wedding of a same-sex couple than it is when hired for a wedding of a Hindu, Jewish, or interfaith couple. To state the obvious: a photographer is paid to take pictures—not to join in the couple's faith practice.

### B.   The Establishment Clause forbids the requested exemption.

Not only does the Free Exercise Clause not mandate the exemption sought here, but the Establishment Clause flatly forbids it.

*a.* The rights to believe, or not, and to practice one's faith, or not, are sacrosanct. But they do not entail a right to impose on others by operation of law the obligation to subsidize one's own beliefs. Government should not, and under the Establishment Clause cannot, favor the religious beliefs of some at the expense of the beliefs and rights of others. For if religious exemptions from general laws detrimentally affect nonbeneficiaries, they amount to unconstitutional preferences for the benefited religious beliefs and their adherents. *See, e.g.*, *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *Caldor*, 472 U.S. at 709–10.

Thus, in *Caldor*, the Supreme Court invalidated a law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." 472 U.S. at 709. The Court held that "unyielding weighting in favor of Sabbath observers over all other interests" had "a primary effect that impermissibly advances a particular religious practice." *Id.* at 710. Similarly, *Texas Monthly, Inc. v. Bullock* invalidated a sales-tax exemption for religious periodicals in part because it "burden[ed] nonbeneficiaries" by making them underwrite the "benefit bestowed on subscribers to religious publications." 489 U.S. 1, 18 n.8 (1989) (plurality opinion).

Free-exercise jurisprudence likewise reflects this fundamental limitation. In *United States v. Lee*, 455 U.S. at 261, the Court rejected an Amish employer's request for an exemption from paying social-security taxes because the exemption would "operate[] to impose the employer's religious faith on the employees." And in *Prince v. Massachusetts*, 321 U.S. 158, 170 (1944), the Court denied an exemption from child-labor laws that would have allowed minors to distribute religious literature because parents are not free "to make martyrs of their children." In contrast, the Court recognized a Seventh-Day Adventist's right to an exemption from a restriction on unemployment benefits in *Sherbert v. Verner*, 374 U.S. 398, 409 (1963), because the exemption would not "serve to abridge any other person's religious liberties." And the Court partially exempted Amish parents from state compulsory-education laws in *Wisconsin v. Yoder*, 406 U.S. 205, 235–36 (1972), only after they demonstrated the "adequacy of their alternative mode of continuing informal vocational education" to meet the children's educational needs.

"[T]he limits [on religious exercise] begin to operate whenever activities begin to affect or collide with liberties of others or of the public." *Prince*, 321 U.S. at 177 (Jackson, J., concurring); *see generally* James Madison, Memorial and Remonstrance Against Religious Assessments ¶¶ 3, 15 (1785) (requiring support for another's faith infringes "the equal right of every citizen to the

14

free exercise of his Religion according to the dictates of conscience"), reprinted in *Everson v. Bd. of Educ.*, 330 U.S. 1, 63–72 (1947) (appendix to dissent of Rutledge, J.). Hence, a religious accommodation "must be measured so that it does not override other significant interests" (*Cutter*, 544 U.S. at 722) or "impose substantial burdens on nonbeneficiaries" (*Texas Monthly*, 489 U.S. at 18 n.8 (plurality opinion)). Otherwise, it would violate the fundamental constitutional protections for religious freedom embodied in the Establishment Clause.

*b.* In only one narrow category of circumstances has the Supreme Court upheld religious exemptions that materially burdened third parties—namely, when core Establishment and Free Exercise Clause protections for the ecclesiastical authority of religious institutions together required the exemption. In *Our Lady of Guadalupe*, 140 S. Ct. at 2055, and *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 196 (2012), the Court held that employment-discrimination laws cannot be enforced in a way that would interfere with a church's selection of its ministers. And in *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 330, 339 (1987), the Court upheld, under Title VII's statutory religious exemption, a church's firing of an employee who was not in religious good standing. These exemptions did not amount to impermissible religious favoritism because they embodied the "special solicitude" for the rights of churches to select clergy and control their internal operations (*Hosanna-Tabor*, 565 U.S. at 189).

This ecclesiastical-authority doctrine has no bearing on whether a for-profit business in the public marketplace may ignore antidiscrimination laws because it holds conflicting religious views. Indeed, in *Masterpiece* the Supreme Court warned against expanding this tightly circumscribed doctrine, lest "a long list of persons who provide goods and services for marriages and weddings . . . refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations." 138 S. Ct. at 1727.

*c.* Recognizing that LGBTQ people "cannot be treated as social outcasts or as inferior in dignity and worth" (*id.*), New York's public-accommodations law ensures that sexual orientation is not a barrier to "acquiring whatever products and services [one] choose[s] on the same terms and conditions as are offered to" everyone else (*id.* at 1728). And it protects LGBTQ people "from a number of serious social and personal harms," including deprivation "of their individual dignity" (*Roberts*, 468 U.S. at 625). Granting a religious exemption would license Carpenter, and by extension, all other public accommodations, to discriminate against customers because of their sexual orientation—and any other protected characteristics—as long as the business asserted a religious reason for doing so. LGBTQ people and members of other vulnerable groups would then suffer the social, psychological, and economic harms that the law was designed to prevent.

To suggest that exempting Carpenter would pose no "actual problem" because other photographers in New York provide services to same-sex couples (Mot. 22) misses the point. Even assuming that there are comparable wedding vendors throughout the State, telling a couple suffering the pain and humiliation of discrimination to "just go someplace else" is no remedy for the grave stigmatic harms. For "[d]iscrimination is not simply dollars and cents, hamburgers and movies; it is the humiliation, frustration, and embarrassment that a person must surely feel when he is told that he is unacceptable as a member of the public." *Heart of Atlanta*, 379 U.S. at 292 (Goldberg, J., concurring); *see id.* at 250 (majority opinion) (antidiscrimination laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments" (citation omitted)); *cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493–95 (1954).

Moreover, that some (or even most) wedding vendors in New York might serve same-sex couples does nothing to alleviate the "serious stigma" (*Masterpiece*, 138 S. Ct. at 1729) of living in a community in which businesses can publicly bar the doors to LGBTQ people. Were the requested exemption granted, same-sex couples and other disfavored classes would awaken each

16

day knowing that, wherever they go, they might be turned away from public accommodations that deem them unfit and unworthy to be served; and they would have no legal recourse as long as the denials were explained in religious terms.

Allowing discrimination by public accommodations also inflicts economic harms well beyond the standalone discriminatory event. *See Heart of Atlanta*, 379 U.S. at 258; *cf.* CHRISTY MALLORY ET AL., WILLIAMS INST., THE IMPACT OF STIGMA AND DISCRIMINATION AGAINST LGBT PEOPLE IN TEXAS 56 (2017), https://bit.ly/2UtopRq (explaining that "state economies benefit from more inclusive legal and social environments"). Must LGBTQ people and members of other historically disfavored classes carry around a Green Book to find establishments that will serve them? *Cf.* Brent Staples, *Traveling While Black: The Green Book's Black History*, N.Y. TIMES (Jan. 25, 2019), https://nyti.ms/3aaPiAB. And must New York allow businesses to force them to do so, at so great a cost to the State, its economy, and the dignity and well-being of its citizens?

Put simply, "acts of invidious discrimination in the distribution of publicly available goods [and] services . . . cause unique evils" (*Roberts*, 468 U.S. at 628), which New York has chosen to exorcise. To accept Carpenter's arguments would instead give official imprimatur to those acts. It would deny LGBTQ people the fundamental American promise of equality for all and diminish their standing in society. These grave harms are ones that the Establishment Clause forbids government to impose in the name of religious accommodation.

## II.   ANTIDISCRIMINATION LAWS PROTECT RELIGIOUS FREEDOM.

This case does not pit religion against only secular rights and interests. For public-accommodations laws like New York's also protect religion and its exercise: The challenged law advances the State's strong interests in preventing discrimination of all kinds, *including religious discrimination*, in the provision of goods and services, thereby ensuring that all people can believe and worship according to their conscience, without fear that they will be denied equal treatment in

the public marketplace. The religious freedom of all is therefore threatened, not served, by efforts to misuse the First Amendment to license discrimination.

Though Carpenter may assert an objection solely to weddings of same-sex couples, the drastic revision of free-exercise law that it seeks could not be so cabined. For in our pluralistic society, there is an almost limitless variety of religious motivations, interests, and potential objections. What is more, many religious adherents view themselves as guided by religion in everything they do. *See Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001). Emilee Carpenter is a case in point: She asserts that her religious beliefs "shape every aspect of her life, including her identity, her relationship with others, . . . her understanding of creation, truth, morality, purity, beauty, and excellence," and "how she treats others." Compl. ¶¶ 21, 43. And antidiscrimination laws "protect[] against exclusion from an almost limitless number of transactions and endeavors that constitute ordinary civic life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996). If this Court were to interpret the Religion Clauses to license violations of these laws whenever one has a religiously based desire not to obey, all manner of discrimination would become permissible: Anyone could be denied service in a restaurant, hotel, shop, or other public establishment, for no reason other than that they are gay, Black, Jewish, or disabled, and the proprietor states a religious reason for barring the doors to them. *Cf., e.g.*, *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 n.5 (1968) (per curiam) (restaurant owner's refusal to serve Black patrons based on belief that federal public-accommodations law "contravenes the will of God" (citation omitted)).

These harms are not merely theoretical. The case law shows—and the experiences of *amici* and our members confirm—that disfavor toward, unequal treatment of, and denials of service to members of minority faiths and nonbelievers are all too common. And religious discrimination, like other forms of discrimination, is often premised on the discriminator's religious views.

18

In *Paletz v. Adaya*, No. B247184, 2014 WL 7402324 (Cal. Ct. App. Dec. 29, 2014), for example, a hotel owner closed a poolside event after learning that it was hosted by a Jewish group. The hotelier told an employee, "I don't want any [f—ing] Jews in the pool" (*id.* at *2 (alteration in original)); said that her family would cut off funding to the business if they learned of the gathering (*id.* at *4); and directed hotel staff to remove the Jewish guests from the property (*id.* at *2). In *Khedr v. IHOP Restaurants, LLC*, 197 F. Supp. 3d 384 (D. Conn. 2016), a restaurant refused service to a Muslim family because of their faith. The father recounted: "The restaurant manager started to look at us up and down with anger, hate, and dirty looks because my wife was wearing a veil, as per our religion of Islam." *Id.* at 385. In front of the family's 12-year-old child, the manager told his staff "not to serve 'these people' any food." *Id.* And in *Fatihah v. Neal*, the owners of a gun range posted a sign declaring the facility a "MUSLIM FREE ESTABLISHMENT," armed themselves with handguns when a Muslim man wanted to use the range, and accused him of wanting to murder them because "'[his] Sharia law' required" it. *See* Compl. ¶¶ 24, 32, 34, No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016).[7]

It follows that if the Religion Clauses were construed to grant businesses a license to violate antidiscrimination laws whenever they profess a religious motivation, religious discrimination would receive governmental sanction and could become commonplace across New York.

---

[7] The context of employment discrimination further illuminates the danger. *See, e.g.*, *Huri v. Office of the Chief Judge*, 804 F.3d 826, 830, 834 (7th Cir. 2015) (supervisor called Muslim employee who wore hijab "evil," denied her time off for Islamic religious holidays, and engaged in "social shunning, implicit criticism of non-Christians, and uniquely bad treatment of [the employee] and her daughter"); *Nappi v. Holland Christian Home Ass'n*, No. 11-cv-2832, 2015 WL 5023007, at *1–3 (D.N.J. Aug. 21, 2015) (Catholic maintenance worker subjected to harassment by colleagues—who encouraged him to leave his church, put religious literature in his locker, "wanted to shoot [him]," and ultimately fired him "because, as a Roman Catholic, he was an 'outsider' who did not 'fit in.'"); *Minnesota ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 846–47 (Minn. 1985) (en banc) (gym excluded job applicants and employees not living according to owners' faith, based on owners' "religious belief that they are forbidden by God, as set forth in the Bible, to work with 'unbelievers'").

19

Suppose that an interfaith couple wished to marry, and in keeping with the religion of one partner, the couple planned to serve kosher or halal food. But the only kosher or halal caterer in town refused to prepare food for the wedding based on its religious belief that interfaith marriages are sinful. Should the caterer have the right, in the face of public-accommodations protections against religious discrimination, to force the couple to choose between forgoing a catered reception, on the one hand, and violating one spouse's sincere religious beliefs, on the other?

What of children who are part of a family that, in the opinion of a businessowner, should not exist because the parents are of different faiths or were married within a faith that the merchant's religion rejects? Might the children be denied a birthday cake or a party celebrating a bar or bat mitzvah or a communion?

And more broadly, may a restaurant turn away a Muslim woman who wears a hijab, because the owner's religion forbids associating with members of other faiths? May a grocer refuse to sell food to an unmarried pregnant woman because his religion tells him that he would be facilitating someone else's living in sin? And what about the recently widowed Catholic whose Protestant spouse wanted a Protestant funeral? May a Protestant funeral director bar the widow from the memorial, leaving her unable to say goodbye in a way that respects her beloved's faith?

If the Religion Clauses license religiously motivated denials of service to same-sex couples, as Carpenter contends, then they also sanction all other religiously motivated denials, including exclusions based on the customer's faith. One could be refused employment, thrown out of a hotel, or barred from purchasing a hamburger just for being of the "wrong" religion. And no state or local authority or law could do anything to remedy the situation. Such a system would devastate religious freedom, not protect it.

## CONCLUSION

A preliminary injunction should be denied and the motion to dismiss should be granted.

Respectfully submitted,

/s/ Fernando Santiago

RICHARD B. KATSKEE*
KENNETH D. UPTON, JR.*
SARAH R. GOETZ*
   *Americans United for Separation of*
      *Church and State*
   *1310 L Street NW, Suite 200*
   *Washington, DC 20005*
   *(202) 466-3234*
   *(202) 466-3353 (fax)*
   *katskee@au.org*

   * *Pro hac vice application forthcoming.*

FERNANDO SANTIAGO
   *Santiago Burger LLP*
   *2280 East Avenue, 2nd Floor*
   *Rochester, NY 14610*
   *(585)_563-2400*
   *(585) 563-7526 (fax)*
   *fernando@litgrp.com*

Date:     June 23, 2021.

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2021, the foregoing brief was filed using the Court's

CM/ECF system, through which counsel for all parties will be served.

/s/ Fernando Santiago

FERNANDO SANTIAGO
    *Santiago Burger LLP*
    *2280 East Avenue, 2nd Floor*
    *Rochester, NY 14610*
    *(585)_563-2400*
    *(585) 563-7526 (fax)*
    *fernando@litgrp.com*