UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

EMILEE CARPENTER, LLC d/b/a
Emilee Carpenter Photography and
Emilee Carpenter,

                Plaintiffs,

    -vs-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
JONATHAN J. SMITH, in his official capacity
as Interim Commissioner of the New York State
Division of Human Rights;[1] and
WEEDEN WETMORE, in his official capacity as
District Attorney of Chemung County,

                Defendants.

21-CV-6303

---

## REPLY IN SUPPORT OF
## STATE DEFENDANTS' MOTION TO DISMISS

**LETITIA JAMES**
New York State Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430
By:   */s/ Heather L. McKay*
     HEATHER L. MCKAY
     Assistant Attorney General
     SANDRA PULLMAN
     Senior Counsel, Civil Rights Bureau
     RICK SAWYER*
     Special Counsel, Civil Rights Bureau
     SWATI PRAKASH**
     Assistant Attorney General
     HANNAH BERNARD**
     Volunteer Assistant Attorney General
     * Application for admission forthcoming.
     ** Of counsel.

---

[1] As of June 2021, Licha Nyiendo is the DHR Commissioner.

**Table of Contents**

I. Plaintiff's standing arguments show her claims to be hypothetical and premature............. 1

II. Plaintiff's free speech arguments fundamentally misunderstand what the public accommodations laws require................................................................................................ 2

III. Plaintiff has abandoned her religious neutrality claims....................................................... 4

IV. Plaintiff cannot show lack of general applicability.............................................................. 5

V. State Defendants do not compel Plaintiff's religious practice.............................................. 8

VI. New York's antidiscrimination laws survive any level of scrutiny..................................... 9

# Table of Authorities

**CASES**

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ...................... 5, 8

*Ctr. for Reproductive Rts. v. Bush*, 304 F.3d 183 (2d Cir. 2002) .................................................. 2

*Daniel v. Paul*, 395 U.S. 298 (1969) ............................................................................................ 10

*DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397 (2d Cir. 2001) ....................................... 8

*Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013) .................................................... 3

*Elliot v. Gen. Motors LLC*, 829 F.3d 135 (2d Cir. 2016) ............................................................... 2

*Employment Div. v. Smith*, 494 U.S. 872 (1990) .......................................................................... 9

*F.X. Maltz, Ltd. v. Morgenthau*, 556 F.2d 123 (2d Cir. 1977) ...................................................... 1

*Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) ......................................................... passim

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................... 9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995) .............. 3, 6

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................................................... 4

*Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38 (1st Cir. 2016) ............................................ 9

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719 (2018) ............. 1, 5, 9, 10

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006) ................................................. 3

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ................................................................ 9

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...................................................................................... 9

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) ............................................... passim

*Telescope Media Grp. v. Lucero*, Civ. No. 16-4094 (JRT/LIB), 2021 WL 2525412 (D. Minn. Apr. 21, 2021) ............................................................................................................................ 1

*Tyler v. Kawaguchi, Inc.*, No. 00-CV-6366T, 2005 WL 857069 (W.D.N.Y. Mar. 30, 2005) ........ 4

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100 (2d Cir. 2018).......................................................... 4

**STATUTES**

Civil Rights Law § 40-c ................................................................................................................. 7

N.Y. Exec. Law § 292 .................................................................................................................... 6

N.Y. Exec. Law § 296 .................................................................................................................... 7

**OTHER AUTHORITIES**

Christy Mallory, et al., *The Impact of Stigma and Discrimination Against LGBT People in West Virginia* (2021) ............................................................................................................... 10

**ARGUMENT**

**I.      Plaintiff's standing arguments show her claims to be hypothetical and premature.**

Plaintiff's standing arguments place into sharp relief how her claims are malleable abstractions geared toward a particular policy outcome, not a real "case or controversy." *See, e.g.*, *Telescope Media Grp. v. Lucero*, Civ. No. 16-4094 (JRT/LIB), 2021 WL 2525412, at *6 (D. Minn. Apr. 21, 2021) (describing "a smoke and mirrors case or controversy…likely conjured up by Plaintiffs to establish binding First Amendment precedent"). As State Defendants explained, Plaintiff's allegations of harm were based in part on very specific but incorrect representations about what the public accommodations laws require. For example, the laws don't require her to sing and pray at weddings or prevent her from expressing her religious views. Plaintiff has no response to these arguments. Yet, she still seeks a declaratory judgment and injunction against those nonexistent legal requirements—the definition of an advisory opinion. *See, e.g.*, *F.X. Maltz, Ltd. v. Morgenthau*, 556 F.2d 123, 125–26 (2d Cir. 1977) (dismissing First Amendment pre--enforcement challenge that required court to guess how obscenity law would be enforced).

Plaintiff now retreats to generics, insisting that because the public accommodations laws "arguably" cover (some of) her proposed conduct, she can ask this Court for a blanket exemption from those laws. D.E. 57 at 3–4. But recent Supreme Court cases have neither granted sweeping exemptions nor considered religious and free speech rights in the abstract. Rather, the Court has proceeded piecemeal, analyzing the particular factual circumstances of individual actions against the broader context of a State's overall enforcement of its laws. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S.Ct. 1719, 1726–32 (2018) (analyzing the specifics of a civil rights enforcement action against baker); *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1874–76 (2021) (analyzing "centuries" of relations between Philadelphia and the Catholic

Church and specific contract language). No such analysis is possible here because Plaintiff is a stranger to State Defendants, who have taken no action to harm her interests. Rather than guess at how State Defendants would "arguably" apply New York law to Plaintiff's "hypothetical set of facts," the Court should reserve its authority for a real controversy. *See Elliot v. Gen. Motors LLC*, 829 F.3d 135, 168 (2d Cir. 2016). And a concrete dispute, based on actual facts about Plaintiff's practices and State Defendants' enforcement policies, would help inform any equitable relief as well—as opposed to the absolute pre-enforcement exemptions Plaintiff seeks.

Plaintiff's standing arguments also flirt with absurdity. For example, Plaintiff asserts a competitive injury because she spends time scouring social media to screen out same-sex couples. D.E. 57 at 11. But missing out on the profits from photographing same-sex weddings is precisely the relief her lawsuit seeks. Nor can she claim "competitive advocate" standing. *Ctr. for Reproductive Rts. v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). Plaintiff's business offers wedding photography; it's not a think tank. And even if her photography business were like an NGO competing to influence public opinion, there is no "uneven playing field." *Id.* State Defendants neither impede her from expressing her views on marriage nor assist her competitors.

II. **Plaintiff's free speech arguments fundamentally misunderstand what the public accommodations laws require.**

Plaintiff's free speech claims simply ignore the fundamental difference between public accommodations laws and direct regulations of speech. Plaintiff has freely chosen to offer her business services to the public at large. As a result of that choice, New York law imposes one and only one obligation on Plaintiff's business conduct: like all other businesses, she may not turn people away based on a protected characteristic. This requirement does not look to the content of Plaintiff's speech (nor to the food served by a restauranteur, or the performances offered by a theater); instead, it regulates only the business decision to deny services to particular

2

people. *See, e.g.*, *Elane Photography, LLC v. Willock*, 309 P.3d 53, 68 (N.M. 2013) ("While photography may be expressive, the operation of a photography business is not."); *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1226 (Wash. 2019) ("The decision to either provide or refuse to provide flowers for a wedding does not inherently express a message about that wedding."); *see also* D.E. 55 at 10–11 (States' Am. Br. in Support of Defs.) (further elaborating this argument). This requirement applies with equal force to *any* type of business operating on the open market, regardless of whether its product is expressive. That's why it doesn't matter whether Plaintiff's photographs are speech. As Plaintiff's own cases demonstrate, the First Amendment permits content-neutral regulations of the sale of goods or services even when they consist of protected speech. *See, e.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 99–100 (2d Cir. 2006) (upholding a licensing requirement for selling clothes painted with graffiti, a protected form of speech).[2]

      Plaintiff's failure to acknowledge the distinct legal status of public accommodations like her business causes her to misread *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995). *Hurley* did not grant businesses an unfettered exemption from public accommodations laws provided they are involved in some kind of expressive activity. Rather, *Hurley* left the public accommodations law intact as a general matter, *id.* at 572, 574, and only rejected its "peculiar" application to a St. Patrick's Day parade, which the Court found was not a *public* accommodation offering goods and services on the open market, but instead the *private* speech of the parade organizer. *Hurley*, 515 U.S. at 561–62, 572, 574; *see Arlene's*

---

[2] Plaintiff mischaracterized State Defendants' position on this question, claiming that we "agree" that the law restricts her speech. *See* D.E. 57 at 14–15 (citing Plaintiff's own briefs as proof). Far from it. Our position has consistently been that the laws prohibit discrimination; we never agreed that they restrict speech as such. *See* D.E. 26 at 15–21; D.E. 27-1 at 16–22.

3

*Flowers*, 441 P.3d at 1226–27; D.E. 26 at 17–18 (State Defs.' PI Resp.); D.E. 55 at 11–12 (States' Am. Br. in Support of Defs.); D.E. 51 at 11–12 (ACLU Am. Br.). Plaintiff's business is different. She offers photography services to all comers and, like all such businesses, she cannot pick and choose her customers because of their protected characteristics.

Plaintiff's claim that her business decisions turn "on message, not status" ignores the obvious: by categorically denying wedding photography to same-sex couples, she would treat LGBT customers worse than other customers. To avoid this conclusion, Plaintiff claims that declining same-sex wedding photography to *both* LGBT and heterosexual customers is "equal treatment." D.E. 57 at 19. But the law has long rejected that kind of doublespeak. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 8 (1967) (holding that "equal application" of prohibition on interracial marriage to all races was still discrimination based on race); *see also Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 126 (2d Cir. 2018) (extending *Loving*'s logic to sexual orientation discrimination). It is not "equal treatment" to turn away LGBT customers looking to hire a photographer for their own wedding while cheerfully inviting LGBT customers to pay for their friends' opposite--sex weddings. *See* D.E. 1 ¶¶ 131–32. By conditioning her service on the identity of the couple getting married, Plaintiff would deny services based on a protected characteristic. That's discrimination, not an editorial decision.

**III.     Plaintiff has abandoned her religious neutrality claims.**

Possibly because of the abstract nature of her complaint, Plaintiff has largely abandoned her argument that State Defendants treated her with anti-religious hostility. *See* D.E. 56 at 4–5.[3] This is no coincidence. Neutrality claims turn on the kind of factual details Plaintiff has not

---

[3]Plaintiff failed to argue *any* of her free--exercise claims in her motion-to-dismiss response. *See* D.E. 57 at 24. The Court can decline to consider those arguments. *See, e.g.*, *Tyler v. Kawaguchi, Inc.*, 2005 WL 857069, at *1 (W.D.N.Y. Mar. 30, 2005) (rejecting an oversized brief).

pleaded. *See, e.g.*, *Masterpiece Cakeshop*, 138 S.Ct. at 1725–27 (combing Colorado's two-tiered adjudication of a civil rights complaint and finding disparaging remarks about religion); *Arlene's Flowers*, 441 P.3d at 1216–17, (scouring the record of a civil rights claim against a wedding florist and finding no evidence of anti-religious hostility), *cert. denied*, No. 19-333, 2021 WL 2742795 (U.S. Sup. Ct. July 2, 2021)*; Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–42 (1993) (examining a municipal ordinance for hostility against religion).

In contrast to those cases, Plaintiff admits that her complaint has not identified a single hostile enforcement action against her or anybody else. D.E. 56 at 4. And she makes no real argument that New York's antidiscrimination laws unlawfully targeted religion. The history of the laws' enactment and enforcement proves otherwise. *See* D.E. 26 at 3–7.

### IV.   Plaintiff cannot show lack of general applicability.

Abandoning neutrality, Plaintiff's real complaint is that New York's sweeping public accommodations laws are somehow not generally applicable. *See Fulton*, 141 S.Ct. at 1877 (holding neutrality and general applicability are analytically distinct). General applicability is violated when a law provides a "mechanism for individualized exemptions" or "prohibits religious conduct while permitting secular conduct that undermines that state's asserted interests in a similar way." *Id.* Although Plaintiff strives to invent exemptions to New York's public accommodations laws, she falls far short of undermining their general applicability.

Plaintiff incorrectly claims that State Defendants "exempt" parades, symphonies, and films from antidiscrimination enforcement. D.E. 56 at 4. This argument misunderstands the concept of "exemptions." Because private artistic expressions like parades, symphonies, and films do not offer goods and services on the open market they are not "exempt" from the public accommodations laws—they are definitionally beyond the laws' scope. *See* N.Y. Exec. Law

§ 292 (defining public accommodations); *see also Hurley*, 515 U.S. at 568–72 (contrasting parades with places that provide "publicly available goods, privileges, and services"); *Fulton*, 141 S.Ct. at 1880–81 (holding foster care agency not a public accommodation because its services were not "readily accessible to the public"). By contrast, *performances* of symphonies, parades, and documentary films, when open to the public, are public accommodations, and attendees cannot be turned away based on protected characteristics. *See* N.Y. Exec. Law § 292. If Plaintiff were to take photographs, even commercial photographs, of her own account—rather than offering them as a service to all comers—the law would have nothing to say about whom she shoots. But Plaintiff's actual business, which offers photography services to the general public, is a public accommodation (as she admits), and she may not turn away customers based on protected characteristics. *See* D.E. 1 at ¶¶ 151–57.

Next, Plaintiff inaccurately claims that State Defendants have, through non-enforcement, "exempt[ed]" conduct that simply was not prohibited by the law. As she concedes, the examples of non-enforcement she pleaded as "exemptions" were in fact circumstances where "no discrimination had taken place": for example, a complainant admitted that a taxi driver had no reason to know her race or religion because he never saw her. D.E. 56 at 5; D.E. 27-1 at 13. In circumstances such as that, where the challenged conduct did not violate the law, a finding of no liability is not an "exemption." The same holds true for Plaintiff's oft-cited baker who refuses to create cakes with anti-LGBT or racist messages. The baker is not "exempt" from liability. If she denies service because of a protected characteristic she can be punished under the law.[4]

---

[4] It is telling, given Plaintiff's other hypothetical allegations, that she had to resort to amicus briefs joined by the Attorney General to even connect this scenario to State Defendants. *See, e.g.*, D.E. 56 at 4; D.E. 57 at 19. Plaintiff does not allege anywhere that State Defendants ever investigated an actual discrimination case in which a baker would not bake a cake.

Plaintiff seems to argue that so long as any organization is permitted to deny service to anyone on any basis, Plaintiff should also be given a blanket religious exemption to discriminate against same-sex couples. But general applicability (for purposes of religion-based claims like Plaintiff's) does not require a law to apply to every activity under the sun. It requires only that government not "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way." *Fulton*, 141 S.Ct. at 1877; *see also* D.E. 52 at 6–7 (Am. Br. of Religious & Civ. Rts. Orgs); *Arlene's Flowers*, 441 P.3d at 1228. Here, the laws protect people from the stigma and indignity of being denied goods or services on the open marketplace because of who they are or whom they love. *See* D.E. 26 at 3–4, 19–20. To achieve that goal, New York need not regulate every conceivable form of indignity against any person anywhere. It suffices that State Defendants do not permit sexual orientation discrimination on the open market for any reason—secular *or* religious.

Plaintiff's argument concerning written exemptions fares no better. It does not apply at all to Civil Rights Law § 40-c because Plaintiff has not identified any exemptions to that statute. (There are none.) And she has abandoned her allegations that exemptions in completely unrelated statutes somehow undermine the public accommodations laws. *See* D.E. 56 at 4–6. Her argument thus concerns only the limited provision in the Executive Law allowing DHR to grant an exemption authorizing "places of public accommodation" to bar a person "because of the sex of such person" for "bona fide considerations of public policy"—an exemption she has not pleaded has ever been granted. N.Y. Exec. Law § 296(2)(b). But Plaintiff does not allege, nor does she argue, that she even qualifies for this exemption, let alone that State Defendants have granted it for secular purposes but denied it to cases of "religious hardship." *See Arlene's Flowers*, 441 P.3d at 1230 (holding that exemptions not relevant when "none is an exemption

7

that [the business] would actually like to invoke"). An exemption undermines a statute's general applicability only when it "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S.Ct. at 1879 (cleaned up). When it comes to sexual orientation discrimination, the statute extends no such invitation.

Plaintiff disagrees, claiming that the limited exemption for sex discrimination is enough to swallow the whole public accommodations law. But Plaintiff has not uncovered a "system of exceptions," like the one rejected in *Fulton*, conveying unfettered discretion to grant exemptions. *See* 141 S.Ct. at 1878. Nor has she found a patchwork of exemptions, like that in *Lukumi*, that "conspicuously omits…religiously motivated conduct." *Arlene's Flowers*, 441 P.2d at 1230. The exemption she found, if ever granted, could apply only to one form of discrimination and only based on limited public policy considerations. Under basic tenets of statutory construction, that exemption simply cannot be read to encompass sexual orientation or any other protected characteristic. *See generally* D.E. 52 at 8. This is not unequal treatment: the law recognizes no secular *or* religious excuse for sexual orientation discrimination.

**V.     State Defendants do not compel Plaintiff's religious practice.**

Nor can Plaintiff state a compelled religion claim. She does not dispute that such a claim requires showing that "state funds [were] used to coerce worship or prayer." *DeStefano v. Emergency Hous. Grp., Inc.*, 247 F.3d 397, 411–12 (2d Cir. 2001). But she continues to ignore both elements. Her weddings are not state-sponsored religious events but rather private ceremonies held by her customers. And the law does not "coerce" her to attend those ceremonies—she has voluntarily chosen a vocation requiring attendance at weddings, including those of many faiths other than hers. It should come as no surprise that Plaintiff has not identified a single compelled practice case with facts remotely similar to hers or that she continues to

mischaracterize the case she most relies upon. *See Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 45 (1st Cir. 2016) (holding that a superior officer violated the Establishment Clause by holding a state-sponsored prayer and punishing a subordinate officer for not attending it).

## VI.    New York's antidiscrimination laws survive any level of scrutiny.

New York's antidiscrimination laws are not subject to strict scrutiny, but they would survive even if they were. Plaintiff's assertion that New York's interest in eradicating discrimination in the public marketplace is "too broad" ignores decades of Supreme Court precedent to the contrary. D.E. 56 at 6; *see, e.g.*, *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984) ("[A]ssuring…citizens equal access to publicly available goods and services…serves compelling state interests of the highest order."); *see also Masterpiece Cakeshop*, 138 S.Ct. at 1728 (finding equal access to the marketplace a compelling interest); D.E. 55 at 4–5, 14–16.[5]

Discrimination in the marketplace causes "unique and severe economic, personal, and social harms" that convinced 21 other States and the District of Columbia to enact laws similar to those under challenge here. D.E. 55 at 4–8. Like New York, and the Supreme Court, those States have recognized that sexual orientation discrimination has "a well-established substantial and harmful effect on the economy." *Id.* at 4 (cleaned up). It also "menaces the institutions and foundation of a free democratic state." D.E. 26 at 3–4, 20; *see also* D.E. 55 at 5 ("[N]o action is more contrary to the spirit of our democracy and Constitution—or more rightfully resented by a

---

[5] Plaintiff misreads *Fulton* as requiring "a more precise analysis." D.E. 56 at 6–7. But *Fulton's* heightened standard applies only to cases where available exemptions have been denied to "particular religious claimants." *See, e.g.*, 141 S. Ct. at 1881 (Catholic Church seeking exemption for foster care services); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006) (religious sect seeking to use controlled substance in religious practice); *Sherbert v. Verner*, 374 U.S. 398 (1963), *overruled by Employment Div. v. Smith*, 494 U.S. 872 (1990) (Seventh-Day Adventist seeking unemployment benefits exemption). Not only can Plaintiff not identify any available exemption, as an accommodation, she has different obligations than those claimants seeking private religious benefits from the government.

citizen who seeks only equal treatment—than a denial of equal service by a business ostensibly open to the general public") (cleaned up) (quoting *Daniel v. Paul*, 395 U.S. 298, 306 (1969)). And it causes irreversible stigma to its individual victims.

Plaintiff's glib assertion that LGBT customers could simply shrug off her denial of service and go elsewhere, D.E. 56 at 7, ignores those grave interests. As amici States observed:

> Plaintiffs' 'just go elsewhere' argument would hearken back to the days when Black travelers relied on the 'Negro Motorist Green Book' to find accommodations…thus reinforcing exactly the kind of social disintegration and economic balkanization that public accommodation laws like New York's are intended to combat.

D.E. 55 at 16. The resulting harm would create "a community-wide stigma inconsistent with the history and dynamics of civil rights laws." *Masterpiece Cakeshop*, 138 S.Ct. at 1727.

Finally, contrary to Plaintiff's assertion, holes in other States' public accommodations laws are not relevant to appropriate tailoring here. Plaintiff left unsaid that *none* of the 14 States joining her cause as amici have a statewide prohibition on sexual orientation discrimination. *See* D.E. 55 at 23. Those States' policy choices can leave LGBT residents at risk of discrimination and harassment.[6] By contrast, New York—and 21 other States—have prioritized protecting LGBT residents and limiting the society-wide harm of discrimination. The laws at issue here are tailored to those compelling interests. Granting Plaintiff's request and "carving out a patchwork of exceptions for ostensibly justified discrimination would fatally undermine that interest." *Id.* at 17 (quoting *Arlene's Flowers*, 441 P.3d at 1235). The Constitution does not require that result.

## CONCLUSION

For the reasons set forth above, the Complaint should be dismissed in its entirety.

---

[6] One study in West Virginia showed that the lack of discrimination protections for LGBT people caused disparities in health and economic security that harmed individual victims and cost the State tens of millions of dollars. Christy Mallory et al., *The Impact of Stigma and Discrimination Against LGBT People in West Virginia* 2–3, 50 (2021), tinyurl.com/5n2zy7s.

Dated: July 21, 2021

                      LETITIA JAMES
                      Attorney General for the State of New York
                      *Attorney for State Defendants*

                      s/ Heather L. McKay
                      HEATHER L. MCKAY
                      Assistant Attorney General of Counsel
                      NYS Office of the Attorney General
                      144 Exchange Boulevard, Suite 200
                      Rochester, New York 14614
                      Telephone: (585) 546-7430
                      heather.mckay@ag.ny.gov